UNITED STATES DISTRICT COURT CENTRAL

DISTRICT OF CALIFORNIA

FILED

2025 SEP 23 AM 11:00

MPV

TANISHA A. BROWN

Plaintiff,

v.

NETFLIX, NETFLIX INC., STATE OF CALIFORNIA, CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, NETFLIX, INC., THE OPPENHEIM GROUP, DONE AND DONE PRODUCTIONS, DREAMGIRL INTERNATIONAL, BARRY RAVEN, CENTRIC BRANDS, GOVERNOR GAVIN NEWSOM, MAYOR KAREN BASS, and DOES 1–10,

Defendant

Case No.: 2:25-cv-07677-FLA-KES

2:25-cv-07678-FLA-KES

**CIVIL STANDING ORDER- PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

# PLAINTIFF'S CONSOLIDATED EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND RECOGNITION OF INTELLECTUAL PROPERTY RIGHTS

Assigned to:Hon. Maame Ewusi-Mensah Frimpong

## I. INTRODUCTION

Plaintiff Tanisha A. Brown, appearing in propria persona, respectfully moves this Court for emergency relief to prevent Defendants — including state, city, county, and private actors — from continuing to misappropriate, tamper with, and suppress Plaintiff's intellectual property, digital frameworks, and authorship records.

This motion is grounded in Fed. R. Civ. P. 65 and 18 U.S.C. § 242 (Color of Law Violations). Plaintiff is the original author and architect of frameworks including Attract™, Reimagine™, Creating Spaces™, Dreamgirl™, and Opportunity Zone equity models, which have been embedded into economic development, housing, entertainment, and technology systems by both public agencies and private corporations without authority or compensation.

Immediate relief is necessary to preserve evidence, protect authorship rights, and prevent irreparable harm.

II. BACKGROUND

Central District of California – Netflix/Oppenheim Case Case No. 2:25-cv-07678-MEMF-MBK (Judge Frimpong) TRO filed against Netflix, The Oppenheim Group, Done and Done Productions, and related defendants for misuse of Plaintiff's authored works (Selling Sunset, Attract Real Estate, Attract TV).

Central District of California – State of California Case
Case No. 2:25-cv-07677-FLA-KES (Judge Aenlle-Rocha; Magistrate Judge Scott)
Concerns the State of California's institutionalization of Plaintiff's frameworks into Go-Biz programs, deployed across city and county partnerships without Plaintiff's authority or compensation.
City of Los Angeles / County of Los Angeles
Mayor's Office, LAHSA, and County officials embedded Plaintiff's frameworks (Reimagine LA, Measure J) into housing, equity, and settlement structures — displacing her authorship while retaining financial and political benefit.
Western District of Washington – AI & Technology Case
Case No. 2:25-cv-00127-JCC (Judge Coughenour)
Misuse of AI frameworks and suppression of Plaintiff's authorship in Agent AI/Attract AI.
District of Columbia – OPM Data Breach Class Action

- Case No. 1:15-mc-01394 (MDL 2664, Judge Jackson)
- Identity compromise and EIN duplication tied to suppression of authorship records. Plaintiff is the sole affected individual.

6. California WCAB – Trauma & Injury
    - Case No. ADJ10647134
    - Verified record of systemic workplace injury supporting damages.
7. Centric Brands & Commercial Exploitation
    - Unauthorized use of Plaintiff's IP in brand portfolios, apparel, and consumer licensing, showing misappropriation extends into the private sector.

**III. CONNECTION TO RELATED MATTERS**

This motion parallels issues raised in LA Alliance for Human Rights v. City of Los Angeles and ACLU advocacy concerning systemic inequities. Plaintiff is not a party to those matters but highlights that her injuries reflect the same structural harms: diversion of resources, inequity in housing and media, and erasure of Black women creators.

By embedding Plaintiff's frameworks into city, county, state, and corporate programs, Defendants collectively created a pipeline of misappropriation spanning government and private industry.

**IV. PLAINTIFF'S ROLE AS THE TRUE "AOC"**

Plaintiff asserts her standing as the "AOC" — Architect of Capital, Architect of Community, and Architect of Change — in recognition of her federally aligned authorship under Executive Order 12372.

This designation has been misattributed and obscured by Defendants. Plaintiff is the original and rightful source of these frameworks, and judicial recognition of her authorship is necessary to prevent further erasure.

**V. LEGAL STANDARD**

A TRO or Preliminary Injunction may be issued when the movant shows:

1. Likelihood of success on the merits;
2. Irreparable harm absent relief;
3. Balance of equities favors the movant;
4. Relief serves the public interest. (Fed. R. Civ. P. 65).

**VI. ARGUMENT**

A. Likelihood of Success

Plaintiff has presented multi-jurisdictional filings, settlement records, and agency reports demonstrating Defendants' knowledge and unauthorized use.

B. Irreparable Harm

Ongoing tampering and unauthorized use threaten permanent displacement of Plaintiff's authorship rights and destruction of evidence.

C. Balance of Equities

Defendants — whether public or private — face no undue hardship from halting unlawful use. Plaintiff faces total loss of authorship, professional standing, and financial stability without relief.

D. Public Interest

Protecting original authors and innovators, particularly Black women creators, serves the public interest and aligns with federal commitments to transparency and equity.

E. Clarification of OPM Breach

Contrary to broad claims, Plaintiff is the sole affected party in the OPM data breach. Recognition of this fact prevents dilution of her claims.

**VII. RELIEF REQUESTED**

Plaintiff respectfully requests that this Court:

1. Issue an Emergency TRO freezing accounts, digital access, and assets tied to Plaintiff's authored works — whether held by corporate or government actors (state, city, county, or affiliated nonprofits).

2. Enjoin Defendants, including State of California, City of Los Angeles, and County of Los Angeles, from further tampering, dissemination, or misappropriation.

3. Order disclosure and financial audits of all contracts, settlements, and revenues derived from Plaintiff's intellectual property, including Go-Biz, LAHSA, NHS, Measure J/Reimagine LA programs, and Centric Brands.

4. Preserve evidence across all relevant platforms and agencies.

5. Recognize Plaintiff's exclusive authorship and override authority under EO 12372.

6. Confirm OPM breach relief applies solely to Plaintiff.

7. Schedule a hearing for preliminary injunction at the earliest possible date.

**VIII. CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant this Consolidated Emergency Motion for Temporary Restraining Order and set a preliminary injunction hearing.

Dated: September 15, 2025

Respectfully submitted,

/s/ Tanisha A. Brown

Pro Se Plaintiff

# EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

TANISHA A. BROWN,

Plaintiff's,

v.

NETFLIX ET AL.,

Defendant's.

2:25-cv-07678-MEMF-KESx

**RESOURCES FOR PRO SE LITIGANTS**

**RESOURCES FOR SELF-REPRESENTED PARTIES**

Judge Frimpong understands that Plaintiff does not have an attorney. People without attorneys are sometimes called "self-represented litigants" or "pro se litigants." Even though Plaintiff does not have an attorney, they still have to follow all of Judge Frimpong's orders, all of Judge Frimpong's "Standing Orders," the Local Rules, and the Federal Rules of Civil Procedure. *See* C.D. Cal. L.R. 83-2.2.3. Judge Frimpong's "Standing Orders" are orders that all people and companies with cases assigned to her have to follow. Look on Judge Frimpong's website, https://www.cacd.uscourts.gov/honorable-maame-ewusi-mensah-frimpong, to find her Standing Orders.

The Local Rules are rules that have been decided by the judges of the Central District of California and all people and companies with cases in the Central District of California have to follow them, unless their individual judge has decided something different. Look on the Central District of California's website, https://www.cacd.uscourts.gov/court-procedures/local-rules, to find the Local Rules.

All people and companies with federal cases have to follow the Federal Rules of Civil Procedure. Look on the United States Courts website, https://www.uscourts.gov/rules-policies/current-rules-practice-procedure/federal-rules-civil-procedure, to find the Federal Rules of Civil Procedure.

While Judge Frimpong does not have restrictions on any party's use of Artificial Intelligence ("AI"), the Court reminds the parties that AI may output information that is false, inaccurate, or biased. It is the responsibility of the parties to personally ensure the accuracy of any statements and representations made in the course of the litigation even if it has been generated by AI. The parties may find it helpful to consult the Practical Guidance issued by the State Bar of California on the usage of AI, https://www.calbar.ca.gov/Portals/0/documents/ethics/Generative-AI-Practical-Guidance.pdf.

Judge Frimpong is not allowed to give legal advice to any party, including self-represented litigants, but there are a number of legal aid organizations that can share information with self-represented litigants and give them guidance about how to follow the rules in federal court. Judge Frimpong would like all self-represented litigants to know about these resources, and she urges self-represented litigants to take advantage of these resources:

- Public Counsel runs a free Federal *Pro Se* Clinic where self-represented litigants can get information and guidance. The Clinic is located at the Roybal Federal Building and Courthouse, 255 East Temple Street, Los Angeles, CA 90012. Self-represented litigants must call or submit an online application to request services as follows: online applications can be submitted at http://prose.cacd.uscourts.gov/los-angeles, or call (213) 385-2977, ext. 270.

- Public Counsel also runs a bankruptcy clinic where self-represented litigants can get information and guidance on bankruptcy cases in particular: https://publiccounsel.org/services/bankruptcy/.
- Public Counsel also has extensive resources for self-represented litigants at its website located at https://publiccounsel.org/services/federal-court/, including instructional videos at https://publiccounsel.org/services/federal-court/instructional-videos/.
- The Court is also informed that the LA Law Library also has extensive resources for self-represented litigants, including those with federal court cases. The LA Law Library's main branch is located across the street from the First Street Courthouse at 301 W. First Street, Los Angeles, CA 90012, but it has other branches in LA County as well as partnerships with other public libraries. The LA Law Library can be reached via email at reference@lalawlibrary.org, or via telephone at (213) 785-2513. Self-represented litigants can also walk in and speak to a reference librarian, and can use free computer terminals to conduct free Westlaw and Lexis research.
- The Legal Aid Foundation of Los Angeles may also be of assistance. They have five offices, located in: Downtown Los Angeles, East Los Angeles, South Los Angeles, Long Beach, and Santa Monica. Their website is: https://lafla.org/.

Various other resources that pro se litigants may find useful are bulleted below:

- E-Filing for Self-Represented Litigants: https://www.cacd.uscourts.gov/e-filing/electronic-filing-and-case-access-people-without-lawyers.
- Judge Frimpong's Web Page—includes the Court's current Civil Standing Order, which lays out various rules and procedures that apply to cases with Judge Frimpong: https://www.cacd.uscourts.gov/honorable-maame-ewusi-mensah-frimpong.
- California Courts Self-Help Guide: https://selfhelp.courts.ca.gov/court-basics
- Civil Litigation Timeline: https://www.courts.ca.gov/documents/CIP_CivilCaseFlowChart.pdf.
- Glossary of Legal Terms: https://www.uscourts.gov/glossary.

IT IS SO ORDERED.

Dated: September 5, 2025

MAAME EWUSI-MENSAH FRIMPONG
United States District Judge

FOR IMMEDIATE RELEASE

# Tanisha A. Brown Invokes Executive Order 12372 to Defend Authorship, Civil Rights, and Equity Frameworks in Landmark Legal Actions

Los Angeles, CA – September 22, 2025 – Tanisha A. Brown, author, innovator, and founder of the Attract™, Reimagine™, and Creating Spaces™ frameworks, announced today that she has submitted Tanisha Systems – Custom Applications Development I IT Services I BPO as an official exhibit in her federal filings. This document demonstrates her authorship and establishes her role as the original architect of Tanisha Systems and related frameworks. Ms. Brown's cases (Brown v. Netflix, Inc., et al., Case No. 2:25-cv-07678-MEMF-MBK; Brown v. State of California, et al., Case No. 2:25-cv-07677-FLA-KES) seek emergency relief under 42 U.S.C. § 1983, citing systemic erasure, property misappropriation, and deprivation of constitutional rights. Her filings invoke Executive Order 12372, under which she asserts federally delegated authority to design and oversee community investment frameworks — authority she contends has been undermined by both public and private actors misappropriating her work.

**A Fight Against Erasure**

Ms. Brown's filings emphasize that her authored frameworks have been co-opted, rebranded, and monetized by those named in her official claims, including corporations, real estate developers, and state actors. She argues that these actions represent a continuation of a long history in which Black women's contributions have been erased from cultural, economic, and political innovation.

"I am the original architect of these frameworks," said Ms. Brown. "Executive Order 12372 recognized my role in aligning equity-driven models with federal and state systems. Yet my work has been lifted, stripped of my name, and used to benefit others. This is about more than me — it is about breaking the cycle of erasure of Black women innovators who shape the systems we all depend on."

**Historical Context and Political Misuse**

In her filings, Ms. Brown underscores the historical reality that Black women have always been central to building American systems, yet their authorship has been denied. She draws parallels to civil rights struggles, noting that federal recognition of her frameworks under EO 12372 and workforce statutes (WIOA) was meant to expand youth opportunity, housing, and equity.

She further alleges that her frameworks have been misappropriated into political agendas without attribution, including references by federal and state actors that distort her original intent.

**Relief Sought**

Ms. Brown requests:

- A Temporary Restraining Order halting all unauthorized use of her frameworks.

• A constructive trust over all revenues, royalties, real estate proceeds, and nonprofit funds derived from her work.
• Nullification of fraudulent UCC filings that undermined her secured interests.
• Injunctions against further property transfers tied to her frameworks.
• Judicial recognition of her authorship and equitable restitution.

**A Vision at Risk**

Ms. Brown frames her litigation not as partisan but as a fight to protect a vision once advanced in the halls of Congress, which she contends was tied to presidential executive orders and national policy recognition. She alleges that actors named in her cases have sought to derail that vision, undermining equity-driven innovation and community uplift.

**Contact:**

Tanisha A. Brown (Pro Se) Email:
thebrowngroupla@outlook.com

INTELLECTUAL PROPERTY OWNERSHIP & AUTHORSHIP FILING

Subject: Unauthorized Use of Original Work in Selling Sunset and Associated Ventures- Attention

Done and Done Production, Jason & Brett Oppenheim and Mary Fitzgerald

By: Tanisha Brown

Date: 5.30.25

Filed To: Netflix Legal, U.S. Copyright Office, WGA, MPA, Legal Counsel (CC)

I. IP Holder & Creator Information

- Name: Tanisha Brown

- Entity/Brand: Attract LLC | The Brown Group | Communication Products LLC

- Registered Business(es): TBG Ventures, Attract Magazine, SKC Communications, TBG DIV

- Associated Licenses: Apache Design Configuration, Trauma-Informed Real Estate Design Model

- Location: Los Angeles, CA

II. Title of Original Work / IP

   - Original IP Name(s):

   - Trauma-Informed Luxury Design in Media & Real Estate

   - Attract Real Estate x Media Integration Model

   - Healing Design as a Lifestyle & Investment Model

   - The Revival (media + real estate integration initiative)

III. Description of Misappropriated IP

A. Visual Style & Language

My proprietary concept integrates trauma-informed design, storytelling, art therapy, and community healing through interior architecture and luxury real estate. It was originally published, pitched, and implemented under Attract LLC and The Brown Group.

B. Misused By:

- Done and Done Productions (Selling Sunset)

- Netflix, Inc.

- Jason Oppenheim, cast of Selling Sunset

- Unknown third parties acting as brokers using my IP

C. Specific Examples:

1. Season 7-8 storylines feature trauma-based design work (e.g., G Flip's project), echoing wellness + design themes I introduced.

2. Luxury-staging, music integrations (Grammys), and F1 activations mirror my original work.

3. Use of design aesthetics and narratives from Attract Magazine and work with Amanza Smith.

IV. Rights Violated

- Copyright Infringement

- Moral Rights Violation

- Economic Harm

- Equity Theft

- Emotional Distress

V. Compensation Demands

- Retroactive Producer Credit

- Royalty Share

- Equity Investigation

- Public Acknowledgment

- Legal Review of unauthorized use


VI. Evidence & Supporting Documentation

- Emails, pitch decks, and meeting records

- Witness declarations

- Photos, renderings, and design boards

- Copyright registration application

- Business registration of concepts under TBG - Discrepancies in public filings or entity misuse


Signed:

Tanisha Brown

CEO, The Brown Group | Founder, Attract

Contact- 747.288.7347

Slide 1 - Welcome

**Slide notes**

Welcome to this module on filing a motion in NextGen CM/ECF. In this module we will simulate you filing a motion to file an amended brief.

Filing a Motion Wednesday, July 23, 2014

Slide 2 - Navigation

Table of Contents
$$cpInfoCurrentSlide
Navigation Instructions
You can Fast Forward or Rewind the lesson by using the Navigation bar at the bottom of the screen.
Table of Contents
There is a Table of Contents, or TOC, located at the top left corner of the screen. Click the TOC button to the right of the Navigation bar to open or close the TOC. From the TOC, you can click on an item to jump to that section in the lesson.
Start
Administrative Office of the U.S. Courts
Department of Technology Services

Slide notes

Here are the instructions for navigating through this module. Click START when you're ready to begin.

Page 2 of 48

Slide 3 - Landing Page

Slide notes

For this demonstration, we'll assume you're already logged in to the application as Cheryl Wilson, using your upgraded PACER username and password, and you are at the main menu landing page. Before we begin the filing, I want to point out some new features.

First, you'll notice that the menu options in NextGen CM/ECF are now right justified at the top of the screen. They work the same, but are just in a different location. There's also a new menu option, Getting Started.

This link provides instructions for entering a basic filing. You can refer to this information at any time. The red arrows next to Reports and Utilities indicate that these menu options have submenus where you select the report or utility program to run.

And finally, this new interface includes the new CM/ECF logo on each screen throughout the application. This logo is a link, and when clicked brings you back to this main CM/ECF landing page.

# Thank you!

Division of Workers' Compensation - Workers' compensation court public information search

## Case detail information

| EAMS case number | Case location | Date of injury | Assigned judge | Archived |
|---|---|---|---|---|
| ADJ16867343 | VNO ADJ | 05/01/2018 - 02/01/2020 | TROY SLATEN | |

| Injured worker first name | Injured worker last name | Employer |
|---|---|---|
| TANISHA | BROWN | ADP TOTAL SOURCE INC LOVIN ENTERPRISES INC |
| | | ADP TOTAL SOURCE INC LOVING ENTERPRISES INC |
| | | LOVIN' ENTERPRISES, INC. |

| | |
|---|---|
| Body Part 1 | 840 NERVOUS SYSTEM - NOT SPECIFIED |
| Body Part 2 | 841 NERVOUS SYSTEM - STRESS |
| Body Part 3 | 842 NERVOUS SYSTEM - PSYCHIATRIC/PSYCH |

| Participant name | Role | Address |
|---|---|---|
| ADP TOTAL SOURCE INC LOVIN ENTERPRISES INC | EMPLOYER | 5548 LINDBERGH LN BELL CA 90201 |
| ADP TOTAL SOURCE INC LOVING ENTERPRISES INC | EMPLOYER | 5548 LINDBERGH LC BELL CA 90201 |
| AIG CLAIMS COSTA MESA | CLAIMS ADMINISTRATOR | PO BOX 25977 SHAWNEE MISSION KS 66225 |
| BRADFORD BARTHEL WOODLAND HILLS | LAW FIRM | PO BOX 348450 SACRAMENTO CA 95834 |
| GB AND C LOS ANGELES | LAW FIRM | 3440 WILSHIRE BLVD STE 1207 LOS ANGELES CA 90010 |
| HELMSMAN MANAGEMENT ROCKLIN | CLAIMS ADMINISTRATOR | PO BOX 779008 ROCKLIN CA 95677 |
| LAW SIDE LOS ANGELES | LAW FIRM | 8605 SANTA MONICA BLVD STE 92394 LOS ANGELES CA 90069 |
| LOVIN' ENTERPRISES, INC. | EMPLOYER | 5548 LINDBERGH LANE BELL CA 90201 |
| METRO HEALTHCARE MEDICAL CRP LOS ANGELES | LIEN CLAIMANT | 3440 WILSHIRE BLVD STE 1207 LOS ANGELES CA 90010 |

New Search | Previous

--

Best,

Azul Arellano



All official correspondence, project management, and legal accountability are assigned to me personally as **CEO of Communication Products LLC**. These filings are already on record with federal entities such as **HUD, EDA, DOC, DOJ**, and others.

Let me remind you:
I have filed official statements with the **Los Angeles County Board of Supervisors (Agenda Item 6)** affirming that the *Reimagine LA* initiative originated with my firm, **Attract LLC**. This initiative has since been repurposed without my consent on public platforms and government grant proposals—**a clear act of misappropriation**.

**I am now formally demanding that you produce all documentation** authorizing your role or affiliation with these initiatives, including:

- Filings naming you as a **partner**, **grantee**, or **licensee**;
- Agreements allowing use of **federal portals**, **public-facing content**, or **materials funded by HUD, EDA, or DOL**that originated from my filings.

To date, nothing has been disclosed. And absent such documentation, your ongoing use of my name, likeness, business, and federal assets constitutes **fraud**, **identity misrepresentation**, and potential violations of **federal grant compliance statutes**.

On Mother's Day, instead of enjoying this time with my mom, my sister sent me the **Wall Street Journal** article featuring Jason. That piece reinforced a harmful public narrative built on the unauthorized use of my work so I am reaching out AGAIN. Here is the article that pushed this issue into the public eye:
**Jason Oppenheim – Wall Street Journal**

https://www.wsj.com/style/jason-oppenheim-los-angeles-real-estate-selling-sunset-05f9e89f

I am currently:

- In formal communication with **Netflix Legal and Compliance**;
- Preparing for a formal meeting with **Inman News**;
- Proceeding with legal action and public disclosures, including through **federal grant ethics officers and compliance reviewers**, should this not be resolved immediately.

**This is your final opportunity to respond truthfully and resolve this matter professionally.** I will take every available legal, federal, and media path to protect what I've built and ensure the record is corrected. The era of silence and erasure ends now.

Sincerely,

**Tanisha A. Brown**
CEO, Communication Products LLC
Founder, The Brown Group & Attract LLC

Lead Counsel, WIOA State Program – California
Registered Federal Grantee: HUD | EDA | DOC | DOJ

747.494.7734
-Tanisha

On Thu, May 8, 2025 at 5:11 PM The Brown Group <thisistbg@gmail.com> wrote:

Hi Jason and Brett,

I'm writing to formally address a matter of serious and escalating concern: the unauthorized
use of my intellectual property, business affiliations, and personal identity across multiple
ventures in media, technology, real estate, and finance—ventures that are directly rooted in
the frameworks I developed and launched over the last decade. This has been extremely
hard for me on many levels.

It's Tanisha. I met both of you through Amanza. These past eight months have been hard.
I've had to watch people I once trusted plot behind my back, extract value from my work, and
erase my name from projects I built from the ground up. Although I knew for a while now, I
needed to digest the situation and investigate what went down. I am not trying to point
fingers or accuse anyone of wrong doing, however when I have been accused of things that
not only hurt my character but also placed a false image of who I am as a person and friend.
With this said, I am the original creator, lead strategist, and principal architect behind the
trauma-informed real estate models, AI-driven storytelling platforms, and economic equity
campaigns now operating under names like Angel AI, Pavan A., Charter Communications,
and several nonprofit initiatives including the Midnight Mission Los Angeles and
Neighborhood Housing Services. These are all built on intellectual property I originated
through Communication Products LLC, The Brown Group, and Attract LLC—yet I've been
systematically excluded.

Since 2014, under Executive Order 12372, I have led federally funded projects that secured
over $15 million in awards and contracts. These were not designed for exploitation. They
were meant to uplift communities—especially the underserved—not to be repackaged and
monetized by others without my knowledge or consent. The concept now rebranded as
"Angel AI" directly traces back to my Comprehensive Strategy for Building Back America
know as the blueprint that has build back America.

This blueprint has since been leveraged across real estate, fintech, wellness, and media
campaigns—all without acknowledgement. I've watched initiatives I authored surface
publicly under banners like the Oppenheim Group's global expansion, "Selling the City," Rising
Star, and Formula 51—all echoing my work and vision.

To support this claim, please see the following:

- Jason Oppenheim & Pavan A. – Celligence

  Press Release – Jason's Role as Ambassador

- Oppenheim Group Global Expansion – Cabo

  People Magazine – Cabo Office Announcement

- Attract x Rams Partnership (Santa Monica Draft Campaign)

SI Sports Illustrated – Rams Draft House

Additionally, I've confirmed the following:

- Netflix stock is being held under my name, with no prior knowledge or authorization. I am meeting with a new broker this Friday to secure all assets under The Brown Group.

- Supplier forms, licensing, and corporate filings list my name, yet I was never informed nor compensated. Individuals are collecting payments and managing projects using my IP without rights.

- Major campaigns—such as "Forward Health" and "The Most Expensive Stay"—stem from wellness and real estate frameworks I co-created with Amanza yet didn't know it was apart of LA 2025. These are now being promoted through franchises like Selling the City with no credit given.

Lastly, Amanza Smith, someone who has shown a great deal of resilience and creativity helped shape these initiatives. During her hospitalization and recovery, I witnessed her work be absorbed, reshaped, and publicly credited to others. She deserves recognition and compensation for her voice, her art, and her vision. It's unclear whether her former agent, Lindsay, was aware—but the outcomes are undeniable. I've also discovered that my name was removed from property ownership records tied to Ventura/Kester, and replaced by individuals with direct links to this broader misuse. I had no idea that Open Corp existed which further proves my claim in this issue. Mutual associates—none of whom had authority—have been listed, while business addresses connected to my company were changed to 811 Wilshire Blvd without my consent (see attached document). This is a clear and traceable breach of identity, ownership, and real estate law.

FILED
CLERK, U.S. DISTRICT COURT
October 22, 2019
CENTRAL DISTRICT OF CALIFORNIA
BY [signature] DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

IN THE MATTER OF

APPOINTMENT OF COUNSEL AND ACCESS TO SEALED DOCUMENTS IN CRIMINAL CASES POTENTIALLY AFFECTED BY THE FIRST STEP ACT

GENERAL ORDER NO. 19-11

On December 21, 2018, the First Step Act of 2018 (FSA) was enacted. Section 603 of the Act may provide certain defendants previously sentenced in this Court with grounds to seek sentence reductions under 18 U.S.C. § 3582(c)(1)(A).

Pursuant to 18 U.S.C. § 3006A(a)(1) and (c), and because of the need to efficiently process petitions under Section 3582(c)(1)(A) as amended by Section 603 of the FSA, IT IS HEREBY ORDERED that the Federal Public Defender for the Central District of California is appointed to represent any defendant who was previously determined to have been entitled to appointment of counsel, or who is now entitled to the appointment of counsel, to evaluate whether that defendant may qualify for a sentence reduction under Section 3582(c)(1)(A) as amended by Section 603 of the FSA, and to present any motions relating thereto to the Court for disposition.

If the Federal Public Defender's Office (FPDO) or previously appointed counsel believes there is a conflict that would prevent the FPDO from assuming appointment

for an individual defendant, counsel shall bring such conflict to the attention of the Court for adjudication of the issue.

To evaluate a defendant's eligibility, counsel may need access to sealed case records, which requires a written order of the Court. *See* L.R. 79-7.1. Rather than entertain applications for such orders in each individual case, *see* L.R. 79-7.2, the Court has determined that it would be more efficient to address the disclosure of all such records through this General Order.

Accordingly, IT IS HEREBY ORDERED that the Clerk is authorized to provide the United States Attorney's Office (USAO) with copies of sealed case records when:

(1) the USAO submits a written request for copies of sealed records, identifying the case number(s) and defendant(s) to which the request relates; and

(2) the request is made expressly pursuant to this General Order, with a certification that it is being made for purposes of contemplated litigation regarding a defendant's eligibility for a sentence reduction pursuant to Section 3582(c)(1)(A) as amended by Section 603 of the FSA.

To the extent possible, the request should be limited to documents that are relevant to determining whether a defendant may qualify for a sentence reduction, and should identify those documents by their docket numbers or by a date range within which all sealed filings are requested. Because it may not always be possible to identify the relevant sealed documents from the docket, however, the USAO may request all sealed documents filed in such a case. Notwithstanding the foregoing, the Clerk is not authorized to provide to the USAO copies of any documents filed "in camera" by a defendant, or of any transcripts or minutes of proceedings held outside the presence of counsel for the government.

Requests submitted pursuant to this General Order may be submitted UNDER SEAL and may seek records from multiple cases in one request. Requests should be submitted in paper format, and the Clerk's Office shall not file or docket a request in

# Exhibit A

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES | Date: March 26, 2025

Title: LA Alliance for Human Rights et al. v. City of Los Angeles et al.

---

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

Karlen Dubon
Courtroom Clerk

Not Present
Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFF:
None Present

ATTORNEYS PRESENT FOR DEFENDANT:
None Present

---

**PROCEEDINGS (IN CHAMBERS): ORDER RE LAHSA RESPONSE AND DOCUMENTATION**

On March 24, 2025, the Los Angeles Homeless Services Authority ("LAHSA") emailed the following documents to the Court: (1) LAHSA's Response to the A&M Assessment; (2) LAHSA's Update on Measure H Recoupment with two spreadsheets related to Measure H Recoupment (one spreadsheet with recent updates and one spreadsheet with full details on recoupment). In the interest of transparency, the Court attaches the submitted documents to this Order as Exhibit A.

The Clerk shall serve this minute order on the parties.

MINUTES FORM 11 | Initials of Deputy Clerk: kdu

CIVIL-GEN

LOS ANGELES HOMELESS SERVICES AUTHORITY
LAHSA

707 Wilshire Blvd. 10th Floor
Los Angeles, CA 90017
213 683.3333
www.lahsa.org

March 24, 2025

The Honorable David O. Carter
United States District Court
Central District of California
411 West Fourth Street, Courtroom 10A
Santa Ana, CA 92701
David_Carter@cacd.uscourts.gov
DOC_Chambers@cacd.uscourts.gov
*Via Email*

**Re: Response to Second Amended Draft of the Alvarez & Marsal Assessment of City of Los Angeles Homelessness Programs, Case No. 2:20-cv-02291-DOC-KES, Document No. 870**

Dear Judge Carter,

On behalf of the Los Angeles Homeless Services Authority (LAHSA), we appreciate the opportunity to respond to the Alvarez & Marsal (A&M) Independent Assessment of City-Funded Homelessness Assistance Programs, as outlined in Docket Number 870, filed on March 6, 2025. We recognize and support the Court's commitment to transparency, accountability, and operational efficiency in addressing homelessness and share these priorities.

Since 2023, LAHSA has implemented targeted reforms to enhance financial oversight, data management, and service provider compliance and performance.

These reforms directly address many of the issues raised in the A&M report, which is based on financial and performance data from the Roadmap – Freeway Agreement, Alliance Program, and Inside Safe Program during the Lookback Period (June 1, 2020 – June 30, 2024). Given LAHSA's implementation began in 2023, the full impact of these measures is not yet reflected in A&M's analysis.

Below are LAHSA's responses to A&M's key findings and the reforms undertaken to address their recommendations:

**I. Poor Data Quality and Integration**

A&M's report identified multiple siloed referral processes, disparate data systems, and inconsistent prioritization and matching criteria, all of which hinder the establishment of a unified Coordinated Entry System (CES). Additionally, the report highlights fragmentation in data systems between LAHSA, the City, and the County, impacting financial and service coordination.

LAHSA agrees that there is a need for more coordinated processes across the system and a centralized database and has continually advocated for its implementation. This issue extends beyond LAHSA's sole control. However, LAHSA has taken significant steps to enhance

unified data system remains a challenge, LAHSA has implemented corrective measures to streamline matching policies and prioritization frameworks. This includes regular meetings with the Department of Health Services (DHS) to align California Health Access Model Program (CHAMP) data standards with LAHSA's Homeless Management Information System (HMIS) to enable better platform integration, and weekly transfers of all HMIS data to the County's Chief Information Officer to improve system-wide coordination.

**II. Quantification of Funding for City Programs**

The report states that A&M identified approximately $2.3 billion in funding related to City programs across the Lookback Period. The document also states that the City and LAHSA were unable to identify and calculate all relevant expenses for City Programs. This is in part due to how the City recorded its expenditures and the complex nature of LAHSA's utilization of braided funding from its various funders.

The inability to quantify the total amount of City funding is further compounded by A&M's characterization of the "Roadmap Program" as a structured initiative. LAHSA respectfully disagrees with this characterization. During interviews conducted with A&M on or around September 9 and 16, 2025, LAHSA clarified that the Roadmap was a legal agreement focused on the creation of additional shelter beds, rather than a comprehensive homeless services delivery program. Service expectations and funding levels varied across sites with some facilities offering wraparound services, while others operated as minimal-support shelters. LAHSA is standardizing, enhancing, and integrating Roadmap beds into the new Scope of Services rolling out with the re-procurement process for July 2025.

**III. Disjointed Continuum-of-Care System**

LAHSA agrees that the current Continuum-of-Care (CoC) structure is fragmented and requires reform, as was noted in a 2021 report [1]commissioned by LAHSA's Ad Hoc Committee on Governance and written by Ann Oliva, who is now the President of the National Alliance to End Homelessness. This report emphasized the need for clearer roles and responsibilities among LAHSA, the County, and the City. Given the variety of funding sources, mandates, and varying priorities, this fragmentation in the system is not unique to LAHSA but rather a result of broader systemic challenges in coordinating services across multiple jurisdictions and funders. As the lead agency, LAHSA administers the Coordinated Entry System, and works with local governments to establish program requirements and participant prioritization policies. However, varying mandates from different funders contribute to the system's disjointed nature. A&M claimed that LAHSA lacked a standardized prioritization policy for its Interim Housing (IH) matching during the Lookback Period. However, LAHSA does have a prioritization policy[2] for interim housing placements at LAHSA-funded interim housing facilities. Discrepancies emerged as the City rapidly expanded shelter programs, including A Bridge Home (ABH) and Roadmap shelters, which followed different prioritization frameworks based on various funding and contractual obligations.

To address these inconsistencies, LAHSA has collaborated with City and County partners to align prioritization standards across all IH programs, ensuring service providers receive enhanced training on prioritization protocols and eligibility criteria. Further improvements include implementing a centralized, real-time bed tracking and prioritization system. The Bed Inventory Module, set for full implementation by July 2025, will automate the matching process and integrate real-time availability tracking within the Homeless Management Information

System (HMIS). This system is designed to improve transparency and efficiency in shelter placements, reducing delays and increasing accessibility for those in need.

In the area of Permanent Housing (PH) and Permanent Supportive Housing (PSH), A&M identified challenges with fragmented referral processes and disparate data systems, resulting in a lack of transparency and inequities in service prioritization. LAHSA has taken steps to address these concerns by developing a unified Matching and Prioritization Guideline, approved by the CES Policy Council, to establish clear, data-driven procedures for PSH referrals. This publicly available guideline improves transparency and consistency, with discussions held in public forums to ensure accountability. Additionally, the enhanced Community Queue (CQ) now serves as the central data hub for PSH placements, integrating information from HMIS, DHS, and DMH to ensure all eligible individuals are considered. Further technological upgrades, including an improved HMIS interface and real-time tracking tools will streamline the PSH matching process, enhance service placements, and improve bed availability monitoring.

**IV. Limited Financial Oversight and Performance Monitoring:**
A&M raised concerns about invoicing inefficiencies, prolonged budget amendments, and inadequate invoice validation. LAHSA agrees that there is a need for enhanced financial oversight and transparency. However, LAHSA emphasizes the distinction between invoice processing and performance monitoring: the former ensures financial accuracy and compliance, while the latter focuses on service outcomes and contractual obligations. To improve accountability, LAHSA has standardized invoice submission through the Enterprise Grants Management System (EGMS) for service providers and Microix for non-service providers. Additionally, LAHSA refined documentation and reporting requirements to mandate detailed, itemized invoices with clear supporting documentation. A risk-based approach is employed for billing reviews, prioritizing higher-risk transactions for deeper scrutiny while ensuring compliance across all invoices.

A&M recommends real-time expenditure monitoring and uniform compliance standards. LAHSA agrees and has improved contract management by conducting monthly expenditure and performance reviews. These reviews track fund utilization, assess progress toward Key Performance Indicators (KPIs), and enable proactive interventions to enhance fiscal management and service delivery. LAHSA has also standardized compliance frameworks to ensure consistent financial reporting and timely expenditure submissions from service providers. Inter-agency coordination with City and County partners has been improved, though challenges remain due to external approval processes requiring multiple agency approvals. LAHSA expanded monitoring with routine spot-checks for invoice accuracy and adherence to funding restrictions, implementing corrective actions as needed. Ongoing training initiatives provide guidance to service providers for proper invoice submission, financial tracking, and compliance. LAHSA's use of dashboards to monitor fiscal and programmatic processes enhances accountability, transparency, and continuous improvement in fiscal oversight and service delivery.

**V. Lack of Contractual Clarity and Accountability:**
The report notes that contracts lacked clear definitions and accountability measures, leading to ambiguity in service delivery. This has historically been a challenge throughout the system. Over the last two years, LAHSA has taken proactive steps to improve contract

monitoring and compliance. LAHSA believes the details of this finding are somewhat mistaken, particularly regarding required services and spend-down of grant allocations.

The report cites the wide scope of allowable services. Each contract includes a Scope of Required Services (SRS) document, which clearly defines expectations, performance measures, and service delivery requirements. These documents are shared with service providers and program teams and made publicly accessible in LAHSA's document library to ensure transparency and accountability. The report notes different service types such as "Residential Supervision" and the perceived ambiguity of how allowable costs for supportive services intersect with the conditions of direct supportive services. Although these terms may not be common language for people not providing services within the homeless services system, these terms relate to specific tasks and services highlighted in LAHSA's SRS.

The report cites that due to lack of clarity in allowable services, service providers are granted discretion in allocating funds for services. Service providers operate under structured budget guidelines, with allowable fund allocations clearly defined based on the SRS and funding restrictions. Providers have some flexibility in managing costs within established budget categories but must adhere to strict expenditure requirements. For non-HUD CoC contracts, providers have discretion in budget allocation as long as expenses remain compliant with grant guidelines. In contrast, HUD CoC programs require rigid allocations, ensuring that funding is directed precisely as designated by the grant.

LAHSA has refined its reporting structures, standardizing contract management processes to ensure providers submit consistent and detailed expenditure reports. In Fall 2024, LAHSA strengthened contract oversight and performance management by implementing Active Contract Management (ACM) and Active System Management (ASM) to ensure ongoing, monthly performance tracking, financial accountability, and compliance monitoring. LAHSA is actively working with providers to scale ACM and ASM to the entire system.

**VI. Cost and Service Variability:**

A&M highlights variability in program costs and service provider performance. LAHSA agrees but emphasizes some key clarifications in monitoring expenses and outcomes. Service provider billing validation is distinct from performance reviews: billing ensures compliance with financial guidelines, while performance reviews focus on participant outcomes and service impact.

Operational models vary significantly between providers, impacting cost structures. Differences in staffing, security contracts, food services, and lease agreements contribute to cost discrepancies.

The A&M analysis does not account for economies of scale, which can distort cost-effectiveness comparisons. Larger providers may benefit from cost-sharing across multiple programs, while smaller providers may have higher per-unit costs. Geographic factors also significantly influence costs. Providers in high-rent areas face higher leasing, utility, and personnel expenses compared to those in lower-cost regions. Service models differ based on the needs of the population served. Providers supporting individuals with higher acuity levels require enhanced staffing, medical care, and intensive case management, increasing operational costs. Inconsistent funding allocations and contractual obligations contribute to cost disparities. Some providers receive private or philanthropic funding, allowing for expanded

LAHSA has improved its monitoring of outcomes through ACM, ASM, and the implementation of its data dashboards. The report states, "a high percentage of document-ready participants or prolonged stays did not appear to result in higher permanent housing placements." LAHSA respectfully disagrees with this claim, noting that there is a demonstrated correlation between longer interim housing stays, increased document readiness, and improved housing placement outcomes. From 2023 to 2024, there was a 29% increase in permanent housing placements from interim housing, indicating positive progress in this area.[3]

**VII. Reconciliation of Spending:**
The report notes that the lack of reconciliation in the City's fiscal reporting between budget allocations and actual spending caused confusion about the total amount spent on homelessness services. A&M recommends linking contract renewals and funding allocations to measurable outcomes.

LAHSA agrees and has implemented an improved outcome-monitoring system in a myriad of ways. This includes updated and enhanced contractual KPIs and joint monthly monitoring of contractual performance and spenddown. LAHSA has incorporated enhanced data-driven decision-making, utilizing system data dashboards to track funding effectiveness and optimize resource allocation. LAHSA also advocates for more performance-based funding models, where contracts and funding allocations are increasingly tied to demonstrated program success and adherence to contract requirements. LAHSA has implemented standardized reporting frameworks, ensuring consistent documentation of outcomes, expenditures, and provider performance to enable informed policy decisions. Collaboration with funders is critical to align funding priorities with data-driven insights, ensuring resources are directed toward the most impactful and sustainable interventions.

**Conclusion**
As Chief Executive Officer of LAHSA, I want to reaffirm LAHSA's unwavering commitment to transparency, accountability, and operational excellence in our mission to addres homelessness in Los Angeles. Since stepping into this role, I have prioritized strengthening financial oversight, improving data accuracy, and enhancing service provider accountability to ensure that public resources are managed responsibly and distributed equitably to those most in need.

The challenges outlined in the report are not taken lightly. We had identified many of them previously and have taken decisive, measurable actions to reinforce fiscal integrity, streamline service coordination, and improve housing placement efficiency by integrating performance-based funding models, refining compliance & monitoring systems, prioritizing real-time data tracking, ensuring services are delivered efficiently, and outcomes are demonstrable.

Homelessness is a complex crisis that requires a collaborative, multi-agency response. I strongly agree with the A&M recommendation for a unified homeless strategy and funding priorities across the City and County of Los Angeles. No single entity can solve this challenge alone. I urge our City and County partners, service providers, and community stakeholders to remain engaged in aligning policies, eliminating inefficiencies, and investing in sustainable housing solutions. Only through coordinated, data-driven decision-making and shared accountability can we enact meaningful, systemic changes.

I respectfully request that the Court recognize the substantial progress achieved and support our ongoing efforts to build a more effective, accountable, and transparent homeless services system. I welcome continued engagement and remain committed to demonstrating our dedication to fiscal responsibility, service excellence, and providing real housing solutions for those experiencing homelessness.

Thank you for your time and consideration.

Sincerely,

Va Lecia Adams Kellum

Dr. Va Lecia Adams Kellum
Chief Executive Officer
Los Angeles Homeless Services Authority

**Cc:**
Michele Martinez, michele@michelecmartinez.com
Lana Gesinsky, lgesinsky@alvarezandmarsal.com
Diane Rafferty, drafferty@alvarezandmarsal.com
Lisa Brown, lisa.brown@alvarezandmarsal.com
Scott McKee, smckee@alvarezandmarsal.com
Dave McCurley, dmccurley@alvarezandmarsal.com
Laura Collier, lcollier@alvarezandmarsal.com
Jessica Mariani, jessica.mariani@lacity.org
Arlene Hoang, arlene.hoang@lacity.org
Louis R. Miller, smiller@millerbarondess.com
Mira Hashmall, mhashmall@millerbarondess.com
Jason H. Tokoro, jtokoro@millerbarondess.com
Dr. Holly Henderson, hhenderson@lahsa.org
Bevin Kuhn, bkuhn@lahsa.org
Dae (Dan) Kim, dkim@counsel.lacounty.gov
Erin Dunkerly, edunkerly@ccllp.law
Chandler Parker, cparker@ccllp.law

Case 2:20-cv-02291-DOC-KES Document 876 Filed 03/26/25 Page 3 of 12 Page ID #:24412

LAHSA LOS ANGELES HOMELESS SERVICES AUTHORITY

707 Wilshire Blvd. 10th Floor
Los Angeles, CA 90017
213 683.3333
www.lahsa.org

March 24, 2025

The Honorable David O. Carter
U.S. Courthouse
350 W. 1st Street
Los Angeles, California 90012

**Subject: March 2025 Update on Recoupment of Measure H Working Capital Advances**

Dear Judge Carter,

This letter provides an update on LAHSA's recoupment of Measure H Working Capital Advances since our last update to the Court on January 7, 2025. Attached is a spreadsheet detailing the status of each organization's advance balance and their most recent payments.

As noted in previous updates, the advances were intended to support Measure H start-up costs and ongoing cashflow needs for service providers. These advances were always meant to be recouped at the conclusion of Measure H, which was originally in 2027. Consistent with this understanding, as of the date of this letter, the County, as the funder, has not sought recoupment of these funds, nor instructed LAHSA to do so.

LAHSA's previous letters to the Court outlined the following progress:

November 26, 2024: LAHSA reported $2.5 million had been recouped at the time of the County's audit, and $3.8 million was recouped as of November 21, 2024, bringing the total recoupments to $6.3 million.

January 6, 2025: LAHSA reported an additional $7.2 million recouped between November 22, 2024 and December 31, 2024, bringing total to $13.5 million and reducing the outstanding advance balance to $37.3 million.

**Further Progress on Recoupment**

- January 1, 2025, and January 29, 2025: LAHSA recouped an additional $263,628.
- January 30, 2025, and March 4, 2025: LAHSA recouped an additional $20,775.

As of the date of this letter, total recoupments are $13,780,961 million, reducing the outstanding advance balance to $37,010,267.

While the recoupment rate has slowed since our last update, this was designed to offer service providers the financial flexibility needed to maintain their operational cash flows.

**LAHSA's Plan for Continued Recoupment**

LAHSA remains committed to fully recouping all Measure H Working Capital advances by June 30, 2027, the originally established end date for the Measure H grant term, or by an adjusted timeline to be determined in collaboration with LA County, if instructed by the County.

As detailed in our November 26, 2024 letter and its attachments in Docket Number 833, LAHSA sent payment plan proposals to the providers in November and December 2023, with most providers returning signed agreements to repay their Measure H advances.

For the service providers that have not signed their repayment notice, LASHA will recoup up to the invoiced amount and issue an AP credit memo moving forward. These service providers may engage with LAHSA to discuss repayment terms.

LAHSA remains committed to ensuring the successful recoupment of these advances, and we will continue to work diligently with our partners to meet this goal.

Sincerely,

Va Lecia Adams Kellum

Dr. Va Lecia Adams Kellum
Chief Executive Officer
Los Angeles Homeless Services Authority

**Los Angeles Homeless Services Authority**
**Measure H Working Capital Advances and Recoupment Status**
**Through March 4, 2025; Target Deadline March 2027**

| No. | Service Provider | Total Advances Issued as of 7/8/2024 (a) | Recouped date of advances in Column D | Letter Issued Date | Letter Returned by Provider | Date of additional Recoupment through FY23-24 | Additional Recoupment amount 11/21/24 (d) | Date of additional Recoupment through 12/31/24 | Additional Recoupment amount since 11/21/24 as of 12/31/24 (e) | Date of additional Recoupment through 1/29/25 | Additional Recoupment amount since 12/31/24 as of 1/29/25 (f) | Date of additional Recoupment through 3/4/2025 | Additional Recoupment amount since 1/29/24 as of 3/4/2025 (g) | Total Recoupment (x) = (b) + (d) + (e) +(f)+(g) | Advance Balance as of 3/4/2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1736 Family Crisis Center | $ 914,593 | 7/16/2024 | 12/18/2023 | 1/5/2024 | 6/4/2024 | 97,637 | 10/5/2024 | 97,638 | 11/8/2024 | $ 24,409.00 | | | $ 279,950 | $ 634,643 |
| 2 | 211 LA County | $ 73,938 | 11/3/2021 | N/A | N/A | N/A | - | N/A | - | | | | | $ 73,938 | $ - |
| 3 | Coalition for Responsible Community Development | $ 268,421 | N/A | 12/15/2023 | 12/22/2024 | 6/12/2024 | 7,500 | 10/8/2024 | 60,000 | | | | | $ 67,500 | $ 200,921 |
| 4 | Community Partners fbo Safe Place For Youth | $ 64,274 | 5/1/2024 | 12/18/2023 | 1/11/2024 | 8/21/2024 | 5,355 | N/A | - | | | | | $ 8,925 | $ 55,349 |
| 5 | Covenant House California | $ 491,468 | 7/3/2024 | 12/15/2023 | 12/20/2023 | 8/21/2024 | 54,608 | 11/28/2024 | 68,260 | 12/16/2024 | $ 13,652.00 | | | $ 150,172 | $ 341,296 |
| 6 | First to Serve | $ 755,528 | N/A | 12/18/2023 | 1/9/2024 | 7/16/2024 | 41,974 | 8/6/2024 | 41,974 | | | | | $ 83,948 | $ 671,580 |
| 7 | Harbor Interfaith Services, Inc. | $ 2,229,945 | 6/30/2019 | 12/18/2023 | 1/29/2024 | 8/7/2024 | 308,346 | N/A | - | | | | | $ 318,949 | $ 1,910,996 |
| 8 | Hathaway-Sycamores Child and Family Services | $ 1,128,937 | N/A | 12/15/2023 | 12/19/2023 | 6/21/2024 | 125,437 | 10/28/2024 | 162,740 | 12/2/2024 | $ 33,065.00 | | | $ 321,242 | $ 807,695 |
| 9 | Home at Last Community Development Corporation | $ 797,681 | N/A | 12/18/2023 | 5/1/2024 | N/A | - | N/A | - | | | | | $ - | $ 797,681 |
| 10 | Homeless Health Care LA | $ 299,682 | 7/20/2024 | 1/11/2024 | 1/22/2024 | N/A | - | N/A | - | | | | | $ 5,344 | $ 294,338 |
| 11 | Hope of the Valley Rescue Mission | $ 68,250 | N/A | 12/15/2023 | 1/9/2024 | 8/13/2024 | 11,375 | 10/28/2024 | 22,750 | | | | | $ 34,125 | $ 34,125 |
| 12 | Jovenes, Inc. | $ 449,117 | 6/4/2024 | 12/18/2023 | 12/19/2024 | 6/21/2024 | 21,618 | N/A | - | | | | | $ 114,043 | $ 335,074 |
| 13 | L.A. Family Housing Corporation | $ 6,373,401 | 12/16/2023 | 1/12/2024 | 1/16/2024 | 8/7/2024 | 1,240,954 | N/A | - | | | | | $ 1,870,761 | $ 4,502,640 |
| 14 | National Health Foundation | $ 52,317 | 6/5/2024 | 12/18/2023 | 12/18/2023 | N/A | - | N/A | - | | | | | $ 52,317 | $ - |
| 15 | New Directions, Inc. | $ 34,347 | N/A | 12/18/2023 | N/A | N/A | - | N/A | - | | | | | $ - | $ 34,347 |
| 16 | People Assisting the Homeless | $ 8,274,239 | N/A | 12/20/2023 | 7/2/2024 | N/A | - | N/A | - | | | | | $ 40,581 | $ 8,233,658 |
| 17 | Rainbow Services | $ 118,317 | N/A | 12/15/2023 | 1/24/2024 | N/A | - | N/A | - | | | | | $ - | $ 118,317 |
| 18 | Sanctuary of Hope | $ 344,884 | 3/20/2024 | 12/18/2023 | 1/19/2024 | 8/21/2024 | 28,412 | 11/18/2024 | 28,412 | | | | | $ 153,104 | $ 191,780 |
| 19 | Special Services For Groups, Inc. | $ 6,674,335 | 4/23/2024 | 12/15/2023 | 1/10/2024 | 8/21/2024 | 306,982 | 12/11/2024 | 5,552,976 | | | | | $ 6,674,335 | $ - |
| 20 | St. Anne's Maternity Home | $ 326,067 | 2/13/2024 | 12/18/2023 | 1/28/2024 | 8/13/2024 | 32,444 | N/A | - | 1/6/2025 | $ 56,777.00 | | | $ 139,510 | $ 186,557 |
| 21 | St. Joseph's Center | $ 2,930,300 | 5/15/2020 | 2/8/2024 | 2/28/2024 | 8/7/2024 | 156,128 | 8/9/2024 | 78,064 | | | | | $ 354,196 | $ 2,576,104 |
| 22 | Testimonial Community Love Center | $ 388,684 | N/A | 1/11/2024 | 1/31/2024 | N/A | - | N/A | - | | | | | $ - | $ 388,684 |
| 23 | The Midnight Mission | $ 448,950 | N/A | 12/19/2023 | N/A | N/A | - | N/A | - | | | | | $ - | $ 448,950 |
| 24 | The People Concern | $ 3,812,087 | N/A | 12/18/2023 | 12/19/2023 | N/A | - | N/A | - | | | | | $ 49,389 | $ 3,762,698 |
| 25 | The Village Family Services | $ 869,561 | 6/7/2024 | 12/15/2023 | 12/21/2023 | 8/21/2024 | 88,738 | N/A | - | | | | | $ 159,653 | $ 709,908 |
| 26 | The Whole Child | $ 914,426 | N/A | 1/22/2024 | 1/23/2024 | N/A | - | N/A | - | | | 2/26/2025 | $ 20,775 | $ 20,775 | $ 893,651 |
| 27 | Union Station Homeless Services | $ 2,035,055 | 2/12/2024 | 12/15/2023 | 12/22/2023 | N/A | - | N/A | - | | | | | $ 45,203 | $ 1,989,852 |
| 28 | United Friends of the Children | $ 783,533 | 3/1/2024 | 12/18/2023 | 1/10/2024 | 8/13/2024 | 87,060 | N/A | - | | | | | $ 130,590 | $ 652,943 |
| 29 | United States Veterans Initiative, Inc. | $ 229,119 | N/A | 12/15/2023 | N/A | N/A | - | 7/8/2024 | 51,520 | | | | | $ 51,520 | $ 177,599 |
| 30 | Upward Bound House | $ 262,105 | 7/20/2002 | 1/22/2024 | N/A | N/A | - | N/A | - | | | | | $ 56,197 | $ 205,908 |
| 31 | Valley Oasis (formerly Antelope Valley Domestic Violen | $ 2,684,614 | 1/16/2024 | 12/15/2023 | 12/21/2023 | N/A | 450,012 | 10/28/2024 | 369,561 | | | | | $ 844,243 | $ 1,840,371 |
| 32 | Volunteers of America of Los Angeles | $ 5,050,169 | 5/1/2024 | 12/18/2023 | 12/21/2023 | 8/13/2024 | 678,625 | 11/1/2024 | 678,625 | 1/6/2025 | $ 135,725.00 | | | $ 1,628,700 | $ 3,421,469 |
| 33 | Weingart Center Association | $ 436,051 | N/A | 1/22/2024 | 3/18/2025 | N/A | - | N/A | - | | | | | $ - | $ 436,051 |
| 34 | Whittier Area First Day Coalition | $ 206,833 | N/A | 12/18/2023 | 12/29/2023 | 8/21/2024 | 23,000 | 11/18/2024 | 28,750 | | | | | $ 51,750 | $ 155,083 |
| | Total | $ 50,791,228 | | | | | $ 3,766,206 | | 7,241,270 | | $ 263,628 | | $ 20,775 | $ 13,780,961 | $ 37,010,267 |

**Los Angeles Homeless Services Authority**
**Measure H Working Capital Advances and Recoupment Status**
**Through March 4, 2025; Target Deadline March 2027**

| No | Service Provider | Total Advances Issued as of 7/8/2024 (a) | Recouped date of advances in Column D | Letter Issued Date | Letter Returned by Provider | Date of additional Recoupment through 1/29/25 | Additional Recoupment amount since 12/31/24 as of 1/29/25 (f) | Date of additional Recoupment through 3/4/2025 | Additional Recoupment amount since 1/29/24 as of 3/4/2025 (g) | Total Recoupment (x) = (b) + (d) + (e) +(f)+(g) | Advance Balance as of 3/4/2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1736 Family Crisis Center | $ 914,593 | 7/16/2024 | 12/18/2023 | 1/5/2024 | 11/8/2024 | $ 24,409.00 | | | $ 279,950 | $ 634,643 |
| 2 | 211 LA County | $ 73,938 | 11/3/2021 | N/A | N/A | | | | | $ 73,938 | $ - |
| 3 | Coalition for Responsible Community Development | $ 268,421 | N/A | 12/15/2023 | 12/22/2024 | | | | | $ 67,500 | $ 200,921 |
| 4 | Community Partners fbo Safe Place For Youth | $ 64,274 | 5/1/2024 | 12/18/2023 | 1/11/2024 | | | | | $ 8,925 | $ 55,349 |
| 5 | Covenant House California | $ 491,468 | 7/3/2024 | 12/15/2023 | 12/20/2023 | 12/16/2024 | $ 13,652.00 | | | $ 150,172 | $ 341,296 |
| 6 | First to Serve | $ 755,528 | N/A | 12/18/2023 | 1/9/2024 | | | | | $ 83,948 | $ 671,580 |
| 7 | Harbor Interfaith Services, Inc. | $ 2,229,945 | 6/30/2019 | 12/18/2023 | 1/29/2024 | | | | | $ 318,949 | $ 1,910,996 |
| 8 | Hathaway-Sycamores Child and Family Services | $ 1,128,937 | N/A | 12/15/2023 | 12/19/2023 | 12/2/2024 | $ 33,065.00 | | | $ 321,242 | $ 807,695 |
| 9 | Home at Last Community Development Corporation | $ 797,681 | N/A | 12/18/2023 | 5/1/2024 | | | | | $ - | $ 797,681 |
| 10 | Homeless Health Care LA | $ 299,682 | 7/20/2024 | 1/11/2024 | 1/22/2024 | | | | | $ 5,344 | $ 294,338 |
| 11 | Hope of the Valley Rescue Mission | $ 68,250 | N/A | 12/15/2023 | 1/9/2024 | | | | | $ 34,125 | $ 34,125 |
| 12 | Jovenes, Inc. | $ 449,117 | 6/4/2024 | 12/18/2023 | 12/19/2024 | | | | | $ 114,043 | $ 335,074 |
| 13 | L.A. Family Housing Corporation | $ 6,373,401 | 12/16/2023 | 1/12/2024 | 1/16/2024 | | | | | $ 1,870,761 | $ 4,502,640 |
| 14 | National Health Foundation | $ 52,317 | 6/5/2024 | 12/18/2023 | 12/18/2023 | | | | | $ 52,317 | $ - |
| 15 | New Directions, Inc. | $ 34,347 | N/A | 12/18/2023 | N/A | | | | | $ - | $ 34,347 |
| 16 | People Assisting the Homeless | $ 8,274,239 | N/A | 12/20/2023 | 7/2/2024 | | | | | $ 40,581 | $ 8,233,658 |
| 17 | Rainbow Services | $ 118,317 | N/A | 12/15/2023 | 1/24/2024 | | | | | $ - | $ 118,317 |
| 18 | Sanctuary of Hope | $ 344,884 | 3/20/2024 | 12/18/2023 | 1/19/2024 | | | | | $ 153,104 | $ 191,780 |
| 19 | Special Services For Groups, Inc. | $ 6,674,335 | 4/23/2024 | 12/15/2023 | 1/10/2024 | | | | | $ 6,674,335 | $ - |
| 20 | St. Anne's Maternity Home | $ 326,067 | 2/13/2024 | 12/18/2023 | 1/28/2024 | 1/6/2025 | $ 56,777.00 | | | $ 139,510 | $ 186,557 |
| 21 | St. Joseph's Center | $ 2,930,300 | 5/15/2020 | 2/8/2024 | 2/28/2024 | | | | | $ 354,196 | $ 2,576,104 |
| 22 | Testimonial Community Love Center | $ 388,684 | N/A | 1/11/2024 | 1/31/2024 | | | | | $ - | $ 388,684 |
| 23 | The Midnight Mission | $ 448,950 | N/A | 12/19/2023 | N/A | | | | | $ - | $ 448,950 |
| 24 | The People Concern | $ 3,812,087 | N/A | 12/18/2023 | 12/19/2023 | | | | | $ 49,389 | $ 3,762,698 |
| 25 | The Village Family Services | $ 869,561 | 6/7/2024 | 12/15/2023 | 12/21/2023 | | | | | $ 159,653 | $ 709,908 |
| 26 | The Whole Child | $ 914,426 | N/A | 1/22/2024 | 1/23/2024 | | | 2/26/2025 | $ 20,775 | $ 20,775 | $ 893,651 |
| 27 | Union Station Homeless Services | $ 2,035,055 | 2/12/2024 | 12/15/2023 | 12/22/2023 | | | | | $ 45,203 | $ 1,989,852 |
| 28 | United Friends of the Children | $ 783,533 | 3/1/2024 | 12/18/2023 | 1/10/2024 | | | | | $ 130,590 | $ 652,943 |
| 29 | United States Veterans Initiative, Inc. | $ 229,119 | N/A | 12/15/2023 | N/A | | | | | $ 51,520 | $ 177,599 |
| 30 | Upward Bound House | $ 262,105 | 7/20/2002 | 1/22/2024 | N/A | | | | | $ 56,197 | $ 205,908 |
| 31 | Valley Oasis (formerly Antelope Valley Domestic Violen | $ 2,684,614 | 1/16/2024 | 12/15/2023 | 12/21/2023 | | | | | $ 844,243 | $ 1,840,371 |
| 32 | Volunteers of America of Los Angeles | $ 5,050,169 | 5/1/2024 | 12/18/2023 | 12/21/2023 | 1/6/2025 | $ 135,725.00 | | | $ 1,628,700 | $ 3,421,469 |
| 33 | Weingart Center Association | $ 436,051 | N/A | 1/22/2024 | 3/18/2025 | | | | | $ - | $ 436,051 |
| 34 | Whitter Area First Day Coalition | $ 206,833 | N/A | 12/18/2023 | 12/29/2023 | | | | | $ 51,750 | $ 155,083 |
| | Total | $ 50,791,228 | | | | | $ 263,628 | | $ 20,775 | $ 13,780,961 | $ 37,010,267 |



Emerging Technologies in Cyber Space
Innovations Shaping the Cyber Universe
AI Revamp
Cyber Space
Future Ready IT
Hire Talent

Mphasis
The Next Applied

Infosys
Navigate your next

wipro

ZenSar
TECHNOLOGIES







About Us

## We are leading provider of custom application and end-to-end IT service.

Founded in 2002, Tanisha Systems is a leading IT service company committed to delivering innovative and customized solutions to help businesses thrive in a rapidly evolving digital landscape. With our extensive industry expertise, technical knowledge, and client-centric approach, we empower organizations to optimize their technology infrastructure, streamline business processes, and achieve their strategic objectives.

### Our mission

Our mission is to transform businesses by leveraging cutting-edge technology, fostering innovation, and delivering exceptional value through our comprehensive range of IT services. We are dedicated to helping our clients stay ahead of the competition, drive operational efficiency, and achieve sustainable growth in today's digital economy.

Read More →

## Onsite & Offshore Development

We provide customized Onsite & Offshore Development solutions designed to provide you with the right mix of local expertise and offshore resources to drive innovation, efficiency, and growth.



## Mobile Application Development

Looking to expand your reach and enhance customer engagement? We offer innovative and tailored mobile application development solutions to meet your unique business needs.



## Custom Application Development

Looking to modernize your technology and streamline your business processes? We offer innovative and tailored custom application development solutions to meet your unique business needs.



## Social Networking

Elevate Your Social Networking Experience with Tanisha Systems!
Unlock the power of social networking to foster connections, drive collaboration, and boost your business growth with our innovative solutions.

232

1057

14357

1181

Tanisha Systems INC

Tanisha Systems empowers businesses to update their technology, rethink their processes, and revolutionize customer experiences, enabling them to stay competitive in an ever-evolving marketplace.

Mobile



## Why Choose Tanisha Systems

We prioritize your objectives and challenges to drive tangible results and foster business growth.

Trust in our innovative and reliable IT services to transform your business in the digital era.



## Expertise and Experience

Our team of skilled professionals has extensive experience and expertise in various technologies and industries, ensuring the delivery of high-quality and reliable IT solutions.



## Client-Centric Approach

We prioritize our clients' needs and objectives, and collaborate closely with them to develop customized solutions that align with their business goals and drive measurable results.



## Innovation and Technology Leadership

We are committed to staying at the forefront of technological advancements and continuously innovating our services to help our clients adapt to new challenges and opportunities in the digital landscape.



## Quality and Reliability

We are dedicated to delivering high-quality and reliable IT services, maintaining the highest standards of excellence, and ensuring customer satisfaction.



## Training

We believe in imparting modern and best in class training to both aspiring graduates and talented professionals to keep them abreast with changing needs of the competitive market place



## Proven Track Record



With a strong history of successful IT projects and happy clients, Tanisha Systems is recognized as a trusted IT service provider. Our client success stories and case studies showcase our expertise in delivering high-quality, innovative IT solutions that foster business growth and success.

# Featured Industry

Driven by positive shifts brought by Industries, the business landscape keeps changing significantly.

At Tanisha Systems, our focus is to provide world class business solutions to a wide range of businesses using cutting edge IT components.



## Banking & Financial

Tanisha Systems service Banks, Brokerage Firms and Investment Firms around the world. To best serve the complex financial industry requirements, we have developed a strong team of leading technology experts with exposure to Retail Banking, Commercial Banking, Investment Banking, Brokerage Systems, Mutual Funds, Asset Management, Trading Systems, Retirement Solutions and others.

Get Started



## Insurance

Tanisha Systems brings together experience & knowledge of the insurance industry with a powerful combination of tried & tested methodologies. Our expertise rang from project architecture design to delivery across multiple jurisdiction, geographies and software solutions. We have a network of Delivery and Business Process Outsourcing centers globally to manage large-scale core insurance projects. We bring best strategic thinking, knowledge and innovation.

- Policy Life Cycle Management
- Quote Systems
- Underwriting Systems.
- Claim Management
- Compliance and Licensing Systems
- Carrier-Broker Integration.

Get Started

# Our Certifications

At Tanisha Systems, we are committed to maintaining the highest standards of excellence and professionalism in our services. We are proud to hold the following certifications, which validate our expertise and capabilities in providing quality IT solutions to our clients

ISO
9001
2015
CERTIFIED

E-Verify

D&B
Dun & Bradstreet
Credibility Corp

MBE
CERTIFIED
Certified Minority
Business Enterprise

# Contact

Give us a call or send us an email and we will get back to you.



## Address

99 Wood Ave South, Suite # 308
Iselin, NJ 08830



## Call Us

+1 212-729-6543



## Email Us

info@tanishasystems.com



## Open Hours

Monday - Friday
9:00AM - 05:00PM



# PUBLIC REQUEST TO ADDRESS THE BOARD OF SUPERVISORS COUNTY OF LOS ANGELES, CALIFORNIA

## Correspondence Received

MEMBERS OF THE BOARD

HILDA L. SOLIS
HOLLY J. MITCHELL
LINDSEY P. HORVATH
JANICE HAHN
KATHRYN BARGER

| | | | The following individuals submitted comments on agenda item: | |
|---|---|---|---|---|
| Agenda # | Relate To | Position | Name | Comments |
| Set Matter 1. | | Favor | Alyss Estay | |
| | | | Arian Cisneros | |
| | | | Charna L Blakely | |
| | | | Chief Marcella fain-sims | |
| | | | Cole Ficklin | |
| | | | Crystal Echols | |
| | | | Danica Hamilton | |
| | | | Kevin Murray | |
| | | | Neal Forman | |
| | | | Penelope Schlee | |
| | | | Rachael Davis | |
| | | | Rebecca Powell | |
| | | | Russell Maycumber | |
| | | | Tanisha Brown | TBG HAS BEEN THE AGENCY YET WE HAVE BEEN BLOCKED. |
| | | | Tyler J Perrin | |
| | | | Una Korac | |
| | | | zoe priore | |
| | | Oppose | Nancy Gancos | |
| | | Item Total | 18 | |
| Grand Total | | | 18 | |

As of: 4/16/2025 7:00:10 AM



AS OF 12/31/2024

## KEY INFORMATION*

| | |
|---|---|
| Inception Date | 11/07/2023 |
| Number of Holdings | 35 |
| Assets Under Management | 95.2mm |
| Total Expense Ratio | 0.59% |
| 30-Day SEC Yield[1] | 3.23% |
| Distribution Frequency | Quarterly |

## TRADING DETAILS

| | |
|---|---|
| Ticker | TBG |
| CUSIP | 02072L375 |
| Exchange | NYSE |

[1] The 30-day Yield represents net investment income earned by the fund over the previous 30-day period, expressed as an annual percentage rate based on the Fund's share price at the end of the 30-day period.

## THE APPROACH

The investment objective of the TBG DIVIDEND FOCUS FUND is to generate long-term growth and capital appreciation and sustainable premium income by investing in a concentrated portfolio of publicly-traded companies that are repeatedly growing their dividends. The strategy uses quantitative and qualitative measures to assess dividend sustainability and the likelihood of distribution growth over time. Free Cash Flow, Balance Sheet strength, and Management Alignment are key components of the fund's analysis. The approach is bottom-up and sector agnostic. Securities are selected seeking to achieve growth, income, and growth-of-income in an investor portfolio.

## SECTOR BREAKDOWN (%)

| Sector | % |
|---|---|
| Financial Services | 18.5% |
| Energy | 14.0% |
| Consumer Staples | 13.5% |
| Tech | 12.0% |
| Healthcare | 11.5% |
| REITs | 7.0% |
| Industrials | 5.5% |
| Communication Services | 4.0% |
| Basic Materials | 4.0% |
| Utilities | 3.0% |
| Consumer Discretionary | 3.0% |
| Cash & Cash Equivalents | 4.0% |

## TOP 10 HOLDINGS

| TICKER | NAME | % OF NET ASSETS |
|---|---|---|
| ET | ENERGY TRANSFER LP | 4.72% |
| IBM | INTERNATIONAL BUSINESS MACHINE CORP | 4.60% |
| SPG | SIMON PROPERTY GROUP INC | 4.47% |
| GILD | GILEAD SCIENCES INC | 4.39% |
| CSCO | CISCO SYSTEMS INC | 4.26% |
| CVX | CHEVRON CORP | 4.02% |
| EPD | ENTERPRISE PRODS PARTNERS LP | 3.91% |
| VZ | VERIZON COMMUNICATIONS INC | 3.86% |
| CMI | CUMMINS INC | 3.65% |
| LYB | LYONDELLBASEL INDUSTRIES NV | 3.60% |

Fund holdings and sector allocations are subject to change.

* Performance quoted represents past performance and does not guarantee future results. Investment return and principal value will fluctuate so shares may be worth more or less when redeemed or sold. Current performance may be lower or higher than that quoted. Short term performance, in particular, is not a good indication of the fund's future performance, and an investment should not be made based solely on returns. For standardized performance of TBG visit https://tbgdividendgrowth.com/

** SEC yield will be provided once initial timeline since inception has passed to provide such

## DEFINITIONS

S&P 500 INDEX An unmanaged index of 500 common stocks primarily traded on the New York Stock Exchange, weighted by market capitalization. Index performance includes the reinvestment of dividends and capital gains.

THE S&P 500 DIVIDEND ARISTOCRATS: A stock market index composed of the companies in the S&P 500 index that have increased their dividends in each of the past 25 consecutive years.

NET DEBT/EBITDA: A measurement of leverage, calculated as a company's interest-bearing liabilities minus cash or cash equivalents, divided by its EBITDA (earnings before interest depreciation and amortization).

PAYOUT RATIO: The proportion of earnings a company pays its shareholders in the form of dividends, expressed as a percentage of the company's total earnings.

NET DEBT/EV: A measurement of leverage, calculated as a company's interest-bearing liabilities minus cash or cash equivalents, divided by its enterprise value (a measure of a company's total value which includes the market capitalization of a company but also short-term and long-term debt and any cash or cash equivalents on the company's balance sheet).

FCF COVERAGE: A ratio that indicates the number of times a company could pay dividends to its common shareholders using its free cash flow (the cash that a company generates after accounting for cash outflows to support operations and maintain its capital assets) over a specified fiscal period.

FCF YIELD: A financial solvency ratio that compares the free cash flow per share a company is expected to earn against its market value per share.

P/E: Ratio for valuing a company that measures its current share price relative to its earnings per share (a company's profit divided by the outstanding shares of its common stock).

P/E: Valuation metric to compare the relative value of different businesses, calculated as a company's enterprise value to its earnings before interest, taxes, depreciation and amortization (EBITDA).

EV/EBITDA: Valuation metric to compare the relative value of different businesses, calculated as a company's enterprise value to its earnings before interest, taxes, depreciation and amortization (EBITDA).

BETA: A measure of the volatility—or systematic risk—of a security or portfolio compared to the market as a whole.

12-MONTH TRAILING YIELD

It is the percentage of income investors received from an investment in the last 12 months, calculated by taking the weighted average of a fund's underlying holdings' yields.

## DISCLOSURES

**New Fund Risk.** The Fund is a recently organized management investment company with no operating history. As a result, prospective investors have no track record or history on which to base their investment decision. There can be no assurance that the Fund will grow to or maintain an economically viable size. **Small- and Mid-Capitalization Companies Risk.** The securities of small- and mid-capitalization companies may be more vulnerable to adverse issuer, market, political, or economic developments than securities of large-capitalization companies. The securities of small- and mid-capitalization companies generally trade in lower volumes and are subject to greater and more unpredictable price changes than larger capitalization stocks or the stock market as a whole. **High Dividend Style Risk.** While the Fund may hold securities of companies that have historically paid a high dividend yield or the Sub-Adviser determines appears likely to pay a high dividend in the future, those companies may reduce or discontinue their dividends, thus reducing the yield of the Fund. Low priced securities in the Fund may be more susceptible to these risks. Past dividend payments are not a guarantee of future dividend payments. Also, the market return of high dividend yield securities, in certain market conditions, may be worse than the market return of other investment strategies or the overall stock market. **REIT Risk.** Real estate investment trusts ("REITs") are subject to the risks associated with investing in the securities of real property companies. In particular, REITs may be affected by changes in the values of the underlying properties that they own or operate. Further, REITs are dependent upon specialized management skills, and their investments may be concentrated in relatively few properties, or in a small geographic area or a single property type. REITs are also subject to heavy cash flow dependency and, as a result, are particularly reliant on the proper functioning of capital markets. A variety of economic and other factors may adversely affect a lessee's ability to meet its obligations to a REIT. In the event of a default by a lessee, the REIT may experience delays in enforcing its rights as a lessor and may incur substantial costs associated in protecting its investments. In addition, a REIT could fail to qualify for favorable regulatory treatment.

**The Fund's investment objectives, risks, charges and expenses must be considered carefully before investing. This and other important information is contained in the prospectus, which may be obtained by following the links Prospectus and SAI or by calling +1.215.882.9983. Please read the prospectus carefully before investing.**

Investments involve risk. Principal loss is possible.

The Fund is actively-managed and is subject to the risk that the strategy may not produce the intended results. The Fund is new and has a limited operating history to evaluate.

ETFs may trade at a premium or discount to their net asset value. ETF shares may only be redeemed at NAV by authorized participants in large creation units. There can be no guarantee that an active trading market for shares will exist. The trading of shares may incur brokerage.

The Fund is distributed by Quasar Distributors, LLC

# EXHIBIT B

# Governor Newsom Announces Dee Dee Myers as Senior Advisor and Director of the Governor's Office of Business and Economic Development (GO-Biz)

SACRAMENTO –Governor Gavin Newsom today announced the appointment of Dee Dee Myers to serve as Senior Advisor to the Governor and Director of the Governor's Office of Business and Economic Development (GO-Biz), a cabinet-level position.

"California is the world's fifth-largest economy and the gateway to the rest of the world," said Governor Newsom. "While the COVID-19 pandemic has greatly impacted our economy, California will bounce back thanks to our incredible assets and our spirit of innovation. An economic recovery that lifts all Californians will require us to work together. With more than three decades of experience in both the public and private sectors – in California and nationally – Dee Dee brings an ability

sectors – in California and nationally – she brings an ability to work across sectors, ensuring that our recovery is built upon common ground and common solutions."

Myers, 59, of Los Angeles, joined the Newsom Administration in May as a volunteer at the peak of the COVID-19 public health crisis working to support the Governor and his team, including the Task Force on Business and Jobs Recovery. Prior to joining the Newsom Administration, Myers served as Executive Vice President of Worldwide Corporate Communications and Public Affairs for Warner Bros. Prior to that, she was a Managing Director of the Glover Park Group, where she counseled corporate and non-profit clients on strategic and crisis communications, reputation management and strategic positioning. Myers also served as White House Press Secretary during President Bill Clinton's first term and was the first woman to hold the position.

After leaving the White House, she worked as a Political Analyst, Commentator and Writer as well as a Contributing Editor to Vanity Fair. She is Author of the New York Times best-selling book "Why Women Should Rule the World." She also co-hosted the CNBC political talk show "Equal Time" and was a consultant on the Emmy Award-winning drama series "The West Wing." Before joining the Clinton presidential campaign in 1991, Myers worked on a number of local, state and national campaigns. She served as Press Secretary for Dianne Feinstein in her 1990 bid for governor of California and worked on the presidential campaigns of Governor Michael S. Dukakis and Vice President Walter F. Mondale. Myers also worked on the staffs of Los Angeles Mayor Tom Bradley and California State Senator Art Torres. Myers is a Director of Wynn Resorts, Ltd. and serves on the boards of the Smithsonian's National Museum of American History and the Mayor's Fund for Los Angeles. This position does not require Senate confirmation and the compensation is $200,004. Myers is a Democrat.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TANISHA A. BROWN<br><br>Plaintiff(s)<br><br>v.<br><br>NETFLIX, et al.<br><br>Defendant(s). | CASE NUMBER:<br><br>2:25-cv-07678-MEMF-MBK<br><br>**NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM** |

**NOTICE TO PARTIES:**

It is the policy of this Court to encourage settlement of civil litigation when such is in the best interest of the parties. The Court favors any reasonable means, including alternative dispute resolution (ADR), to accomplish this goal. *See* L.R. 16-15. Unless exempted by the trial judge, parties in all civil cases must participate in an ADR process before trial. *See* L.R. 16-15.1.

The district judge to whom the above-referenced case has been assigned is participating in an ADR Program that presumptively directs this case to either the Court Mediation Panel or to private mediation. *See* General Order No. 11-10, §5. For more information about the Mediation Panel, visit the Court website, www.cacd.uscourts.gov, under "ADR."

Pursuant to L.R. 26-1(c), counsel are directed to furnish and discuss with their clients the attached ADR Notice To Parties *before* the conference of the parties mandated by Fed.R.Civ.P. 26(f). Based upon the consultation with their clients and discussion with opposing counsel, counsel must indicate the following in their Joint 26(f) Report: 1) whether the case is best suited for mediation with a neutral from the Court Mediation Panel or private mediation; and 2) when the mediation should occur. *See* L.R. 26-1(c).

At the initial scheduling conference, counsel should be fully prepared to discuss their preference for referral to the Court Mediation Panel or to private mediation and when the mediation should occur. The Court will enter an Order/Referral to ADR at or around the time of the scheduling conference.

Clerk, U.S. District Court

August 15, 2025
Date

By /s/ Estrella Liberato
Deputy Clerk

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**NOTICE TO PARTIES: COURT POLICY ON SETTLEMENT AND USE OF ALTERNATIVE DISPUTE RESOLUTION (ADR)**
**Counsel are required to furnish and discuss this Notice with their clients.**

Despite the efforts of the courts to achieve a fair, timely and just outcome in all cases, litigation has become an often lengthy and expensive process. For this reason, it is this Court's policy to encourage parties to attempt to settle their disputes, whenever possible, through alternative dispute resolution (ADR).

ADR can reduce both the time it takes to resolve a case and the costs of litigation, which can be substantial. ADR options include mediation, arbitration (binding or non-binding), neutral evaluation (NE), conciliation, mini-trial and fact-finding. ADR can be either Court-directed or privately conducted.

The Court's ADR Program offers mediation through a panel of qualified and impartial attorneys who will encourage the fair, speedy and economic resolution of civil actions. Panel Mediators each have at least ten years of legal experience and are appointed by the Court. They volunteer their preparation time and the first three hours of a mediation session. This is a cost-effective way for parties to explore potential avenues of resolution.

This Court requires that counsel discuss with their clients the ADR options available and instructs them to come to the initial scheduling conference prepared to discuss the parties' choice of ADR option. The ADR options available are: a settlement conference before the magistrate judge assigned to the case or the magistrate judge in Santa Barbara, the Court Mediation Panel, and private mediation. Counsel are also required to indicate the client's choice of ADR option in advance of the initial scheduling conference. *See* L.R. 26-1(c) and Fed.R.Civ.P. 26(f).

Clients and their counsel should carefully consider the anticipated expense of litigation, the uncertainties as to outcome, the time it will take to get to trial, the time an appeal will take if a decision is appealed, the burdens on a client's time, and the costs and expenses of litigation in relation to the amounts or stakes involved.

Each year thousands of civil cases are filed in this district, yet typically no more than one percent go to trial. Most cases are settled between the parties, voluntarily dismissed, resolved through Court-directed or other forms of ADR, or dismissed by the Court as lacking in merit or for other reasons provided by law.

For more information about the Court's ADR Program, the Mediation Panel, and the profiles of mediators, visit the Court website, www.cacd.uscourts.gov, under "ADR."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Tanisha A. Brown, PLAINTIFF(S) v. Netflix, et al., DEFENDANT(S) | CASE NUMBER 2:25-cv-07678-MEMF-MBK |
| | ORDER ON REQUEST TO PROCEED *IN FORMA PAUPERIS* (NON-PRISONER CASE) |

The Court has reviewed the Request to Proceed *In Forma Pauperis* (the "Request") and the documents submitted with it. On the question of indigency, the Court finds that the party who filed the Request:

☒ is not able to pay the filing fees. ☐ is able to pay the filing fees.

☐ has not submitted enough information for the Court to tell if the filer is able to pay the filing fees. This is what is missing:

IT IS THEREFORE ORDERED that:

☐ The Request is GRANTED.

☒ Ruling on the Request is POSTPONED for 30 days so that the filer may provide additional information.

☐ The Request is DENIED because the filer has the ability to pay.

☐ As explained in the attached statement, the Request is DENIED because:

- ☐ The District Court lacks ☐ subject matter jurisdiction ☐ removal jurisdiction.
- ☐ The action is frivolous or malicious.
- ☐ The action fails to state a claim upon which relief may be granted.
- ☐ The action seeks monetary relief against defendant(s) immune from such relief.

IT IS FURTHER ORDERED that:

☒ Within 30 days of the date of this Order, the filer must do the following:

Plaintiff must file an Amended Complaint. See the attached statement.

If the filer does not comply with these instructions within 30 days, this case will be DISMISSED without prejudice.

☐ As explained in the attached statement, because it is absolutely clear that the deficiencies in the complaint cannot be cured by amendment, this case is hereby DISMISSED ☐ WITHOUT PREJUDICE ☐ WITH PREJUDICE.

☐ This case is REMANDED to state court as explained in the attached statement.

August19, 2025
Date

United States District Judge



CALIFORNIA
DEPARTMENT OF JUSTICE

**Rob Bonta**
***Attorney General***

455 GOLDEN GATE AVENUE, SUITE 11000
SAN FRANCISCO, CA 94102-7004

Public: (415) 510-4400
Telephone: (415) 510-3476
Facsimile: (415) 703-5480
E-Mail: Christopher.Lamerdin@doj.ca.gov

December 3, 2024

OPENAI, INC.
Attn: Board of Directors
3180 18th St., Suite 100
San Francisco, CA 94110

RE: In re: OpenAI Inc.'s Potential Corporate Restructuring

Dear Board of Directors:

The Attorney General of California has the primary responsibility for supervising charitable trusts, "for ensuring compliance with trusts and articles of incorporation, and for protecting assets" held by charitable trusts and charitable corporations operating in or holding property in California. (Gov. Code, §§ 12582.1, 12588, 12598.) Recent press reports have indicated OpenAI, Inc., is considering a corporate restructuring.

OpenAI, Inc.'s Amended and Restated Certificate of Incorporation, in the Third Article states:

> "THIRD: This Corporation shall be a nonprofit corporation organized exclusively for charitable purposes within the meaning of section 501(c)(3) of the Internal Revenue Code .... The specific purpose of this corporation is to ensure that artificial general intelligence benefits all of humanity, including by conducting and/or funding artificial intelligence research. The corporation may also research and/or otherwise support efforts to safely develop and distribute such technology and its associated benefits, including analyzing the societal impacts of the technology and supporting related educational, economic, and safety policy research and initiatives. The resulting technology will benefit the public and the corporation will seek to distribute it for the public benefit when applicable. The corporation is not organized for the private gain of any person. In furtherance of its purposes, the corporation shall engage in any lawful act of activity for which nonprofit corporations may be organized under the General Corporation Law of Delaware."

Article Five states that OpenAI, Inc.'s assets are irrevocably dedicated to its charitable purpose.

In furtherance of the Attorney General's responsibility to protect assets held in charitable trust, and in light of OpenAI, Inc.'s Amended and Restated Certificate of Incorporation irrevocably dedicating its assets for charitable purposes, the Attorney General seeks the following information:

1. Information on OpenAI's restructuring plans;
2. Value of OpenAI's charitable assets;
3. Value of OpenAI's charitable assets held by its subsidiaries; and
4. Plans for the transfer and/or disposition of OpenAI, Inc.'s charitable assets with the restructuring plans.

Thank you for your attention to this matter. Please provide the requested information by January 8, 2025.

Sincerely,

CHRISTOPHER C. LAMERDIN
Deputy Attorney General

For ROB BONTA
Attorney General

CCL:

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

TANISHA A. BROWN

PLAINTIFF(S)

v.

STATE OF CALIFORNIA , et al.

DEFENDANT(S).

CASE NUMBER:

2:25-cv-07677-FLA-KES

**NOTICE OF JUDGE ASSIGNMENT AND REFERENCE TO A UNITED STATES MAGISTRATE JUDGE**

This case has been assigned to the calendar of the Honorable Judge Fernando L. Aenlle-Rocha , U. S. District Judge, and referred to U. S. Magistrate Judge Karen E. Scott , who is authorized to consider preliminary matters and conduct all further hearings as may be appropriate or necessary. Thereafter, unless the Magistrate Judge determines that a trial is required, the Magistrate Judge shall prepare and file a report and recommendation regarding the disposition of this case, which may include proposed findings of fact, conclusions of law, and proposed written order or judgment, which shall be served on all parties. If the Magistrate Judge concludes that a trial is required, the Magistrate Judge shall so report to the District Judge.

Pursuant to Local Rule 5-4.1, all subsequent documents in this case must be filed electronically, unless exempted by Local Rule 5-4.2. Documents exempt from electronic filing pursuant to Local Rule 5-4.2(b), or presented by filers exempt from electronic filing pursuant to Local Rule 5-4.2(a), must be filed with the Clerk in paper at the following location:

Western Division
255 East Temple Street, Suite TS-134
Los Angeles, CA 90012

Please note that, pursuant to Local Rule 83-2.5, all matters must be called to the judge's attention by appropriate application or motion filed in compliance with the Court's Local Rules. Parties are not permitted to write letters to the judge.

Local Rule 83-2.4 requires that the Court must be notified within five (5) days of any address change. If mail directed by the clerk to your address of record is returned undelivered by the Post Office, and if the Court and opposing counsel are not notified in writting within five (5) days thereafter of your current address, the Court may dismiss the petition, with or without prejudice, for want of prosecution.

Clerk, U.S. District Court

August 27, 2025
Date

By /s/ Shaunte M Hunter
Deputy Clerk

**NOTICE TO COUNSEL / PRO SE LITIGANT**

*The party who filed the case-initiating document in this case must serve a copy of this Notice on all parties it serves with the case-initiating document.*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TANISHA A. BROWN<br>PLAINTIFF(S),<br>v.<br>NETFLIX, et al.<br>DEFENDANT(S). | CASE NUMBER:<br>2:25–cv–07678–MEMF–MBK<br>**Notice to Counsel Re Consent to Proceed Before a United States Magistrate Judge** |

The parties are advised they may consent to proceed before any available magistrate judge participating in the Voluntary Consent to Magistrate Judges Program to conduct all further proceedings in the case pursuant to 28 U.S.C. § 636(c) and Federal Rules of Civil Procedure 73. The consent list and consent form are available on the court's website at http://www.cacd.uscourts.gov/judges-requirements/court-programs/voluntary-consent-magistrate-judges-program. To confirm a particular magistrate judge's availability to schedule the trial in the time frame desired by the parties and/or willingness to accommodate any other special requests of the parties, please contact the magistrate judge's courtroom deputy prior to filing the consent.

Since magistrate judges do not handle felony criminal trials, civil trial dates are not at risk of being preempted by a felony criminal trial, which normally has priority. Further, in some cases, the magistrate judge may be able to assign an earlier trial date than a district judge. The parties can select a participating Magistrate Judge from any of the three divisions in the Central District of California. There may be other advantages or disadvantages which you will want to consider.

The plaintiff or removing party must serve this Notice on each named party in the case.

On August 15, 2025, Plaintiff filed a Complaint and a Request to Proceed In Forma Pauperis. (ECF Nos. 1, 3.) Plaintiff alleges that she "is the founder and original creator of federally recognized innovation frameworks, including ATTRACT, Reimagine, Creating Spaces, and Dreamgirl, and serves as a State Point of Contact under Executive Order 12372 overseeing federal funds tied to housing, health care, and community programs." (ECF No. 1 at 2.) "For years," Defendants allegedly "have unlawfully controlled Plaintiff's career, rebranding her work under other names, diverting credit and profit, and erasing Plaintiff from her own story in real state, media, and federally recognized programs." (Id.) Defendants allegedly have "attempted to dissolve Plaintiff's company, depriving her of assets, business operations, and professional opportunity." (Id.) "Despite repeated and formal objections and complaints, no agency or governing body intervened, allowing the unlawful exploitation of Plaintiff's work to continue for years." (Id.) Plaintiff names at least 13 Defendants. (Id.) Plaintiff raises causes of action for violations of her constitutional rights, misappropriation of intellectual property, tortious interference with contracts and economic relations, and unfair competition/false designation of origin. (Id. at 1.)

Because Plaintiff seeks to proceed in forma pauperis, the Court has reviewed the Complaint to determine whether the action is frivolous or malicious; fails to state a claim upon which relief may be granted; or seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B). Because the Complaint is conclusory, it fails to state a federal claim upon which relief may be granted. A Complaint "demands more than an unadorned, the-defendant[s]-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." Id. The original Complaint suffers from these defects because Plaintiff provides no factual allegations to support the causes of action asserted.

For example, Plaintiff has failed to state a claim for violation of constitutional rights because all the Defendants appear to be private parties, not state actors. See Sutton v. Providence St. Joseph Medical Center, 192 F.3d 826, 835 (9th Cir. 1999) (a party charged with constitutional deprivation generally must be a governmental actor because 42 U.S.C. "§ 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrong"). Plaintiff also has failed to state a claim for misappropriation of intellectual property or unfair competition/false designation of origin. In the first place, Plaintiff must allege she owns a valid trademark. See Pinterest Inc. v. Pintrips Inc., 15 F. Supp. 3d 992, 998 (N.D. Cal. 2014). Then, "[t]o state a claim for false designation of origin, including infringement of an unregistered trademark, a plaintiff must allege: (1) defendant's use of a designation or false designation of origin, (2) in interstate commerce, (3) in connection with goods and services, (4) where the designation is likely to cause confusion, mistake or deception as to the affiliation, connection, or association of defendant with another person, or as to the origin, sponsorship or approval of defendant's goods, services, or commercial activities by another person, and (5) that plaintiff has been or is likely to be damaged by these acts." Webpass Inc. v. Banth, 2014 WL 7206695, at *2 (N.D. Cal. Dec. 18, 2014). Moreover, "[t]he ultimate test for federal unfair competition is the same as for federal trademark infringement: whether the public is likely to be decided or confused by the similarly of the marks." Ronnie Home Textile, Inc., 2016 WL 5956096, at *6 (C.D Cal. Jan. 5, 2016).

If Plaintiff wishes to proceed, Plaintiff must file an Amended Complaint within 30 days. The Amended Complaint must be complete in itself and should not refer to the initial Complaint. The Amended Complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft, 556 U.S. at 678. The Amended Complaint must not name any Defendant unless Plaintiff specifically alleges what the Defendant did wrong. See Brazil v. U.S. Dept. of Navy, 66 F.3d 193, 199 (9th Cir. 1995). If the Plaintiff doe not file an Amended Complaint, or files an Amended Complaint without the required allegations, the Court will dismiss this action.

*(attach additional pages if necessary)*

On August 15, 2025, Plaintiff Tanisha A. Brown ("Plaintiff") filed a Complaint and a Request to Proceed In
Forma Pauperis. Dkts. 1, 3. Plaintiff alleges that the Defendants State of California, Gavin Newsom
("Newsom"), Karen Bass ("Bass"), Holly Mitchell, and Sydney Dove (collectively, "Defendants") acted "to
misappropriate Plaintiff's federally protected intellectual property, reassign federal and state contract
opportunities, and exclude Plaintiff from leadership roles and compensation in programs she designed."
Dkt. 1 at 2. Plaintiff allegedly created "frameworks" that "were used to secure large-scale public funding for
housing, technology, and economic development initiatives." Id. Defendants allegedly "implemented
Plaintiff's work without attribution" while major contractors "built directly on her intellectual property."
Id. Newsom allegedly "acted to remove or exclude Plaintiff from positions, programs, or funding she
originated, in violation of her rights." Id. at 3. Bass allegedly "participated in or allowed the
misappropriation and diversion of Plaintiff's work and roles." Id. Plaintiff claims, without further
explanation, several violations of federal and state law. Id. at 2.

Because Plaintiff seeks to proceed in forma pauperis, the court has reviewed the Complaint to determine
whether the action is frivolous or malicious; fails to state a claim upon which relief may be granted; or seeks
monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B). Because
Plaintiff has not stated a claim, she is ordered to file an amended complaint if she wishes to proceed.

The Complaint is deficient in multiple respects. "All we have to go on in trying to understand and analyze
the claims are the bare allegations in the complaint" along with citations to various legal authorities. White
Mountain Apache Tribe v. Williams, 810 F.2d 844, 852 (9th Cir. 1985). The Complaint consists of no "more
than an unadorned, the-defendant[s]-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662,
678 (2009). The Complaint offers "naked assertion[s]" devoid of "further factual enhancement." Id.
Moreover, Plaintiff names multiple Defendants without clearly alleging what each Defendant did wrong.
See Schuman v. State of Cal., 584 F.2d 868, 870 (9th Cir. 1978) (where a complaint "alleges no acts on the
part of the . . . defendants . . . but merely lists their names, no claim for relief is stated as to them"). Plaintiff
also appears to have disregarded state sovereign immunity. See College Sav. Bank v. Florida Prepaid
Postsecondary Educ. Expense Bd., 527 U.S. 666, 691 (1999) (discussing state sovereign immunity under
Eleventh Amendment from trademark claims).

If Plaintiff wishes to proceed, Plaintiff will file an amended complaint within thirty (30) days. The amended
complaint will be complete in itself and will not refer to the initial Complaint. The amended complaint will
offer more than conclusions and will contain sufficient factual matter, accepted as true, to "state a claim to
relief that is plausible on its face." Ashcroft, 556 U.S. at 678. The amended complaint will not name any
defendant unless Plaintiff specifically alleges what each defendant did wrong. The failure to file an amended
complaint, or the filing of an amended complaint without the required allegations, will result in the
dismissal of this action.

*(attach additional pages if necessary)*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:25-cv-07678-MEMF-MBK Date: August 19, 2025

Title *Tanisha A. Brown v. Netflix et al*

Present: The Honorable: Maame Ewusi-Mensah Frimpong

| Damon Berry | N/A |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| N/A | N/A |

**Proceedings: Order Denying Plaintiff's Application Temporary Restraining Order (ECF No. 4)**

On August 15, 2025, Plaintiff Tanisha Brown ("Ms. Brown") filed the instant lawsuit alleging several claims including deprivation of civil rights, violation of the Takings Clause of the Fifth Amendment, violation of the Due Process Clause of the Fourteenth Amendment, misappropriation of intellectual property, tortious interference with contractual relations, and unfair competition. ECF No. 1. On August 15, 2025, Ms. Brown also filed an Application for a Temporary Restraining Order. ECF No. 4 ("Application").

Under Federal Rule of Civil Procedure 65, a court may issue a temporary restraining order without notice to the adverse party only if there are specific facts in an affidavit or complaint that show "immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard," and the movant certifies "in writing any efforts made to give notice and the reasons why it should not be required."

Nothing in Ms. Brown's Application indicates that notice has been provided to the Defendants or demonstrates why such notice should not be given. As such, Ms. Brown has not met her burden on demonstrating that notice need not be given to the Defendants.

Accordingly, the Court DENIES the Motion.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to:

District Judge **Maame Ewusi–Mensah Frimpong**
Magistrate Judge **Michael B. Kaufman**

The case number on all documents filed with the Court should read as follows:

**2:25–cv–07678–MEMF (MBKx)**

District judges in the Central District of California refer all discovery-related motions to the assigned magistrate judge pursuant to General Order No. 05-07. Discovery-related motions should be noticed for hearing before the assigned magistrate judge. Please refer to the assigned judges' Procedures and Schedules, available on the Court's website at www.cacd.uscourts.gov/judges-requirements, for additional information.

Clerk, U.S. District Court

August 15, 2025
Date

By */s/ Estrella Liberato*
Deputy Clerk

## ATTENTION

*The party that filed the case-initiating document in this case (for example, the complaint or the notice of removal) must serve a copy of this Notice on all parties served with the case-initiating document. In addition, if the case-initiating document in this case was electronically filed, the party that filed it must, upon receipt of this Notice, promptly deliver mandatory chambers copies of all previously filed documents to the newly assigned-district judge. See L.R. 5-4.5. A copy of this Notice should be attached to the first page of the mandatory chambers copy of the case-initiating document.*

STATE OF CALIFORNIA
FAIR POLITICAL PRACTICES COMMISSION
1102 Q Street • Suite 3000 • Sacramento, CA 95811

March 28, 2023

Aja Brown
[redacted]

**Warning Letter (FPPC Case Nos. 2019-00249 and 2022-00233) re: Aja Brown**

Dear Aja Brown:

The Enforcement Division of the Fair Political Practices Commission enforces the provisions of the Political Reform Act.[1] The cases noted above arise from two staff/filing officer referrals and one anonymous complaint, which raised concerns about certain parts of the Act, including filing/reporting requirements for statements of economic interests—as well as the Act's prohibition against receiving honoraria payments.

Regarding the honoraria issues (and related reporting issues) we are closing this matter without further action. Regarding the non-filing and late filing of certain statements of economic interests, we are closing this matter with this warning letter, as discussed below.

Various elected and appointed officials, including city councilmembers (as well as public officials who manage public investments) must file Form 700 statements of economic interests ("SEI" filings) on an annual basis. Generally, these must be filed each year by April 1, for the period covering January 1 through December 31 of the prior year. For an official who holds multiple positions, an expanded statement may be filed for all positions held. Similar statements must be filed within 30 days of leaving office. Additionally, for any person who holds a designated position with an agency that has adopted a Conflict of Interest Code, similar filing requirements apply. (See Sections 87200, *et seq.* Also, see Regulations 18723 and 18723.1.)

From 2017 through 2021, you held various positions for which you were required to file these SEI statements, but you failed to do so, as noted below.[2]

As the Mayor of Compton, you failed to file an annual SEI for calendar year 2017, and your annual SEI for 2018 was filed about 106 days late—in violation of Section 87203.

As a board member of the Gateway Cities Council of Governments, your annual SEI for calendar year 2017 was filed about 45 days late, and you failed to file a leaving office SEI within 30 days of leaving your position—in violation of Section 87300.

---

[1] The Political Reform Act—sometimes simply referred to as the Act—is contained in Government Code sections 81000 through 91014. The regulations of the Fair Political Practices Commission are contained in California Code of Regulations, title 2, sections 18110 through 18998. Unless otherwise noted, all statutory references are to the Government Code, and all regulatory references are to Title 2, Division 6 of the California Code of Regulations—as they were in effect during calendar year 2018 (at the time of the violations in this case).

[2] This warning letter applies to your SEI filing violations that occurred within the past five years. The oldest of these violations involve failure to timely file annual SEI statements for calendar year 2017 by the due date of April 2, 2018—for which the five-year statute of limitations started to run on April 3, 2018 (the first day that such filings were late). See Section 91000.5.

As director of Los Angeles County Sanitation Districts 1, 2, and 8, you failed to file annual SEI statements for calendar years 2017 through 2020—and when you left the position in June 2021, you failed to file a leaving office SEI within 30 days—in violation of Sections 87203 and 87204.

Also, when you left your position as a board member of the Independent Cities Finance Authority in July 2021, you failed to file a leaving office SEI within 30 days—in violation of Section 87204.

In mitigation, you no longer hold any of these positions, and as detailed above, some of the statements ultimately were filed, albeit late. Additionally, except as noted above, your annual SEI filings for 2019 and 2020 for multiple positions were timely filed. Based on the foregoing, and in accordance with the Enforcement Division Policy Directives formally adopted by the Commission on January 26, 2023, which require the Enforcement Division to take all appropriate actions within its discretion to decrease the Division's annual carryover caseload, the Enforcement Division is closing this case with this warning letter.[3] Discretion was used based upon mitigating or aggravating circumstances and the totality of the circumstances.[4] This resolution may not be used as a comparable case for other enforcement matters.[5]

Although the Enforcement Division is closing this case without seeking a penalty, you are still required to file all outstanding SEIs and pay any late filing fees assessed by your filing officer. Please contact your filing officer at Form700@fppc.ca.gov for further information about your required filings. Any future non-filings may result in monetary penalties and this warning letter may be considered in any future enforcement actions.

The information in this matter will be retained and may be considered should an enforcement action become necessary based on newly discovered information or future conduct. Failure to comply with the provisions of the Act in the future will result in monetary penalties of up to $5,000 for each violation.

A warning letter is an Enforcement Division case resolution without administrative prosecution or fine. The Commission has adopted Regulation 18360.1 to authorize the Enforcement Division to issue warning letters to conclude cases in specified circumstances. However, the warning letter resolution does not provide you with the opportunity for a probable cause hearing or hearing before an Administrative Law Judge or the Commission. If you wish to avail yourself of these proceedings by requesting that your case proceed with prosecution rather than a warning, please notify us within ten (10) days from the date of this letter. Upon this notification, the Enforcement Division will rescind this warning letter and proceed with administrative prosecution of this case. If we do not receive such notification, this warning letter will be posted on the Commission's website ten (10) days from the date of this letter.

If you need guidance regarding your obligations in the future, please visit our website at www.fppc.ca.gov/advice.html or call the Commission's Toll-Free Advice Line at 1-866-ASK-FPPC (1-866-275-3772).

///

[3] https://www.fppc.ca.gov/content/dam/fppc/NS-Documents/AgendaDocuments/General%20Items/2023/january/15.0-Enforcement-directives.pdf

[4] Regulations 18360.1 and 18360.3.

[5] See Regulation 18361.5, subdivision (e)(3).

Thank you for your attention to this matter. Please do not hesitate to call if you have any questions.

Very truly yours,

*Neal P. Bucknell*

Neal P. Bucknell
Senior Commission Counsel
Enforcement Division
nbucknell@fppc.ca.gov
(916) 323-6424

**Blue Shield of California**
PO Box 272560
Chico, CA 95927-2560

blue of california

Blue Shield of California
An Independent Member of the Blue Shield Association

AB 01 006091 75948 H 23 A

SARA TAJZIEHCHI
5565 CANOGA AVE
APT 317
WOODLAND HILLS, CA 91367-6654

# EXPLANATION OF BENEFITS

## This is NOT a Bill

This Explanation of Benefits (EOB) is to notify you that we have processed your claim. It clarifies your payment responsibility or reimbursement. Retain this for your records along with any provider bills. If you have any questions, please call us at **(855) 836-9705**.

**Access your EOB online**
Signing up to get paperless delivery of your EOBs is easy. Simply log in to blueshieldca.com/digitaleobs and set up your notification preferences.

### CLAIM SUMMARY AT A GLANCE

| Patient Name: SARA TAJZIEHCHI | | Subscriber ID: 900934042 Claim Number: 255036399700 |
|---|---|---|
| **Patient responsibility:** (Amount you paid or owe to provider.) | **$270.00** | **Your claim was received 08/15/25 and processed in 1 day(s).** |
| Blue Shield responsibility: | $0.00 | **Deductible Status:** This plan has no deductible. |
| **Network savings:** (Amount saved by using a network provider.) | **$0.00** | You can get your updated deductible information by logging on to www.blueshieldca.com. Your year-to-date total is available in the My Health Plan section or you can call Customer Service. |
| Amount billed by Provider: | $270.00 | |

**DETAIL** **Provider:** PRIMEX CLINICAL
**Exclusive Provider No**

| Service Date | Type of Service and Procedure Number | Amount Billed (Provider billed for services) | Amount Allowed (Used to calculate benefits) | Blue Shield Responsibility | Patient Responsibility: Non Covered | Patient Responsibility: Deductible (You pay provider before we begin payments) | Patient Responsibility: Copayment/ Coinsurance | Notes |
|---|---|---|---|---|---|---|---|---|
| 08/04/25 | Laboratory 87624 | 150.00 | 0.00 | 0.00 | 150.00 | 0.00 | 0.00 | 1 |
| 08/04/25 | Laboratory 88175 | 120.00 | 0.00 | 0.00 | 120.00 | 0.00 | 0.00 | 1 |
| | **Claim Totals:** | **270.00** | | **0.00** | **270.00** | **0.00** | **0.00** | |

**Notes**
1 Coverage for this service was not in effect at the time the service was provided.

**Messages**
Diagnosis and treatment codes billed on this claim and their meanings can be requested by contacting Customer Service.

## Thank you for choosing Blue Shield.

To see the extra services and support available to you, go to **www.blueshieldca.com**.

Issue Date: 08/18/25
EOB Number: 25230B100056189713
Page: 1 of 3

Please see reverse side for more information.

Group ID: X0001004
Group Name: IFP ON EXCHANGE

006091 1/2

5467

| Helpful Definitions - *See your Evidence of Coverage for additional information. | |
|---|---|
| **Amount Billed**<br>The amount your provider billed for the services you received.<br>**Amount Allowed***<br>The amount we used to calculate your benefits for the services provided.<br>**Blue Shield Responsibility**<br>The amount payable to your provider or you.<br>**Copayment*/Coinsurance***<br>The predetermined amount (copayment) for which you are responsible or a percentage of the cost (coinsurance) for which you are responsible, based on your plan benefits. You are responsible for this amount.<br>**Date(s) of Service**<br>The day or dates the patient received services. | **Deductible**<br>The dollar amount that you must pay for covered services each year before we start paying benefits under your plan. You are responsible for this amount.<br>**Non Covered**<br>The portion of the Amount Billed not covered by your plan. You are responsible for this amount.<br>**Patient Responsibility**<br>The amount you are responsible to pay the provider. It consists of Deductible, Copayment/Coinsurance, and Non Covered amounts.<br>**Network Savings**<br>The amount you saved by using a Blue Shield network provider. |

**Questions?** Contact us directly by telephone, letter or online by visiting http://www.blueshieldca.com. We will be able to answer most of your questions immediately; otherwise, you will receive a response within 30 days. Additionally, you have the right to request copies of all documents, records and other information we used in evaluating your claim, at no cost to you.

**Contact Us:**
**P. O. Box 272540**
**Chico, CA 95927-2540**
**(855) 836-9705**

If you are not satisfied with our response to your inquiry, you (or your provider or a representative on your behalf) may initiate a grievance by calling, writing or by completing a Grievance Form. You may obtain the form by calling us, or by visiting our web site at http://www.blueshieldca.com. Submit your letter or completed form to Blue Shield Appeals and Grievance, P.O. Box 5588, El Dorado Hills, CA 95762-0011 or online at http://www.blueshieldca.com. We will provide you with a response within 30 days. You may file grievances for at least to within 180 days following any incident or action with which you are not satisfied.

The California Department of Managed Health Care is responsible for regulating health care service plans. If you have a grievance against your health plan, you should first telephone your health plan at **(855) 836-9705** and use your health plan's grievance process before contacting the department. Utilizing this grievance procedure does not prohibit any potential legal rights or remedies that may be available to you. If you need help with a grievance involving an emergency, a grievance that has not been satisfactorily resolved by your health plan, or a grievance that has remained unresolved for more than 30 days, you may call the department for assistance. You may also be eligible for an Independent Medical Review (IMR). If you are eligible for IMR, the IMR process will provide an impartial review of medical decisions made by a health plan related to the medical necessity of a proposed service or treatment, coverage decisions for treatments that are experimental or investigational in nature and payment disputes for emergency or urgent medical services. The department also has a toll-free telephone number **(1-888-466-2219)** and a TDD line (**1-877-688-9891**) for the hearing and speech impaired. The department's Internet Web site **www.dmhc.ca.gov** has complaint forms, IMR application forms and instructions online.

You have the right to request an IMR through the Department of Managed Health Care (DMHC), as indicated in the paragraph above. You may apply for IMR if A) your provider has recommended a health care service as medically necessary, or B) you have received urgent care or emergency services that a provider determined was medically necessary, or C) you, in absence of a provider recommendation or the receipt of urgent care or emergency services, have been seen by an in-plan provider for the diagnosis or treatment of the medical condition for which you seek independent review. You can contact the DMHC directly.

If your employer's health plan is governed by the Employee Retirement Income Security Act (ERISA), you may have the right to bring civil action under Section 502(a) of ERISA if all required reviews of your claim have been completed and your claim has not been approved. Additionally, you and your plan may have other voluntary alternative dispute resolution options, such as mediation.

# EXHIBIT C



OMB Number: 0610-0094
Expiration Date: 10/31/2024

# ED-900 – General Application for EDA Programs

This form is required for application to EDA grant programs, consistent with the requirements outlined in each program Notice of Funding Opportunity (NOFO). **Applicants are strongly encouraged to clearly and concisely respond to each answer in the space provided.  Applicants should not provide additional documents or narratives without prior written approval from EDA.**

## A. Applicant Information

**A.1.    Please identify all applicants for this project.**

The Lead Applicant is the party who is responsible for handling disbursements of funds and reporting to EDA.

**Please note**: Active registration with the System for Award Management (SAM) is required of all EDA applicants and awardees at www.SAM.gov. Please list the relevant Commercial and Government Entity CAGE Code and SAM expiration data for all applicants and co-applicants (if any) in the table below.

|  | Name | SAM.gov CAGE Code | SAM.gov Registration Expiration Date | Fiscal Year End Date (mm/dd) |
|---|---|---|---|---|
| Lead Applicant | COMMUNICATION PRODUCTS LLC |  | 11/19/2023 | 11/23 |
| Co-Applicant 1 | COMMUNICATION PRODUCTS LLC |  | 11/19/2023 | 11/23 |
| Co-Applicant 2 |  |  |  |  |
| Co-Applicant 3 |  |  |  |  |
| Co-Applicant 4 |  |  |  |  |
| Co-Applicant 5 |  |  |  |  |

**Agency Disclosure Notice:** *This information collection is authorized by OMB control #0610-0094. Public reporting burden for this collection of information is estimated to average 17.1 hours per response for non-construction projects and 43 hours per response for construction projects, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to U.S. Department of Commerce, Economic Development Administration at jknott@eda.gov.  Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number.*

## B. Scope of Work

**B.1.    Describe the scope of work for the proposed EDA investment, including a list of project tasks to be undertaken.**

List the specific tasks/activities that will be undertaken as a result of this investment.

**Applicants for construction assistance** should also include a statement of project components, including whether the proposed project involves the construction of a new facility (or facilities) or the expansion, renovation, or replacement of an existing facility or facilities. Applicants should also describe the proposed project components in terms of dimensions, capacities, quantities, square footage, etc. and should verify the description aligns with the engineering description provided in the preliminary engineering report, the environmental narrative, and other application materials.

**Applicants for Partnership Planning Assistance** should provide a narrative on the economic development activities that will be undertaken, which must include managing and maintaining the Comprehensive Economic Development Strategy (CEDS) process.

**Applicants for Short Term Planning Assistance or Local Technical Assistance** should provide a narrative explaining how the proposed scope of work will enhance economic development planning capacity of the identified region. Applicants should include information regarding any relationship or collaboration with other public and private entities, and should explain how the strategy will expand the capacity of public officials and economic development organizations to work effectively with employers and enable the region to plan and coordinate the use of available resources to support economic recovery and the development of a regional economy and/or develop innovative approaches to economic revitalization in the region.

**Applicants for State Planning Assistance** should provide a narrative outlining the proposed scope of work for the project, including the relationship to any existing CEDS or similar planning processes, and the goals and objectives of the proposed project.

**Applicants for a Revolving Loan Fund (RLF)** should clearly define the service area of the proposed Revolving Loan Fund, the types and size of loans anticipated to be made under the RLF and the focus area of the RLF (if any). Applicants should describe how the RLF will be designed to make loans to businesses that cannot otherwise obtain traditional bank financing. Applicants should describe what (if any) technical assistance will be provided for loan applicants/borrowers and explain how quickly grant funds are expected to be deployed (i.e. lent) to potential borrowers.

Change begins with leadership that possesses a deep understanding of current conditions and the necessary actions. While reading books, listening to podcasts, and conducting extensive research can provide valuable information for Economic Development, firsthand experience is essential for truly comprehending what is required to achieve maximum results. In 2023, Los Angeles County is making a commitment and investment to bridge the gap in racial inequality, opportunity, and wealth building. The leadership aims to overcome historical factors such as restrictive covenants, redlining, zoning, and underinvestment in communities that deserve a chance to experience the American Dream. Focused Communities:

http://lachamber.com/clientuploads/LUCH_committee/082609_ConcentratedPovertyFinal_LUCH.pdf
Los Angeles, known as the City of Dreams, but is this true for everyone?

Persistent economic distress has resulted in limited education, high unemployment rates, and a lack of job opportunities in communities that have been deemed "underserved" due to biased leadership and executive orders in United States history. Without proper actions and strategies in place to bring about real change, limited access to capital will continue to contribute to ongoing hardships. Diverse decision-makers who recognize the challenges and can provide better solutions are crucial for bringing about change. Additionally, other populations within a service area may face unique challenges based on their cultural background or identity. Middle-class individuals may possess education and experience, but the lack of resources and opportunities creates another barrier to growth and success.

We would like to express our gratitude to The Biden and Harris Administration for their commitment to accountability. This recognition will help us develop comprehensive strategies to address economic distress and promote inclusive economic growth.

Equity, inclusion, and diversity are fundamental values of our team. Diversity is the first step towards creating meaningful change. Individuals must have personal experiences and face hardships in order to genuinely understand and speak about them. While research and learning are valuable, having someone who looks like you and has lived through similar experiences can make a significant impact. We have assembled a diverse team from various backgrounds, including government, entertainment, and sports. Through extensive research, we have discovered that this space is often overlooked and needs to be properly taught. Access to opportunities in this field can only be challenging without proper guidance and education. Many qualified organizations exist, but without awareness, they cannot apply. Our program aims to address this issue through a digital platform that can measure its success. With our connections, we can reach out to various initiatives and individuals to promote diversity, equity, and inclusion.

**B.2.** Describe the specific deliverables/outcomes that the project will produce and the primary beneficiaries or audience of those deliverables. Please note that deliverables are defined as the specific outcomes that will come from the project and differ from information on project tasks/activities requested in B.1. Project tasks/activities requested in B.1 should be reported as process steps that will be achieved to reach the final project while deliverables/outcomes detailed in B.2 are the final product produced.

PROGRAM STRUCTURE

Women

Title: SHE-E-O Project: Empowering Women for Success and Representation

Objective: The SHE-E-O Project is a program dedicated to promoting success and representation for women in all industries. By featuring women from diverse backgrounds, the program aims to provide advice, inspiration, and guidance to future female leaders, referred to as SHE-E-O's (Success-Driven, Hardworking, Empowered, and Outstanding).

Components of the Program:

1. Mentor ship: Pair each SHE-E-O participant with a successful woman mentor who can provide guidance and support and share their experiences in navigating their respective industries.

2. Speaker Series: Organizing regular speaker sessions where accomplished women from various fields share their stories, challenges, and strategies for success. These sessions will inspire and motivate participants to pursue their goals fearlessly.

3. Skill-Building Workshops: Conducting workshops focused on developing essential skills for professional growth, such as leadership, negotiation, communication, networking, and personal branding. These workshops will equip participants with the tools they need to excel in their chosen industries.

4. Industry Experiences: Facilitating opportunities for participants to gain hands-on experience in their desired fields through internships, job shadowing, or industry-specific projects. This component will provide practical exposure and help participants build a strong career foundation. Also, introductions to creative decision-makers include music, entertainment, culinary, film, beauty, etc.

5. Empowerment Workshops: Conduct workshops on building self-confidence, resilience, and a growth mindset. These workshops will address common challenges faced by women in the workplace and provide strategies for overcoming them.

6. Community Engagement: Encouraging participants to give back to their communities through volunteer work, mentorship programs for younger girls, or initiatives that promote gender equality and empowerment. This component will foster a sense of social responsibility and create a positive impact.

By implementing the SHE-E-O Project, we aim to empower women to break barriers, shatter glass ceilings, and succeed in any industry they choose. Through mentorship, inspiration, skill-building, and community engagement, we will create a strong network of empowered women who will pave the way for future generations of female leaders.

Youth and Youth Transitioning out of Foster Care

Title: Empowering Foster Youth: Building a Path to Independence

Objective: This program aims to provide youth (age 18-25) and foster youth aging out of the system with the necessary support, resources, and life-skill training to transition into adulthood successfully. We aim to empower them to overcome barriers and achieve independence by addressing their unique challenges and providing comprehensive assistance.

Components of the Program:

1. Life Skills Training: Workshops and training sessions focused on essential life skills such as financial literacy, budgeting, time management, communication, problem-solving, and self-care. These sessions will equip foster youth with the tools they need to successfully navigate various aspects of adulthood.

Women Through Housing

Objective: This program aims to provide safe and supportive housing for women where they can create
their serenity and build a foundation for personal growth and empowerment.

Components of the Program:

1. Safe and Secure Housing: Establishing housing facilities specifically designed for women,
ensuring a safe and secure environment free from violence, abuse, and discrimination. These spaces
will prioritize the physical and emotional well-being of residents.

2. Personalized Living Spaces: Providing women with the opportunity to create their own serene
living spaces with our in-house design team. Each resident will be free to personalize their rooms,
allowing them to express their individuality and develop a sense of comfort and belonging.

3. Supportive Community: Fostering a supportive community within the housing facilities where women
can connect, share experiences, and provide mutual support. This community will serve as a source
of encouragement, friendship, and empowerment.

4. Counseling and Therapy Services: Offering on-site counseling and therapy services to address
residents' emotional and mental health needs. These services will provide a safe space for women to
heal, process trauma, and develop coping mechanisms.

5. Life Skills Training: Workshops and sessions focused on building essential life skills such as
financial literacy, self-care, communication, conflict resolution, and goal setting. These sessions
will empower women to take control of their lives and make informed decisions.

6. Education and Employment Support: Assisting women in pursuing educational opportunities and
securing stable employment. This may include access to scholarships, vocational training programs,
career counseling, and job placement assistance. Introduce a career path in the creative,
entertainment, and beauty space

7. Holistic Wellness Programs: Offering holistic wellness programs that promote physical, mental,
and emotional well-being. This may include yoga and meditation classes, fitness programs, art
therapy, and nutrition workshops.

8. Financial Independence: Providing resources and support to help women achieve financial
independence. This may include financial literacy training, access to micro-finance programs,
entrepreneurship support, and assistance securing affordable housing options.

By implementing this program, we aim to provide women with a safe and empowering environment where
they can create their serenity. We can help women rebuild their lives, gain independence, and
thrive through personalized living spaces, supportive communities, and comprehensive support
services. This program will provide housing and catalyze personal growth, empowerment, and a
brighter                                                                                    future.

**B.3.** Identify the proposed time schedule for the project, including specific project milestones.

This project will start in 2 weeks and continue.

**B.4.**   Describe how the proposed project aligns with one or more of EDA's investment priorities.  Current EDA investment priorities are available at https://www.eda.gov/about/investment-priorities/. Applicants must identify all relevant investment priorities with which the project aligns with and describe how the project advances each relevant  priority (ies).

Based on years of redlining, zoning and discrimination, there has always been an unequal playing field. Now that the EDA has funding, the funds are yet going to the majority. This is why things aren't changing. If you have lived life with no barriers, how would you know what programs are needed? However, its so hard to receive funding because of the lack of knowledge and complicated process.

## C. Project Region

### C.1. Project Location

Project location is the physical location where the project work occurs.  Project location information helps EDA conduct application reviews and map projects.  Providing complete and accurate information is important to the application review process.  For revolving loan funds (RLF), the project location is the RLF lending area.

**C.1.a. For construction projects**, identify the physical location of construction.  Include as much geographical information as possible including street address (or close approximation), census tract(s), county(ies), and state(s).  If more than one census tract applies, please identify all census tracts where the project will be located.

Example 1 (single location project such as a Water Tower, workforce training center or incubator): 1234 Daisy St., Census Tract: 53123456789, County: Adams County, State: WA

Example 2 (multi location project that does not have a defined address, such as a water or sewer line or access road): Pump at Intersection of Hwy 70 and Route 24, 500 linear feet of sewer at Mockingbird Lane, Census Tract: 53123456789, 53123456790, 53123456791, State: WA

**C.1.b. For planning, technical assistance, revolving loan funds or other non-construction projects,** identify the primary location(s) where the work will be conducted. Include as much geographical information as possible including census tract(s), county(ies), and state(s). If more than one census tract applies, please identify all census tracts where the project will be located. If all census tracts in a county apply, include "All Census Tracts" after the county name. For Revolving Loan Fund applications, please describe the proposed geographic lending area.

Example 1 (single location project such as feasibility study or economic impact study where the project location is the location where analysis is being performed): 1234 Daisy St., Census Tract: 53123456789, County: Adams County, State: WA

Example 2 (multi-location project such as a Partnership Planning grant, regional resilience project, or other regional project): County Robeson (All Census Tracts), Bladen (All Census Tracts), Columbus (all Census tracts), state NC

Example 3 (multi location project that is a statewide project): State of NC (All counties and Census Tracts)

12615 S. Slater Ave, Compton, California, 90222, Census Tract: 06037101110, 06037101122, 06037101210, 06037101220, 06037101300, 06037101400, Los Angeles County

**C.2. Estimated Area of Impact**

The estimated area of impact for your project is the area expected to benefit directly from the proposed EDA project. For construction projects, area of impact could include the commuting shed where potential employees may reside. For non-construction projects the area of impact could include the geographic scope where the work will occur and where the output of the work will be utilized. Defining the area of impact helps EDA to assess the economic benefits of projects and the merits of applications. Providing complete and accurate information is critical to the application review process.

List all census tracts, counties, and state where the project benefit will occur. If all census tracts in a county apply, include "All Census Tracts" after the county name.

Example 1 (single location project such as feasibility study or economic impact study where the project location is the location where analysis is being performed but the impact is two counties that serve as the commuting area and economic engine for the location of the project ): 1234 Daisy St., Census Tract:, County: Benton and Grant County, State: WA

Example 2 (multi-location project such as a Partnership Planning grant, regional resilience project, or other regional project): project performed by entity located in Raleigh, NC for statewide project: State of NC (All counties and Census Tracts)

Example 3 (a multi-location project could cross state boundaries): State of WA (All counties and Census Tracts), Nez Perce County (Idaho), and Multnomah County (Oregon).

5414.00 - 5426.01 - 5416.03 - 5416.04 - 5425.01 - 5425.02 - 5421.05 - 5421.06, Compton, California, 90222, Census Tract: 06037102104, 06037102105, 06037102107, Los Angeles County

**C.2.a. Underserved Populations/Geographies**

Does the majority of proposed project's planned area of impact (as defined above) serve an underserved population or represent an underserved geography? For definitions of these terms in relation to the planned area of impact, please visit https://eda.gov/about/investment-priorities/. Please identify the specific populations/geographies below following the guidance provided at the website referenced above and describe how the project will intentionally attempt to improve the economic conditions of the underserved population or geography within the project's planned area of impact.

[ ] No

[n] Yes

If yes, enter an explanation in the field below:

The Tax Cuts and Jobs Act of 2017 was signed into law on December 22, 2017. This act created qualified opportunity zones, and 879 designated opportunity zones are in California, where eight (8) of these census tracks are in the City of Compton. These tracts have been certified by the U.S. Treasury on April 9, 2018. As indicated by the following chart, this certification is valid for 10 years.

## D. Economic Development Needs

**D.1. Current Economic Conditions - Area of Impact**. Briefly describe the economic conditions of the estimated area of impact with a focus on available data describing the level of distress, if applicable. This should also include a concise overview of the economic development needs, area's workforce, industry clusters, main economic drivers, challenges, and assets. Describe the economic adjustment problems or economic dislocations the area is experiencing (or is likely to experience in the next 24 months). Relevant data may be drawn from the regional CEDS, https://eda.gov/resources/tools/, as well as other sources. You'll be asked to provide more details about this in Section H.   For revolving loan fund applications, please include information on borrowers and industry sectors that the loan fund is anticipated to target.

**D.2.** Explain how the proposed EDA investment addresses the economic development needs identified in D.1. For revolving loan fund projects, please explain the need for capital in the area.

**D.3.** Does the project align with the regional Comprehensive Economic Development Strategy (CEDS)? Except for grants to fund developing, updating or refining a CEDS as described in 13 C.F.R. § 303.7, the project must be consistent with the CEDS for the area in which the project will be located, unless EDA approves an alternative strategy. Information on the CEDS can be obtained at http://www.statsamerica.org/ceds/Default.aspx.

☐ Yes If Yes, what is the CEDS your project aligns with?

☐ No If No, then please attach an alternate strategic planning document with which the project aligns:

[ ] Add Attachment | Delete Attachment | View Attachment

☐ N/A – Not Applicable

**D.4.** How does the proposed project align with the regional CEDS (and for revolving loan fund projects, how does the proposed project align with the applicable RLF Plan)? Applicants should identify the specific CEDS strategy(s) that the project helps advance and explain how the project supports the identified goal(s).

**D.5. Attach a letter from the organization responsible for the CEDS indicating how the proposed project aligns with the CEDS.** If the estimated impact area is not covered by a CEDS, attach a letter of support from the organization responsible for the alternative planning document.

ED_900_GA_1_2-V1.2.pdf | Add Attachment | Delete Attachment | View Attachment

## E. Economic Impact of the Project

**E.1.** Provide a clear and compelling justification for the long-term potential economic impact of the proposed project, through anticipated job creation or retention, private investment leveraging, number of businesses or collaborations supported, or other appropriate measures. All job and private investment estimates should reflect the anticipated impact within nine years of the potential EDA investment and applicants should provide documentation or third-party data to substantiate claims.

For RLF applications, applicants should clearly define lending and technical assistance (if applicable) impacts expected, including targeted borrowers and industry sectors, and should describe the applicant's plan for ensuring sustainability of RLF lending into perpetuity, including information on other lending programs that may be leveraged to subsidize operational costs through economies of scale and loan pricing, and other relevant factors.

Tanisha Brown and Partnerships

**E.2.** Does the proposed project have one or more committed beneficiaries? A committed beneficiary is defined as a specific business that is expected to create or retain jobs and/or invest private funds as a result of the proposed project.

☐ Yes

n No, Go to E.5

**E.3. Beneficiaries of the project**

If applicants have identified specific private sector employers that are expected to create and/or save jobs as a result of the project, applicants should list those beneficiaries in the table provided below.

All job and private investment estimates should reflect the anticipated impact within nine years of the potential EDA investment. Jobs should be reported as full-time equivalents (FTEs) and should be attributable to the proposed EDA investment. Private investment reflects the amount of funds expected to be invested in the business as a result of the project.

Applicants should identify the North American Industry Classification System (NAICS) code for the major industry category of the beneficiary company (see https://www.census.gov/naics/ for a searchable list).

Form ED-900B must be completed and signed by an authorized representative of each beneficiary that expects to create and/or save 15 or more jobs as a result of the project.

| Beneficiary Name | NAICS Code | Main product or service produced by beneficiary | Estimated Jobs Created | Estimated Jobs Retained | Estimated Private Investment |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Total | | | 0 | 0 | $0.00 |

**E.4.** Do all "Other Parties" (as listed in question E.3.), i.e., businesses that estimate they will create and/ or save 15 or more jobs as a result of the EDA project, understand and agree to comply with all applicable civil rights requirements listed in 13 C.F.R. § 302.20, including the requirement to provide signed assurances of compliance (Form ED-900B)?

[n] Not Applicable (No Other Parties Identified)      [ ] Yes      [ ] No (explain below)

**E.5.** Please identify the total estimated jobs expected to be created and retained and the amount of private investment expected to be generated by this project. If your project is not expected to generate/retain jobs or attract private investment please enter 0 for each category in the table below.

| Estimated Jobs Created | Estimated Jobs Retained | Estimated Private Investment |
|---|---|---|
| 100 | 50 | |

**E.6.** Please identify the source(s) of the jobs and private investment estimates provided above in E.5 (check as many as apply):

[n] Signed Beneficiary forms (Form ED-900B)

[n] Letters from Beneficiaries of the Project

[n] Input/Output Model (e.g. IMPLAN, REMI)

[n] Other Method (specify below)

**E.7.** If your project is estimated to generate/retain jobs, will those jobs exceed the prevailing wage for the industry (ies) in the project area? Prevailing wage is defined by the Department of Labor as "the average wage paid to similarly employed workers in a specific occupation in the area of intended employment." For more information, visit https://eda.gov/about/investment-priorities/.

☐ No

☐ n Yes

If Yes, please provide an explanation below (e.g., how far above the prevailing wage?).

Creative jobs based on networking

**E.8.** If your project is estimated to generate/retain jobs, will the associated jobs be represented by a union?

☐ No, none of the jobs will be represented by a union

☐ Unknown. Please provide an explanation or additional information in the box below:

☐ n Yes, all of the jobs will be represented by a union

☐ Yes, some of the jobs will be represented by a union

If only some of the jobs will be represented by a union, please provide the percentage of jobs that will be represented by a union in the box below:

## F. Capacity and Administration

**F.1. List and describe the strategic partners and organizations that will be engaged in this project**
Describe any third-party organizations, including governmental agencies, that will be directly engaged in supporting the proposed project, and explain how each partner will be engaged in the project.

**For revolving loan fund applications**, please include any RLF supporting partners, such as banks, other economic development lenders, and business support entities that will be engaged in supporting the RLF.

Banks, Sports Teams, Brands, LA Times and Celebrities

**F.2. Applicant's organizational capability**

Briefly describe your organization's capability to administer, implement, and maintain the project, including prior experience with federal awards. List any awards received from EDA in the last five years, along with the relevant federal award ID numbers, if known.

**For Revolving Loan Fund applications**, please include a list of other lending programs that your organization currently operates, its approximate size, source of capitalization, and the general target(s) of each fund, if any. Revolving loan fund applicants should also explain their capacity to operate a public lending program, to manage lending activities, and to create networks between the business community and other financial providers. RLF applicants should also describe any other lending programs managed by the applicant, and describe the applicant's ability to sustain the RLF lending into perpetuity (which could include other lending programs that subsidize operational costs through economies of scale and loan pricing – interest and fee income).

This will be my first.

**F.3. Applicant's staff capacity**

Identify the key staff members who will be responsible for implementing the project and briefly describe how their expertise and experience qualifies them for the project. State whether you will administer the award yourself or contract with a third party for grant administration.

**For revolving loan fund applications**, applicants should clearly specify whether they intend to manage the fund themselves or will enter into a management agreement with another entity.

Tanisha Brown and Arlana Brooks

## G. Budget and Match Information

**G.1.** Are all non-EDA funds committed to the project, available as needed, and not conditioned or encumbered in any way that would preclude their use for the project?

[n] Yes [ ] No (explain below)

**G.1.a. Identify the source, nature and amount of all non-EDA funds.** Applicants should identify the source, nature and amount of all non-EDA funds, including in-kind contributions (non-cash contributions may include space, equipment, services, or assumptions of debt). Explain the status of all funding commitments, including the date the funds will be available from each source, and describe any conditions or restrictions on the use of such funds. If in-kind contributions are included, explain the basis on which they are valued, and describe the source, amount and any terms and conditions of the funding, and when the funding will be available for use by the applicant.

| Source | Amount | Date Available | Type | Restriction/Comments |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**G.1.b.** Do you plan to seek other federal financial assistance as part of or in connection with this project, including federal funds passed through by state governments or other entities? If so, identify the source, amount, timing of funding availability, and whether the funds are subject to any restrictions relevant to the project.

**Revolving loan fund applicants** should specify any other federal loan funds they administer, including source, amount, and focus.

[n] Yes (explain below) [ ] No

We are here based on the hardship to receive funds

**G.1.c.** Attach documentation confirming all non-EDA funding is available, committed, and unencumbered. Documentation is required from all sources of match. For example, if bonds are contemplated as match, counsel opinion of the applicant's bonding authority and eligibility of the bonds for use as match, along with full disclosure of the type of bonds and the schedule of the applicant's intended bond issue, are required.

Add Attachment | Delete Attachment | View Attachment

**G.1.d. This question should only be completed for construction projects.**
Attach a budget narrative with a breakdown for each "cost classification" line item included on the SF-424C and its associated tasks. The budget narrative must include both EDA and non-EDA funds and be consistent with the detailed construction cost estimate in the preliminary engineering report.

Add Attachment | Delete Attachment | View Attachment

**G.1.e. This question should only be completed for design and engineering assistance only projects.**
Attach a budget narrative with a breakdown for each "cost classification" line item included on the SF-424C and its associated tasks. The budget narrative must include both EDA and non-EDA funds.

Add Attachment | Delete Attachment | View Attachment

**G.1.f. The following questions should only be completed for non-construction projects.**
Attach a budget narrative with a breakdown for each "cost classification" line item included on the Form SF-424A and its associated tasks. The budget narrative must include both EDA and non-EDA funds and be consistent with the detailed construction cost estimate in the preliminary engineering report.

[ ] Add Attachment | Delete Attachment | View Attachment

G.1.f.1. Is your organization seeking indirect costs on your non-construction project?

[ ] Yes [ ] No

G.1.f.2. Is your organization requesting the de minimis indirect cost rate on your non-construction project in accordance with Uniform Guidance at § 200.414.

[ ] Yes [ ] No

If indirect costs are requested as part of the budget, attach a copy of your organization's current federal negotiated indirect cost rate agreement or other indirect cost documentation as permitted under the applicable NOFO.

[ ] Add Attachment | Delete Attachment | View Attachment

**G.2. Justification for sole source procurement**

Will you contract work to complete part or all of this project?

[n] Yes [ ] No

If yes, will contracts be awarded by competitive bid?

[n] Yes [ ] No

Provide a justification for contracts that will not be awarded competitively.

**G.3. Equipment**

Will any funds be used to purchase equipment? (Per 2 CFR § 200.33 equipment is defined as tangible personal property (including information technology systems) having a useful life of more than one year and a per-unit acquisition cost greater than $5,000).

[n] Yes [ ] No

If yes, will project funding be used to install the equipment?

[n] Yes [ ] No

Will the applicant provide EDA a security interest in the significant items of tangible personal property acquired or improved with EDA investment assistance? (For more information, see 13 C.F.R. 314.9).

[ ] Yes [n] No (explain below)

computer and office supplies

Attach a list of equipment to be purchased, including unit price, quantity, description, purpose, and estimated useful life.

[ ] Add Attachment | Delete Attachment | View Attachment

## G.4. Business Incubators and Accelerators

Does the applicant intend to construct or renovate a business incubator, accelerator, commercialization center, or similar project?

[n] Yes [ ] No

If Yes, please attach a feasibility study demonstrating the need for the Project and an operational plan based on the industry best practices demonstrating the plan for ongoing successful operations. See the applicable

NOFO for additional information and guidance.

Real Estate Developer_and Market Analysis Report Los Angeles_Brown Estates July 23 2023 V02(2).pdf | View Attachment

## H. Regional Eligibility

**H.1.** Explain how the estimated area of impact defined in section C.2 above meets EDA's distress criteria as defined in the applicable NOFO. EDA will review and evaluate documentation submitted by the applicant to verify eligibility.

There will be changes that will be documented.

**H.2. Economic Distress**

**Public Works and Economic Adjustment Assistance projects** must satisfy regional eligibility requirements (see the relevant NOFO for more details). This section will assist EDA in determining if the proposed project satisfies these eligibility requirements.

**Planning and Technical Assistance applications:** although meeting specific distress criteria is not a prerequisite for funding under these programs, the economic distress level of the region impacted by a project serves as the basis for establishing the EDA share of the total cost of the project and can inform competitiveness.

Check all that apply in establishing regional eligibility (see NOFO for more details):

- [n] **Unemployment rate**
- [ ] **Per capita income**
- [ ] **Special need**, including:
  - [ ] Closure or restructuring of industries or the loss of a major employer, essential to the regional economy;
  - [ ] Substantial out-migration or population loss;
  - [ ] Underemployment; that is, employment of workers at less than full-time or at less skilled tasks than their training or abilities permit;
  - [ ] Military base closure or realignment, defense contractor reductions-in-force, or U.S. Department of Energy defense-related funding reductions;
  - [ ] Natural or other major disasters or emergencies;
  - [ ] Extraordinary depletion of natural resources or other impact attributable to a new or revised federal regulation or policy that will have a significant impact on a community's ability to prevent an extraordinary depletion of natural resources;
  - [ ] Negative effects of changing trade patterns; or
  - [ ] Other circumstances set forth in the applicable NOFO (please explain below).

**H.3. Source of data provided for regional eligibility determination**

Check the box denoting what data source you used to establish eligibility:

- [ ] The most recent ACS data published by the U.S. Census Bureau.
- [n] The most recent Bureau of Labor Statistics Data.
- [ ] The most recent other federal data for the region in which the project is located (e.g., U.S. Census Bureau or the Bureaus of Economic Analysis, Labor Statistics, Indian Affairs, etc.).
- [ ] If no federal data are available, the most recent data available through the state government for the region in which the project is located.
- [ ] Other data to substantiate regional eligibility based on a "Special Need" as defined in 13 C.F.R. § 300.3.

**H.4. Substantial Direct Benefit**

If the project does not meet any of the criteria above, is it located in an Economic Development District (EDD), and will it provide substantial direct benefit to residents of an area within that EDD that does meet the distress criteria?

☐ Yes          ☐ No

Identify the Economic Development District (EDD) where the project will be located.

A project provides a "substantial direct benefit" if it provides significant employment opportunities for unemployed, underemployed or low-income residents of the identified area within the EDD that meet the distress criteria.  Please explain how the proposed project will provide a substantial direct benefit to this distressed area within the identified EDD.

**H.5. Location in a geographic area of distress**

If the project is located in a region that overall does not meet any of the criteria above, is the project located in a defined geographic area that meets EDA's distress criteria for unemployment or per capita income? To qualify, a project must be physically located in a distressed area (for construction projects) or primarily intended to benefit the distressed area (for non-construction projects).

☐ Yes ☐ No

If yes, define the area of distress where the project will be located using Census tracts or other geographical designations (e.g., political subdivisions) and explain how the area meets the distress criteria for unemployment or per capita income. Identify the source of the data used to demonstrate distress.

# I. Administrative Requirements

### I.1. Civil rights

Do you understand and agree to comply with all applicable civil rights requirements (see 13 C.F.R. § 302.20)?

[n] Yes                    [ ] No (explain below)

### I.2. Lobbying certifications

**All applicants** for federal financial assistance must certify that federal funds have not been used and will not be used for lobbying in connection with this request for federal financial assistance (Form CD-511). If non- federal funds have been or are planned to be used for lobbying in connection with this request for federal financial assistance, Form SF-LLL also must be completed. Applicants must comply with 13 C.F.R. § 302.10 regarding attorneys' and consultants' fees and the employment of expediters. This regulation requires that applicants identify and disclose the amount of fees paid to anyone engaged to assist the applicant in obtaining assistance under the Public Works and Economic Development Act of 1965 (PWEDA), as amended.

Will you be able to comply with federal requirements regarding lobbying?

[n] Yes                    [ ] No (explain below)

**I.3. Compliance with Executive Order 12372, State Single Point of Contact (SPOC)**

Does the state in which the project will be located have a project review process that requires submission to a Single Point of Contact (SPOC)? A list of states that maintain a Single Point of Contact can be found at https://www.whitehouse.gov/wp-content/uploads/2020/04/SPOC-4-13-20.pdf.

[n] Yes

[ ] No, go to question I.4

If Yes, does this request for EDA investment assistance require review by SPOC?

[ ] Yes [n] No (explain below)

I am new to federal grants which is again is hard for people like me to get funded.

If Yes, were SPOC comments/clearance received?

[ ] Yes

Please attach the comments/clearance:

[ ] Add Attachment | Delete Attachment | View Attachment

[ ] No. The review period has expired and no comments were received.

[ ] No. Comments have been requested but the review period has not yet expired.

Please attach evidence of your request for comments:

[ ] Add Attachment | Delete Attachment | View Attachment

**I.4. Single Audit Act Requirement**

Did your organization expend more than $750,000 in federal funds during your previous fiscal year?

[ ] Yes [n] No

If yes, what is the date of the last submission of the audit Federal Audit Clearinghouse?

[ ]

If no, please attach your organization's most recent financial audit or financial statement.

Tanisha 2021_TaxReturn-1 copy.pdf | Add Attachment | Delete Attachment | View Attachment

***TABLE 5 – PRIORITIZATION OF NEW AND EXPANSION DV BONUS PROJECTS***

| Project Type | Additional Ordering Criteria, If Applicable * | Rationale |
|---|---|---|
| 3. RRH | Up to $1.8M in requests; ordered by RFP score *within* this project type | Addresses significant community need for additional housing resources as identified by DV and human trafficking communities during community outreach leading up to the competition |

*"In the event that the CoC fails to receive enough qualifying applications under a given component, the component caps of $1.8M will be ignored so that the CoC can apply for the maximum allowable bonus amount. For example, if the CoC receives only one qualifying TH-RRH project of $1M but receives in excess of $1.8M in qualifying RRH projects, the CoC will select for ranking the TH-RRH project and the highest scoring RRH projects until $3.6M in eligible projects have been selected for HUD funding consideration."

**Consumer Affairs Advisory Commission**
**2024 Committee Interest Card**

The purpose of this form is to gauge your interest in serving on a committee listed below. This information will assist the Commission Chair in making Committee selections. Please indicate your selection by placing an "X" in the column to the right. If you are interested in serving on both Committees, you must not be serving as Chair or Vice-Chair of the Commission, or Chair of a Committee. Each Commissioner may only serve on a maximum of two (2) Committees.

**Commissioner Name:** Tanisha Brown

| Committee | Purpose | Interest |
|---|---|---|
| Legislative | Ensures the protection and promotion of consumer interests by identifying, researching, presenting, and advising the Director of Consumer Affairs on needed improvements or changes to existing County legislation. | Y |
| Public Information | Identifies, facilitates, and enhances methods of public outreach regarding available public services and/or programs to the diverse communities of Los Angeles County. | Y |

**Are you interested in serving as a Committee Chair?** Yes [/] No [ ]

The duties and responsibilities of a Committee Chair include, but are not limited to:
In consultation with the Department of Consumer and Business Affairs Commission Services Staff: set the dates, times, and location for meetings; establish and confirm an agenda for each meeting; ensure that meetings are called to order and held in accordance with commission polices and the Brown Act for Public Meetings; provide leadership to the committee and ensure that discussion on agenda items are on topic, productive, and professional. If you are selected as Chair of a Committee, attendance at the Executive Committee meeting is also required and counts towards the two (2) Committees per Commissioner limit. The Executive Committee meets from 11:30 a.m. - 12:30 p.m. on the same dates as listed below.

| Committee Schedule | |
|---|---|
| The Legislative Committee meets at 9:00 a.m. on the following dates:<br>February 15, 2024<br>April 18, 2024<br>June 20, 2024<br>August 15, 2024<br>October 17, 2024<br>December 19, 2024 | The Public Information Committee meets at 10:15 a.m. on the following dates:<br>February 15, 2024<br>April 18, 2024<br>June 20, 2024<br>August 15, 2024<br>October 17, 2024<br>December 19, 2024 |



We empower through designing spaces that reflect their aspirations.



**Collective Partnership Agreement Letter**
**California Jobs First: Los Angeles County Region**

5/6/2024

Los Angeles County Economic Development Corporation
633 West 5th Street, 33rd Floor
Los Angeles, CA 90071

To the Los Angeles County Economic Development Corporation (Regional Convener):

The Communication Products LLC is pleased to inform you that we are in agreement with the goals of
California Jobs First (CJF), formerly the Community Economic Resilience Fund (CERF), proposal for the Los
Angeles County Region developed by the California Community Foundation (Fiscal Agent), and the Los
Angeles County Economic Development Corporation (Regional Convener) in collaboration with a broad
array of community partners in the region.

We agree to participate actively in the CJF planning process, including the development of a fair and
democratic governance structure that shares decision-making and balances the interests of all
represented groups, as well as contribute to the outreach and engagement strategy. We are committed
to working in partnership with a wide range of regional stakeholders with diverse interests to create a
more inclusive, equitable, sustainable, competitive, and resilient economy for the Los Angeles County
Region.

Communication Products LLC, is a firm that designs products that foster collaboration, empowers
communities and fuel strength through our purposeful design infrastructure projects.

We will bring to the table a dynamic blend of architects, interior designers, researchers,
influencers, celebrities, and artists from diverse industries, united to embody change,
innovation, unity, and diversity. With our diverse and skilled team, we not only merge
various skills and perspectives but also immerse ourselves in a rich tapestry of experiences.

Our primary contact for this process will be:

Contact Person: Tanisha A. Brown
Email Address: tbrown@tbaconsultingfirm.org
Phone: (310) 349-9218
Address: 5565 Canoga Ave #317 Woodland Hills, CA 91367

Sincerely,

5/6/2024

Authorized Signatory: Tanisha A. Brown, Owner          Date 5/6/2024



OFFICE OF COMMUNITY PLANNING
AND DEVELOPMENT

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, DC 20410-7000

MEMORANDUM FOR:     Marion M. McFadden, Principal Deputy Assistant Secretary, D

THROUGH             Claudia I. Monterrosa, Deputy Assistant Secretary
                    for Grant Programs, D      CLAUDIA         Digitally signed by
                                                               CLAUDIA MONTERROSA
                                               MONTERROSA      Date: 2024.02.27 15:06:07
                                                               05:00'

FROM:               Kimberly Nash, Acting Director,    KIMBERLY NASH
                    Office of Block Grant Assistance, DGB

SUBJECT:            Environmental Assessment and Finding of No Significant Impact
                    Under the National Environmental Policy Act for the Issuance of
                    a FY23 Notice of Funding Opportunity for Preservation and
                    Reinvestment Initiative for Community Enhancement (PRICE)
                    (FR-6700-N-99)

It is the finding of this Office that issuance of the attached Notice of Funding
Opportunity (NOFO) does not constitute a major Federal action having an individually or
cumulatively significant effect on the human environment and, therefore, does not require the
preparation of an environmental impact statement.

The PRICE NOFO sets forth the requirements governing the competitive grant made
available through the authorization in the FY23 Consolidated Appropriations Act (Pub. L. No.
117-328, approved December 29, 2022). PRICE is a newly authorized component of the larger
Community Development Block Grant Program (CDBG), authorized by Title I of the Housing
and Community Development Act of 1974 (42 U.S.C. 5301 et seq.), as amended (HCDA).

**Public Law 117-328**
Congress made available under the FY23 Consolidated Appropriations Act, Community
Development Block Grant funds for communities to preserve long-term housing affordability
for residents of manufactured housing communities (MHCs), to redevelop MHCs, and to
primarily benefit low-and moderate-income residents. The funding will be granted on a
competitive basis for communities to preserve and revitalize manufactured housing and eligible
manufactured housing communities. The competition invites, local and state governments,
metropolitan planning organizations (MPOs), and multijurisdictional entities, colonias, resident
controlled MHCs, Cooperatives, non-profit entities (including consortia of non-profit entities),
Community Development Financial Institutions (CDFIs), Indian tribes or their Tribally
designated Housing Entities (TDHEs), tribal non-profits, tribal organizations, and Native
CDFIs to apply for funds for their eligible activities that preserve and revitalize manufactured
housing units at one or multiple sites.

The individual projects that may be funded by the PRICE grant competition are generally undetermined at the time the grants are awarded and may not be known at the time that sub-awards are made to local affiliates, but all activities awarded PRICE funding are subject to environmental review in accordance with the NEPA requirements at 24 CFR Part 58, or Part 50 for grantees who are not States or units of general local government (UGLGs) or are not recipients of funding under Title I of the Housing and Community Development Act of 1974 and HUD's regulations at 24 CFR 58.2(a)(5).

Assistance under the CDBG program is subject to the environmental review requirements of 24 CFR Part 58. Responsible Entities are responsible for completing environmental reviews on specific projects in accordance with Part 58. If applicable, the recipient must receive an Authority to Use Grant Funds (AUGF) form from HUD or the State if the review is performed under Part 58, or approval of the project from HUD if the review is performed under Part 50, before it can commit funds or take any choice limiting action with respect to a project. In cases in which States carry out activities directly, the State must, in accordance with 24 CFR 58.4, submit the certification and Request for Release of Funds (RROF) to HUD for approval. Issuance of the notice of funding opportunity does not constitute approval of any proposed projects. Any impacts arising from program activities would be localized and addressed in the appropriate environmental reviews prior to any choice-limiting actions.

Accordingly, the issuance of this notice of funding opportunity is deemed not to be a major Federal action having a significant impact on the human environment.

Concurrences:

OMRI GROSS

Omri Gross
Environmental Clearance Officer, Office of
Community Planning and Development

CHRISTOPHER HARTENAU Digitally signed by CHRISTOPHER HARTENAU
DN: CN = CHRISTOPHER HARTENAU C = US O = U.S. Government OU = Department of Housing and Urban Development Office of General Counsel
Date: 2024.02.27 09:14:18 -05'00'

Christopher H. Hartenau
Environmental Clearance Officer, Office of
General Counsel

KRISTIN FONTENOT Digitally signed by KRISTIN FONTENOT
Date: 2024.02.27 09:24:15 -05'00'

Kristin L. Fontenot
Departmental Environmental Clearance Officer

Approval:

Marion McFadden
Principal Deputy Assistant Secretary for Community Planning and Development



OFFICE OF COMMUNITY PLANNING AND DEVELOPMENT

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON DC  20410-7000

MEMORANDUM FOR:      Marion M. McFadden, Principal Deputy Assistant Secretary, D

THROUGH              Claudia I. Monterrosa, Deputy Assistant Secretary
                     for Grant Programs, D

FROM:                Kimberly Nash, Acting Director,
                     Office of Block Grant Assistance, DGB

SUBJECT:             Environmental Assessment and Finding of No Significant Impact
                     Under the National Environmental Policy Act for the Issuance of a
                     Modification to the FY23 Notice of Funding Opportunity (NOFO)
                     for Preservation and Reinvestment Initiative for Community
                     Enhancement (PRICE) (FR-6700-N-99)

The PRICE NOFO, as modified, sets forth the requirements governing the competitive grant made available through the authorization in the FY23 Consolidated Appropriations Act (Pub. L. No. 117-328, approved December 29, 2022) and the FY24 Consolidated Appropriations Act (Public Law 118-42, approved March 9, 2024). PRICE is a newly authorized component of the larger Community Development Block Grant Program (CDBG), authorized by Title I of the Housing and Community Development Act of 1974 (42 U.S.C. 5301 et seq.), as amended (HCDA).

The PRICE NOFO modifications incorporated $10 million in funding from Public Law 118-24 and included updates to address frequently asked questions, clarifying language, and technical corrections. There were no substantive changes to eligible activities, eligible applicants, or the environmental review procedures in the modified PRICE NOFO.



**Employment Eligibility Verification**
**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-9**
OMB No. 1615-0047
Expires 10/31/2022

**► START HERE: Read instructions carefully before completing this form. The instructions must be available, either in paper or electronically, during completion of this form. Employers are liable for errors in the completion of this form.**

**ANTI-DISCRIMINATION NOTICE:** It is illegal to discriminate against work-authorized individuals. Employers **CANNOT** specify which document(s) an employee may present to establish employment authorization and identity. The refusal to hire or continue to employ an individual because the documentation presented has a future expiration date may also constitute illegal discrimination.

## Section 1. Employee Information and Attestation *(Employees must complete and sign Section 1 of Form I-9 no later than the **first day of employment**, but not before accepting a job offer.)*

| Last Name *(Family Name)* | First Name *(Given Name)* | Middle Initial | Other Last Names Used *(if any)* |
|---|---|---|---|
| **Unknown** | **Unknown** | **N/A** | **N/A** |

| Address *(Street Number and Name)* | Apt. Number | City or Town | State | ZIP Code |
|---|---|---|---|---|
| | | | | |

| Date of Birth *(mm/dd/yyyy)* | U.S. Social Security Number | Employee's E-mail Address | Employee's Telephone Number |
|---|---|---|---|
| __________/________ | | **N/A** | |

**I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.**

**I attest, under penalty of perjury, that I am (check one of the following boxes):**

☐ 1. A citizen of the United States

☐ 2. A noncitizen national of the United States *(See instructions)*

☐ 3. A lawful permanent resident (Alien Registration Number/USCIS Number):

☐ 4. An alien authorized to work until (expiration date, if applicable, mm/dd/yyyy):

Some aliens may write "N/A" in the expiration date field. *(See instructions)*

*Aliens authorized to work must provide only one of the following document numbers to complete Form I-9: An Alien Registration Number/USCIS Number OR Form I-94 Admission Number OR Foreign Passport Number.*

1. Alien Registration Number/USCIS Number:

**OR**

2. Form I-94 Admission Number:

**OR**

3. Foreign Passport Number:

Country of Issuance:

QR Code - Section 1
Do Not Write In This Space

| Signature of Employee | Today's Date *(mm/dd/yyyy)* |
|---|---|
| | |

## Preparer and/or Translator Certification (check one):

☐ I did not use a preparer or translator. ☐ A preparer(s) and/or translator(s) assisted the employee in completing Section 1.

*(Fields below must be completed and signed when preparers and/or translators assist an employee in completing Section 1.)*

**I attest, under penalty of perjury, that I have assisted in the completion of Section 1 of this form and that to the best of my knowledge the information is true and correct.**

| Signature of Preparer or Translator | Today's Date *(mm/dd/yyyy)* |
|---|---|
| | |

| Last Name *(Family Name)* | First Name *(Given Name)* |
|---|---|
| | |

| Address *(Street Number and Name)* | City or Town | State | ZIP Code |
|---|---|---|---|
| | | | |

 *Employer Completes Next Page* 



**Employment Eligibility Verification**
**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-9**
OMB No. 1615-0047
Expires 10/31/2022

## Section 2. Employer or Authorized Representative Review and Verification

*(Employers or their authorized representative must complete and sign Section 2 within 3 business days of the employee's first day of employment. You must physically examine one document from List A OR a combination of one document from List B and one document from List C as listed on the "Lists of Acceptable Documents.")*

| Employee Info from Section 1 | Last Name *(Family Name)* | First Name *(Given Name)* | M.I. | Citizenship/Immigration Status |
|---|---|---|---|---|

| List A<br>Identity and Employment Authorization | OR | List B<br>Identity | AND | List C<br>Employment Authorization |
|---|---|---|---|---|
| Document Title | | Document Title | | Document Title |
| Issuing Authority | | Issuing Authority | | Issuing Authority |
| Document Number | | Document Number | | Document Number |
| Expiration Date *(if any) (mm/dd/yyyy)* | | Expiration Date *(if any) (mm/dd/yyyy)* | | Expiration Date *(if any) (mm/dd/yyyy)* |
| Document Title | | Additional Information | | QR Code - Sections 2 & 3<br>Do Not Write In This Space |
| Issuing Authority | | | | |
| Document Number | | | | |
| Expiration Date *(if any) (mm/dd/yyyy)* | | | | |
| Document Title | | | | |
| Issuing Authority | | | | |
| Document Number | | | | |
| Expiration Date *(if any) (mm/dd/yyyy)* | | | | |

**Certification: I attest, under penalty of perjury, that (1) I have examined the document(s) presented by the above-named employee, (2) the above-listed document(s) appear to be genuine and to relate to the employee named, and (3) to the best of my knowledge the employee is authorized to work in the United States.**

**The employee's first day of employment *(mm/dd/yyyy)*:** **_(See instructions for exemptions)_**

| Signature of Employer or Authorized Representative | Today's Date *(mm/dd/yyyy)* | Title of Employer or Authorized Representative |
|---|---|---|

| Last Name of Employer or Authorized Representative | First Name of Employer or Authorized Representative | Employer's Business or Organization Name |
|---|---|---|

| Employer's Business or Organization Address *(Street Number and Name)* | City or Town | State | ZIP Code |
|---|---|---|---|

## Section 3. Reverification and Rehires *(To be completed and signed by employer or authorized representative.)*

| A. New Name *(if applicable)* | | | B. Date of Rehire *(if applicable)* |
|---|---|---|---|
| Last Name *(Family Name)* | First Name *(Given Name)* | Middle Initial | Date *(mm/dd/yyyy)* |

C. If the employee's previous grant of employment authorization has expired, provide the information for the document or receipt that establishes continuing employment authorization in the space provided below.

| Document Title | Document Number | Expiration Date *(if any) (mm/dd/yyyy)* |
|---|---|---|

**I attest, under penalty of perjury, that to the best of my knowledge, this employee is authorized to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.**

| Signature of Employer or Authorized Representative | Today's Date *(mm/dd/yyyy)* | Name of Employer or Authorized Representative |
|---|---|---|

## LISTS OF ACCEPTABLE DOCUMENTS
## All documents must be UNEXPIRED

Employees may present one selection from List A
or a combination of one selection from List B and one selection from List C

| LIST A<br>Documents that Establish Both Identity and Employment Authorization | OR | LIST B<br>Documents that Establish Identity | AND | LIST C<br>Documents that Establish Employment Authorization |
|---|---|---|---|---|
| 1. U.S. Passport or U.S. Passport Card<br>2. Permanent Resident Card or Alien Registration Receipt Card (Form I-551)<br>3. Foreign passport that contains a temporary I-551 stamp or temporary I-551 printed notation on a machine-readable immigrant visa<br>4. Employment Authorization Document that contains a photograph (Form I-766)<br>5. For a nonimmigrant alien authorized to work for a specific employer because of his or her status:<br>a. Foreign passport; and<br>b. Form I-94 or Form I-94A that has the following:<br>(1) The same name as the passport; and<br>(2) An endorsement of the alien's nonimmigrant status as long as that period of endorsement has not yet expired and the proposed employment is not in conflict with any restrictions or limitations identified on the form.<br>6. Passport from the Federated States of Micronesia (FSM) or the Republic of the Marshall Islands (RMI) with Form I-94 or Form I-94A indicating nonimmigrant admission under the Compact of Free Association Between the United States and the FSM or RMI | | 1. Driver's license or ID card issued by a State or outlying possession of the United States provided it contains a photograph or information such as name, date of birth, gender, height, eye color, and address<br>2. ID card issued by federal, state or local government agencies or entities, provided it contains a photograph or information such as name, date of birth, gender, height, eye color, and address<br>3. School ID card with a photograph<br>4. Voter's registration card<br>5. U.S. Military card or draft record<br>6. Military dependent's ID card<br>7. U.S. Coast Guard Merchant Mariner Card<br>8. Native American tribal document<br>9. Driver's license issued by a Canadian government authority<br>**For persons under age 18 who are unable to present a document listed above:**<br>10. School record or report card<br>11. Clinic, doctor, or hospital record<br>12. Day-care or nursery school record | | 1. A Social Security Account Number card, unless the card includes one of the following restrictions:<br>(1) NOT VALID FOR EMPLOYMENT<br>(2) VALID FOR WORK ONLY WITH INS AUTHORIZATION<br>(3) VALID FOR WORK ONLY WITH DHS AUTHORIZATION<br>2. Certification of report of birth issued by the Department of State (Forms DS-1350, FS-545, FS-240)<br>3. Original or certified copy of birth certificate issued by a State, county, municipal authority, or territory of the United States bearing an official seal<br>4. Native American tribal document<br>5. U.S. Citizen ID Card (Form I-197)<br>6. Identification Card for Use of Resident Citizen in the United States (Form I-179)<br>7. Employment authorization document issued by the Department of Homeland Security |

**Examples of many of these documents appear in the Handbook for Employers (M-274).**

**Refer to the instructions for more information about acceptable receipts.**



AN
ArcGIS Notifications
To You

9:16 AM

You recently requested that ArcGIS send you the username or usernames associated with your email address. Here they are:

Organizational Account : tanishab30
Organization Name : County of Los Angeles Community Hub
Organization Admin Contact(s): LACounty EGIS (egis@isd.lacounty.gov)
Esri Access : enabled

If you are having trouble with a particular Organizational Account, please contact your Organization Admin for that account.

As lead counsel for the CoC Program in District 2, SPA 6, under Supervisor Holly Mitchell's jurisdiction, I envisioned collaboration to demonstrate the power of government, private sector, nonprofit, women of color in leadership and community partnerships. However, my contributions are being disregarded.

 # Gmail - Fw: Participatory Budge

Tanisha Brown <ta

**Fw: Participatory Budget Project – Advisory Committee Workshop #2 TCs 1.20.24**

**tbaconsultingfirm.org** <tbrown@tbaconsultingfirm.org> Mon,
To: "tanishab30@gmail.com" <tanishab30@gmail.com>

---

From: tbaconsultingfirm.org <tbrown@tbaconsultingfirm.org>
Sent: Monday, October 21, 2024 3:10 AM
To: lindsey.horvath@bos.lacounty.gov <lindsey.horvath@bos.lacounty.gov>
Cc: janice.hahn@bos.lacounty.gov <janice.hahn@bos.lacounty.gov>
Subject: Fw: Participatory Budget Project – Advisory Committee Workshop #2 TCs

Good Morning Supervisors Lindsey P. Horvath and Janice Hahn,

My name is Tanisha A. Brown, and I want to express my heartfelt appreciation for tl work both of you are doing in Los Angeles. Your leadership is truly inspiring, and I a to collaborate with you in my role as CEO of Los Angeles! Despite facing numerous I am deeply grateful to be part of REIMAGINE Los Angeles. This initiative is vital for our communities, mental health services, youth development, small job creation, an housing. We are building a more inclusive future, with a special emphasis on suppo who now have the opportunity to dream and live the American Dream. I have attach documents for your reference. I would love the opportunity to meet with you both to we can further these efforts and solve these issues as soon as possible. Thank you advance.

Sincerely,

Tanisha A. Brown
CEO
Communication Products LLC- The Brown Group<https://www.linkedin.com/compai groupla>
Cell- 310.349.9218
[https://media.licdn.com/dms/image/v2/D4E0BAQHJbRTkHfBwOw/company-

logo_200_200/company-logo_200_200/0/1715075784018?e=2147483647&v=beta
dbbHM6YDtlXkNGhj9AaeBoLU2Y15JAJZLbG60]<https://www.linkedin.com/compa
brown-groupla>
The Brown Group | LinkedIn<https://www.linkedin.com/company/the-brown-groupla
The Brown Group | 3 followers on LinkedIn. CREATING SPACES WITH PURPOSE
Development for All. Creating Space for Purpose.
www.linkedin.com

---

From: Tanisha Brown <tbrown@tbaconsultingfirm.org>
Sent: Thursday, February 1, 2024 9:03 PM
To: Martinez, Viridiana <VMartinez@bos.lacounty.gov>
Cc: Gracian, Isela <IGracian@bos.lacounty.gov>; Arlana Brooks <lanab011014@gı
Scott Bales <sbales@cuningham.com>; Nenci Bates <nbates@n-built.com>
Subject: Re: Participatory Budget Project – Advisory Committee Workshop #2 TCs

Unveiling a Vision: Ladera Heights and Florence-Firestone Community Developmer

Hi Viridiana,

I trust this message finds you well. I'm excited to present our comprehensive comm
development proposal for Ladera Heights and Florence-Firestone (please see attac

Only 4% of LA landmarks currently reflect the vibrant tapestry of African American h
culture. However, through Participatory Budgeting, our commitment is resolute – we
to restore and preserve unique histories but also to embrace and celebrate the richi
diversity.

**LADERA HEIGHTS PROJECT**:

- **Objective**: Create a dynamic space that pays homage to the rich history of the

Sincerely,

Tanisha Brown

https://www.ibtimes.com/trauma-informed-design-architecture-promote-economic-g inclusion-3722151

Get Outlook for iOS<https://aka.ms/o0ukef>

---

From: Martinez, Viridiana <VMartinez@bos.lacounty.gov<mailto:VMartinez@bos.la
Sent: Friday, January 19, 2024 12:21:09 PM
To: Tanisha Brown <tbrown@tbaconsultingfirm.org<mailto:tbrown@tbaconsultingfir
Subject: FW: Participatory Budget Project – Advisory Committee Workshop #2 TCs

From: Wright, Stephanie <SWright@bos.lacounty.gov<mailto:SWright@bos.lacount
Sent: Friday, January 19, 2024 12:07 PM
To: Martinez, Viridiana <VMartinez@bos.lacounty.gov<mailto:VMartinez@bos.lacou
Subject: Participatory Budget Project – Advisory Committee Workshop #2 TCs 1.20
Importance: High

Hi Viri – pls print out 2 sets of the attached TCs from your desk printer along with th

Stephanie

## 12 attachments

image001.png
6K View Scan and download

image002.png
7K View Scan and download

image003.png
4K View Scan and download

image004.png
1K View Scan and download

image005.png
2K View Scan and download

image006.png
2K View Scan and download

image007.png
2K View Scan and download

Trauma Informed Design .pdf
6049K View as HTML Scan and download

Recipient-Contact-Form (1).docx
21K View as HTML Scan and download

Support (2).zip
26077K Scan and download

**Vice President Harris, Treasury Department Announce Over $175 Million to Small Businesses as Part of the Biden-Harris Administration's Investing in Agenda _ U.S. Department of the Treasury.pdf**
65K View as HTML Scan and download

Letter .pdf
140K View as HTML Scan and download

If these issues are not addressed promptly, I am prepared to escalate this matter to the Mayor's Office, Congress, and other relevant authorities. I strongly urge the LAHSA team to resolve the platform issues and ensure my inclusion in all future decisions, as my leadership is critical to the success of this initiative.

Please prioritize a resolution and confirm receipt of this email to avoid further setbacks.

**I am requesting an urgent meeting and payment process with Culver City today no later than Monday afternoon.**

Thank you for your immediate attention.

Sincerely,

Tanisha Brown
Lead Counsel- Build Back Better
Designer of the Comprehensive Strategy
**Companies**
The Brown Group Partners
Spruce Communications
SKC Agency
Contact- 747.494.7734

Get Outlook for iOS

**From:** Gracian, Isela <IGracian@bos.lacounty.gov>
**Sent:** Tuesday, December 10, 2024 2:01 PM

# EXHIBIT C



# Direct Deposit Form

Tanisha Brown

CUSTOMER NAME

001

PAY TO THE ORDER OF XXXXXXXXXXXXXXXXX $

XXXXXXXXXXXXXXXXXXXXXXXXX DOLLARS

041215663 — ROUTING NUMBER

1333877777320 — ACCOUNT NUMBER

Banking services provided by [redacted]

AUTHORIZATION

I, Tanisha Brown, authorize Mensch

to directly deposit my wages (less lawful withholdings and deductions), or earnings, as applicable, to my Cash App account, including my final pay upon termination of my employment or engagement.

This authorization replaces any previous direct deposit authorization and shall remain in effect until my employer receives written notification from me of its termination. The information for my Cash App account is provided above.

I wish to deposit ☐ % ☐ $ ☑ Entire paycheck

[signature] 12 / 30 /24

SIGNATURE DATE

Cash App | 1955 Broadway, Suite 600 | Oakland, CA 94612

Questions? Contact support@cash.app

State Farm Insurance

PO Box 2915
Bloomington IL 61702-2915

State Farm

: 24789 E-LOSSRUN
23- 0501-
BUS-MERCANTILE

AT1 023904 3153-05
ATTRACT LLC
5565 CANOGA AVE APT 317
WOODLAND HLS CA 91367-6654

ST-0101-0000

June 3, 2025

Policy number: 92-G4-M674-7 California
Policy type: Retail Sales Policy
Location: 10250 Santa Monica Blvd Ste 1
Los Angeles Ca
90067-6633

Coverage Period: From November 20, 2020 to March 25, 2021

IMPORTANT NOTICE

Our records show that there have been no claims submitted as of May 30, 2025 for the policy years that we provided coverage, up to a maximum of 5 years.

The premium history for this policy is:

| POLICY PERIOD | ANNUAL PREMIUM |
| --- | --- |
| 11-20-2020 | $931 |

THANK YOU FOR CHOOSING STATE FARM. WE APPRECIATE YOUR BUSINESS.

If you have any questions, please call your State Farm agent, Lulu Camberos at (310) 973-5858.

E-LOSSRUN
cc: Lulu Camberos, 0501

# S K C COMMUNICATION PRODUCTS, INC.

Unique Entity ID
**MG3GDFXEKNC5**

CAGE / NCAGE
**0RRD2**

Purpose of Registration
**All Awards**

Registration Status
**Inactive Registration**

Expiration Date
**Mar 2, 2013**

Physical Address
**8320 Hedge Lane TER**
**Shawnee Mission, Kansas 66227-3543**
**United States**

Mailing Address
**8320 Hedge Lane Terrace**
**Shawnee Mission, Kansas 66227-3543**
**United States**

## Business Information

Doing Business as
**(blank)**

Division Name
**(blank)**

Division Number
**(blank)**

Congressional District
**(blank)**

State / Country of Incorporation
**Kansas / United States**

URL
**http://www.skccom.com**

### Registration Dates

Activation Date
**(blank)**

Submission Date
**(blank)**

Initial Registration Date
**Aug 29, 2001**

### Entity Dates

Entity Start Date
**Jun 1, 1986**

Fiscal Year End Close Date
**Dec 31**

### Immediate Owner

CAGE
**(blank)**

Legal Business Name
**(blank)**

### Highest Level Owner

CAGE
**(blank)**

Legal Business Name
**(blank)**

### Executive Compensation

**Registrants in the System for Award Management (SAM) respond to the Executive Compensation questions in accordance with Section 6202 of P.L. 110-252, amending the Federal Funding Accountability and Transparency Act (P.L. 109-282). This information is not displayed in SAM. It is sent to USAspending.gov for display in association with an eligible award. Maintaining an active registration in SAM demonstrates the registrant responded to the questions.**

### Proceedings Questions

**Registrants in the System for Award Management (SAM.gov) respond to proceedings questions in accordance with FAR 52.209-7, FAR 52.209-9, or 2. C.F.R. 200 Appendix XII. Their responses are displayed in the responsibility/qualification section of SAM.gov. Maintaining an active registration in SAM.gov demonstrates the registrant responded to the proceedings questions.**

## Exclusion Summary

Active Exclusions Records?
**No**

## SAM Search Authorization

I authorize my entity's non-sensitive information to be displayed in SAM public search results:
**Yes**

## Entity Types

### Business Types

Entity Structure
**Corporate Entity (Not Tax Exempt)**

Entity Type
**Business or Organization**

Organization Factors
**Subchapter S Corporation**

Profit Structure

Check the registrant's Reps & Certs, if present, under FAR 52.212-3 or FAR 52.219-1 to determine if the entity is an SBA-certified HUBZone small business concern. Additional small business information may be found in the SBA's Dynamic Small Business Search if the entity completed the SBA supplemental pages during registration.

## Financial Information

| Accepts Credit Card Payments | Debt Subject To Offset |
|---|---|
| **Yes** | **No** |
| EFT Indicator | CAGE Code |
| **0000** | **0RRD2** |

## Points of Contact

### Electronic Business

**CARRIE HUMISTON**

**8320 Hedge Lane Terrace**
**Shawnee Mission, Kansas 66227**
**United States**

MELEA MCRAE

8320 Hedge Lane Terrace
Shawnee Mission, Kansas 66227
United States

### Government Business

**DUC PHAM**

**8320 Hedge Lane Terrace**
**Shawnee Mission, Kansas 66227**
**United States**

TODD VINCENT

8320 Hedge Lane Terrace
Shawnee Mission, Kansas 66227
United States

## Service Classifications

### NAICS Codes

| Primary | NAICS Codes | NAICS Title |
|---|---|---|
| | **334310** | **Audio And Video Equipment Manufacturing** |
| | **517911** | **Telecommunications Resellers** |
| | **517919** | **All Other Telecommunications** |
| | **811213** | **Communication Equipment Repair And Maintenance** |

### Product and Service Codes

| PSC | PSC Name |
|---|---|
| **5805** | **Telephone And Telegraph Equipment** |
| **5895** | **Miscellaneous Communication Equipment** |
| **5965** | **Headsets, Handsets, Microphones And Speakers** |
| **T016** | **Photo/Map/Print/Publication- Audio/Visual** |

## Disaster Response

This entity does not appear in the disaster response registry.

Name: Tanisha A. Brown
Address: 5565 Canoga Ave #317
Woodland Hills CA 91367
Phone: 8188257968
Fax:
In Pro Per

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Tanisha A. Brown<br><br>Plaintiff<br><br>v.<br>Jason Oppenheim, The Oppenheim Group, Netflix, Done and Done Productions, and all affiliated entities,<br><br>Defendant(s). | CASE NUMBER:<br><br>TITLE OF PLEADING |

Violation of Federal Civil Rights (42 U.S.C. § 1983)

Violation of Fifth Amendment – Takings Clause

Violation of Fourteenth Amendment – Due Process Clause

Misappropriation of Intellectual Property (ATTRACT™, Reimagine™, Creating Spaces™, Dreamgirl)

Tortious Interference with Contracts and Economic Relations

Unfair Competition / False Designation of Origin (15 U.S.C. § 1125)

Declaratory and Injunctive Relief

I. PARTIES

Plaintiff Tanisha A. Brown is the founder and original creator of federally recognized innovation frameworks, including ATTRACT™, Reimagine™, Creating Spaces™, and Dreamgirl, and serves as a State Point of Contact under Executive Order 12372 overseeing federal funds tied to housing, health care, and community programs.

Defendants include Jason Oppenheim, Brett Oppenheim, The Oppenheim Group, Netflix, Done and Done Productions, Barry Raven, Dreamgirl, Chris Detert, Ryan Detert, Lisa Lafferty, Mary Fitzgerald, Jesse Cretaro, Dinae Stanman, and Does 1– 50, who have unlawfully controlled, misrepresented, and profited from Plaintiffs work and career.

II. JURISDICTION AND VENUE

This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 (civil rights and constitutional claims), and 28 U.S.C. § 1338 (intellectual property claims).

Venue is proper in the Central District of California because a substantial portion of the wrongful acts, business dealings, media activities, and property misappropriations occurred here.

III. FACTUAL ALLEGATIONS

Plaintiff is the original creator and owner of the intellectual property frameworks ATTRACT™, Reimagine™, Creating Spaces™, and Dreamgirl, developed and applied across education, housing, media, and community engagement.

For years, Defendants have unlawfully controlled Plaintiff′ s career, rebranding her work under other names, diverting credit and profit, and erasing Plaintiff from her own story in real estate, media, and federally recognized programs.

Defendants attempted to dissolve Plaintiff′ s company, depriving her of assets, business operations, and professional opportunity. These actions violate her Fifth Amendment rights (Takings Clause) and Fourteenth Amendment rights (Due Process Clause).

Despite repeated formal objections and complaints, no agency or governing body intervened, allowing the unlawful exploitation of Plaintiffs work to continue for years.

I. PARTIES

Plaintiff Tanisha A. Brown is the founder and original creator of federally recognized innovation frameworks, including ATTRACT™, Reimagine™, Creating Spaces™, and Dreamgirl, and serves as a State Point of Contact under Executive Order 12372 overseeing federal funds tied to housing, health care, and community programs.

Defendants include Jason Oppenheim, Brett Oppenheim, The Oppenheim Group, Netflix, Done and Done Productions, Barry Raven, Dreamgirl, Chris Detert, Ryan Detert, Lisa Lafferty, Mary Fitzgerald, Jesse Cretaro, Dinae Stanman, and Does 1– 50, who have unlawfully controlled, misrepresented, and profited from Plaintiffs work and career.

II. JURISDICTION AND VENUE

This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 (civil rights and constitutional claims), and 28 U.S.C. § 1338 (intellectual property claims).

Venue is proper in the Central District of California because a substantial portion of the wrongful acts, business dealings, media activities, and property misappropriations occurred here.

III. FACTUAL ALLEGATIONS

Plaintiff is the original creator and owner of the intellectual property frameworks ATTRACT™, Reimagine™, Creating Spaces™, and Dreamgirl, developed and applied across education, housing, media, and community engagement.

For years, Defendants have unlawfully controlled Plaintiff' s career, rebranding her work under other names, diverting credit and profit, and erasing Plaintiff from her own story in real estate, media, and federally recognized programs.

Defendants attempted to dissolve Plaintiff' s company, depriving her of assets, business operations, and professional opportunity. These actions violate her Fifth Amendment rights (Takings Clause) and Fourteenth Amendment rights (Due Process Clause).

Despite repeated formal objections and complaints, no agency or governing body intervened, allowing the unlawful exploitation of Plaintiffs work to continue for years.



**CITY OF LOS ANGELES**
Office of Finance
P.O. Box 53200
Los Angeles CA 90053-0200

COMMUNICATION PRODUCTS LLC
TBA CONSULTING FIRM

5565 CANOGA AVENUE UNIT #314
WOODLAND HILLS, CA 91367-6654

5565 CANOGA AVENUE UNIT #314
WOODLAND HILLS, CA 91367-6654

Tax-report

THIS CERTIFICATE MUST BE POSTED AT PLACE OF BUSINESS

## CITY OF LOS ANGELES TAX REGISTRATION CERTIFICATE

THIS CERTIFICATE IS GOOD UNTIL SUSPENDED OR CANCELLED

**Business TAX** ISSUED:06/03/2025

| ACCOUNT NO. | FUND/CLASS | DESCRIPTION | STARTED | STATUS |
|---|---|---|---|---|
| 0003350401-0001-8 | L049 | Professions / Occupations | 01/20/2023 | Active |

ISSUED TO

COMMUNICATION PRODUCTS LLC
TBA CONSULTING FIRM

5565 CANOGA AVENUE UNIT #314
WOODLAND HILLS, CA 91367-6654

5565 CANOGA AVENUE UNIT #314
WOODLAND HILLS, CA 91367-6654

ISSUED FOR TAX COMPLIANCE PURPOSES ONLY
NOT A LICENSE, PERMIT, OR LAND USE AUTHORIZATION

ISSUED BY:

CITY TREASURER
DIRECTOR OF FINANCE

"No registration certificate or permit issued under the provisions of the Business Tax ordinances of the LAMC, or the payment of any tax required under the provisions of the Business Tax ordinances of the LAMC shall be construed as authorizing the conduct or continuance of any illegal business or of a legal business in an illegal manner."

NOTIFY THE OFFICE OF FINANCE IN WRITING OF ANY CHANGE IN OWNERSHIP OR ADDRESS- Office of Finance P.O. Box 53200 Los Angeles CA 90053-0200

IMPORTANT – READ REVERSE SIDE

**PLEASE READ ALL INFORMATION CAREFULLY**

Sections 21.08(b) / 21.7.6(4) Los Angeles Municipal Code
"This business tax registration certificate (and/or) Transient Occupancy Registration Certificate signifies that the person named on the face hereof has fulfilled the requirements of Article 1 of Chapter II of the Los Angeles Municipal Code (and/or) the Uniform Transient Occupancy Tax Ordinance, by registering with the Director of Finance for the purpose of paying business tax for the classification of business for which this certificate is issued (and/or) collecting from transients the Transient Occupancy Tax and remitting said tax to the Director of Finance. This certificate does not authorize the person to conduct any unlawful business or to conduct any lawful business in an illegal (or) unlawful manner or to conduct within the City of Los Angeles the business for which this certificate has been issued, nor to operate a hotel, without strictly complying with all the provisions of the ordinances of said City (or) all local applicable laws, including but not limited to those requiring a permit from any board, commission, department or office of the City. **THIS BUSINESS TAX REGISTRATION CERTIFICATE (AND/OR) CERTIFICATE DOES NOT CONSTITUTE A PERMIT.** Any failure to comply with the requirements of Article 1 of Chapter II of the Los Angeles Municipal Code shall constitute grounds for suspension of this certificate."

This certificate is void upon any change of ownership or location. Annual taxes are due and payable January 1st each year and delinquent if not paid on or before the last day of February each year. Quarterly taxes are due and payable on the first day of January, April, July, and October of each year, and delinquent if not paid on or before the last day of the month due.

STATE BOARD OF EQUALIZATION NOTICE

Sales or use tax may apply to your business activities. You may seek written advice regarding the application of tax to your particular business by writing to the nearest State Board of Equalization office.

# RMS ALTERNATIVE FORM

Reference: 2827678

*Completed applications should be emailed to* Finance.RMS@lacity.org or mailed to City of Los Angeles, Office of Finance/Enforcement Division P.O. Box 53234, Los Angeles, CA 90053-0234.

Upon review of your response, you will be removed from the database or contacted for further information.

*Please print or type:*
**Legal Name:** ____________________
Do not use DBA (fictitious name) here

**Mailing Address:** ____________________
Street Address City State Zip Code

Please select why you are not completing the Business Tax Application AB63, and write the required information in the space below:

- ❑ I have already registered with the City this year - *provide your Account Number below*

____________________

- ❑ I am not subject to City business tax- *see the* ***back of this notice*** *and indicate the reason why you are not subject to the tax.*

____________________

- ❑ I only operate a business outside of Los Angeles - *provide that business address below*

____________________

- ❑ I am an employee of a company, and not self-employed, an independent contractor, or a business owner - *please write the name of your employer below, and complete this form*

https://finance.lacity.gov/sites/g/files/wph1721/files/2023-01/AB63%20Employee%20Certification%202023%20%281%29.pdf

____________________

- ❑ I do not fall into any of these categories - *explain your circumstances below*

____________________
____________________

**I declare, under penalty under the laws of the State of California, that to the best of my knowledge the foregoing is true, correct, and complete.**

Signature ____________________ Date __________

Title ____________________

Daytime Telephone Number __________ Email Address __________

## List of Businesses Not Subject to City Business Tax

This list is not exhaustive, please visit finance.lacity.gov/other-exemptions for a list of businesses not subject to City business tax. These types of businesses do not need to register for a business tax certificate, but must complete the AB63 Alternative Form:

- Childcare provider for less than 8 children
- 501C3 Non-Profit Business – please visit the following link and follow the filing instructions: https://finance.lacity.gov/non-profit-charitable-or-religious-organization-exemptions
- Notary Public
- Rents 3 or fewer residential units
- Real Estate Agent
- Religious leaders in their religious capacity
- Residential care facility for the elderly, which serves six or fewer residents
- Licensed bail bond agents/companies
- Financial institutions

**Non-financial information pertaining to your City of Los Angeles tax and permit records are subject to public disclosure under provisions of the California Public Records Act, Government Code Section 6250 et seq. If you engaged in a home-based business, your residential information is also subject to public disclosure if that location is utilized for business purposes.**

**Van Nuys Civic Center Hours - Open by Appointment Only**
https://kiosk.na1.qless.com/kiosk/app/home/100100000108
6262 Van Nuys Blvd., Suite 110
Monday 8:00 AM - 4:00 PM
Tuesday 8:00 AM - 4:00 PM
Wednesday 9:00 AM - 11:30 AM
Thursday 8:00 AM - 11:30 AM
Friday: Closed
*Closed daily 11:30am-12:30pm
**Please note that office locations do not have phone operators.

**Hours for City Hall Rm 101 - Open by Appointment Only**
https://kiosk.na1.qless.com/kiosk/app/home/100100000097
200 N. Spring St. Room 101
Monday 8:00 AM - 4:00 PM
Tuesday 8:00 AM - 4:00 PM
Wednesday 9:00 AM - 11:30 AM
Thursday 8:00 AM - 11:30 AM
Friday: Closed
*Closed daily 11:30am-12:30pm
(Note: Use Main Street Entrance)
**Please note that office locations do not have phone operators.

**Customer Service Center: (844) 663-4411**
**Effective Monday, June 05, 2023 phone hours:**
**Monday through Thursday: 9:00 a.m. to 3:00 p.m.**
**Friday: 9:00 a.m. to 2:00 p.m.**

For additional information on business registration, police and fire permits, choosing a location, hiring employees, and more, please visit the L.A. Business Portal website at:

https://business.lacity.gov

**BUSINESS TAX APPLICATION – RMS** **RMS Ref #: 2827678**

2 8 2 7 6 7 8

*Completed applications should be emailed to* Finance.RMS@lacity.org or mailed to City of Los Angeles, Office of Finance/Enforcement Division P.O. Box 53234, Los Angeles, CA 90053-0234.

**Business Type** (check one): ☐ Individual ☐ Partnership ☐ LLC ☐ Corporation ☐ Trust

*Please print or type:*

**Legal Name:** ______________________________

Do not use DBA (fictitious name) here

**Social Security No. (SSN)** - OR - **Federal Employer Identification No. (FEIN):** ______________

(NOTE: SSN/FEIN is confidential and not part of any public record)

**Business Address:** ______________________________

Do not use P.O. Box here Street Address City State Zip Code

Please check appropriate box ☐ Commercial Location ☐ Residence

**Business Name (DBA):** ______________________________

**Care Of (C/O):** ______________________________

**Mailing Address:**

______________________________

If different from Business Address Street Address or P.O. Box City State Zip Code

**Description of Business:** ______________________________

(Provide in Detail) ______________________________

**LA Starting Date of Business:** Month ____________ Day ____________ Year ________

**LA Ending Date of Business (if applicable):** Month ____________ Day ________ Year ________

**Gross Receipts*:**

Business activity**/Date activity started

Calendar Year Gross Receipts:

| 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| ______ | ______ | ______ | ______ | ______ | ______ | ______ | ______ |

**Please Note: A minimum business tax may be due based on your business activity(ies) for the first year of operation.**

*If your business is located within the City of Los Angeles and a portion of your gross revenue is derived from outside the City, or your business is located outside the City and a portion of your gross revenue is derived from inside the City, then applicable apportionment formulas may reduce your tax liability.

** For specific activities and rates, contact the Office of Finance or visit our website (www.finance.lacity.gov).

**I declare, under penalty under the laws of the State of California, that to the best of my knowledge the foregoing is true, correct and complete.**

Signature ______________________________ Date ______________

Title ______________________________

Daytime Telephone Number ______________ Email Address ______________

# CITY OF LOS ANGELES

CALIFORNIA

OFFICE OF FINANCE
ENFORCEMENT DIVISION
P.O. BOX 53234
LOS ANGELES, CA 90053-0234

Finance.RMS@lacity.org

KAREN BASS
MAYOR

DIANA MANGIOGLU
DIRECTOR OF FINANCE
CITY TREASURER

****************AUTO**5-DIGIT 91367 38
COMMUNICATION PRODUCTS LLC 7146
5565 CANOGA AVE APT 317
WOODLAND HILLS, CA 91367-6654

**May 22, 2025**

**RMS Ref #: 2827678**

Re: **City of Los Angeles Business Tax**

The City of Los Angeles is conducting an ongoing program to ensure that individuals and/or companies engaged in business are in compliance with Section 21 (Business Tax) of the Los Angeles Municipal Code. Based on information received from the California Secretary of State's office, it appears you may be engaged in business within the City of Los Angeles.

Our records indicate that you or your company do not have a valid Business Tax Registration Certificate (BTRC) and may be out of compliance with L.A.M.C. Section 21. You must register with the City by reporting all business-related activity between 2017 and 2024 on the included application. If you have already registered or believe you are not subject to this requirement, complete and return the attached RMS Alternative Form. Failure to respond to this notification within **20 business days** may result in further enforcement action, including a tax assessment based on estimated receipts.

**Please take one of the following actions in order to avoid a tax assessment:**

| To register and to be eligible for exemptions for future reporting periods ⇓ | If you believe you are not subject to the City of Los Angeles Business Tax ⇓ |
|---|---|
| 1. Complete the attached "Business Tax Application RMS" | 1. Complete the attached "RMS Alternative Form" |
| 2. Scan or take a picture of the completed "Business Tax Application RMS" | 2. Scan or take a picture of the completed "RMS Alternative Form" and submit it for review |
| 3. Email it to **Finance.RMS@lacity.org** | 3. Email it to **Finance.RMS@lacity.org** |
| 4. You will be registered with the City of Los Angeles | 4. Our records will be updated upon review of your response |

For any questions regarding this notice, please visit http://finance.lacity.gov/faq/rms-tax-discovery-faq or email Finance.RMS@lacity.org. You may mail your response to the City of Los Angeles, Office of Finance, Enforcement Division – RMS Unit, P.O. Box 53234, Los Angeles, CA 90053-0234. Thank you in advance for registering your business with the City of Los Angeles.

Diana Mangioglu
City Treasurer and Director of Finance
City of Los Angeles Office of Finance

County Of Los Angeles

Department of Audit Controller

Direct Deposit Authorization Form

SubmittedDate: 11/24/2022 11:07 PM

213-974-4196
213-974-4810.
~~213-974-8301~~ or
~~213-974-0320~~
747-288-7347 TB.

## VENDOR INFORMATION

| | |
|---|---|
| Vendor Number (Code): | 208139 |
| Payee Name: | COMMUNICATION PRODUCTS LLC |
| Social Security#/Taxpayer Identification#: | ***-**-5605 |
| Direct Deposit Notification Email Address:: | tbrown@tbaconsultingfirm.org |

## BANKING INFORMATION

| | |
|---|---|
| Type of Account : | Checking |
| Bank Account Number: | 7148617587 |
| Bank Routing Number: | 256074974 |
| Financial Institution Name: | NAVY FCU |

## CERTIFICATIONS

I hereby confirm and certify my authority, as an authorized signer of the above-referenced payee ("payee"), to agree to the following terms and authorizations, and to issue these instructions to credit and/or debit payee's bank account on behalf of the payee:

The County of Los Angeles (County), Department of Auditor-Controller (Department), and its agents, are authorized to direct deposit all entitled payments associated with the payment address(es) provided on this form to the above-referenced bank account. The Department is authorized to initiate (if necessary) debit entries or adjustments (1) that were made in error, (2) of an incorrect amount, or (3) that were duplicates of a correct payment.

This authorization will remain in effect until five business days after a written cancellation request is received by the Department. The Department is also authorized, in its sole discretion, to issue a warrant in place of a direct deposit at any time.

Payee authorizes the County to update my payment contact information on file with the email address provided on this form.

Payee understands that if payee's bank account is closed without providing the Department at least five business days written notice, payments to the payee may be delayed. Payee understands that it is the payee's responsibility to update payee's direct deposit and bank account information when changes are made to payee's payment address (es). Payee understands that he/she will receive remittance information via the email address that is provided on this form; or, payee may access the County's Vendor Self Service website to retrieve information about payment(s).

| | |
|---|---|
| Authorized Signer's Name: | Tanisha Brown |
| Authorized Signer's Title: | President |
| Authorized Signer's Phone Number/Ext: | (310)349-9218 |
| Authorized Signer's Email Address: | tbrown@tbaconsultingfirm.org |
| Confirmation Number: | 0FVMBK |

☑ I authorize this request for direct deposit.

## ATTACHMENTS

Total: 1

## DIRECT DEPOSIT PAYMENT OPTION SELECTED

1. 22287 MULHOLLAND HWY, CALABASAS, CA, 91302-5157

State Farm Insurance
PO Box 2915
Bloomington IL 61702-2915

State Farm

30905 E-LOSSRUN
23- 0501-
WORKERS COMP

AT1 029692 3153-05
ATTRACT LLC
5565 CANOGA AVE APT 317
WOODLAND HLS CA 91367-6654

ST-0101-0000

May 28, 2025

Policy number: 92-J0-F496-7 California
Policy type: Workers Compensation Policy
Location: 395 Santa Monica Blvd
Santa Monica Ca
90401-0000

Coverage Period: From June 24, 2021 to July 24, 2021

IMPORTANT NOTICE

Our records show that there have been no claims submitted as of May 23, 2025 for the policy years that we provided coverage, up to a maximum of 5 years.

The premium history for this policy is:

| POLICY PERIOD | ANNUAL PREMIUM |
|---|---|
| 06-24-2021 | $1,873 |

THANK YOU FOR CHOOSING STATE FARM. WE APPRECIATE YOUR BUSINESS.

If you have any questions, please call your State Farm agent, Lulu Camberos at (310) 973-5858.

E-LOSSRUN
cc: Lulu Camberos, 0501

IRS Department of the Treasury Internal Revenue Service

CINCINNATI OH 45999-0038

038259.660906.438618.25661 1 AB 0.593 852

ATTRACT
TANISHA BROWN SOLE MBR
5565 CANOGA AVE UNIT 317
WOODLAND HILLS CA 91367

038259

CUT OUT AND RETURN THE VOUCHER AT THE BOTTOM OF THIS PAGE IF YOU ARE MAKING A PAYMENT.

The IRS address must appear in the window. 0244510816

BODCD-

Use for payments

Letter Number: LTR0147C
Letter Date : 2025-04-03
Tax Period : 000000

INTERNAL REVENUE SERVICE

OGDEN UT 84201-0102

ATTRACT
TANISHA BROWN SOLE MBR
5565 CANOGA AVE UNIT 317
WOODLAND HILLS CA 91367

853231231 LT ATTR 00 2 000000 670 00000000000

IRS Department of the Treasury Internal Revenue Service

CINCINNATI OH 45999-0038

038256.660906.438618.25661 1 AB 0.593 852

TANISHA BROWN
BROWN GROUP
5565 CANOGA AVE APT 317
WOODLAND HLS CA 91367-6654

038256

CUT OUT AND RETURN THE VOUCHER AT THE BOTTOM OF THIS PAGE IF YOU ARE MAKING A PAYMENT.

The IRS address must appear in the window.
0244510816
BODCD-

Use for payments
Letter Number: LTR0147C
Letter Date : 2025-04-03
Tax Period : 000000

INTERNAL REVENUE SERVICE
OGDEN UT 84201-0102

TANISHA BROWN
BROWN GROUP
5565 CANOGA AVE APT 317
WOODLAND HLS CA 91367-6654

922159882 FO BROW 00 2 000000 670 00000000000

 CINCINNATI OH 45999-0038

038258.660906.438618.25661 1 AB 0.593 852

COMMUNICATION PRODUCTS LLC
TANISHA BROWN SOLE MBR
5565 CANOGA AVE APT 317
WOODLAND HLS CA 91367-6654

038258

CUT OUT AND RETURN THE VOUCHER AT THE BOTTOM OF THIS PAGE IF YOU ARE MAKING A PAYMENT.

The IRS address must appear in the window.
0244510816
BODCD-

Use for payments
Letter Number: LTR0147C
Letter Date : 2025-04-03
Tax Period : 000000

INTERNAL REVENUE SERVICE
OGDEN UT 84201-0102

COMMUNICATION PRODUCTS LLC
TANISHA BROWN SOLE MBR
5565 CANOGA AVE APT 317
WOODLAND HLS CA 91367-6654

884035605 XQ COMM 00 2 000000 670 00000000000

IRS Department of the Treasury Internal Revenue Service

CINCINNATI OH 45999-0038

038257.660906.438618.25661 1 AB 0.593 852

BROWN AGENCY
TANISHA BROWN SOLE MBR
5565 CANOGA AVE APT 317
WOODLAND HLS CA 91367

038257

CUT OUT AND RETURN THE VOUCHER AT THE BOTTOM OF THIS PAGE IF YOU ARE MAKING A PAYMENT.

The IRS address must appear in the window.
0244510816
BODCD-

Use for payments
Letter Number: LTR0147C
Letter Date : 2025-04-03
Tax Period : 000000

INTERNAL REVENUE SERVICE
OGDEN UT 84201-0102

BROWN AGENCY
TANISHA BROWN SOLE MBR
5565 CANOGA AVE APT 317
WOODLAND HLS CA 91367

884267668 XR BROW 00 2 000000 670 00000000000



CINCINNATI OH 45999-0038

038255.660906.438618.25661 1 AB 0.593 852

LEE & BROWN PROPERTIES
MURLYNN LEE MBR
5565 CANOGA AVE APT 317
WOODLAND HLS CA 91367

038255

CUT OUT AND RETURN THE VOUCHER AT THE BOTTOM OF THIS PAGE IF YOU ARE MAKING A PAYMENT.

The IRS address must appear in the window.
0244510816
BODCD-

Use for payments
Letter Number: LTR0147C
Letter Date : 2025-04-03
Tax Period : 000000

INTERNAL REVENUE SERVICE

OGDEN UT 84201-0102

LEE & BROWN PROPERTIES
MURLYNN LEE MBR
5565 CANOGA AVE APT 317
WOODLAND HLS CA 91367

923542603 AC LEE& 00 2 000000 670 00000000000

# EXHIBIT E

FILED
CLERK, U.S. DISTRICT COURT
October 22, 2019
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

IN THE MATTER OF

APPOINTMENT OF COUNSEL AND ACCESS TO SEALED DOCUMENTS IN CRIMINAL CASES POTENTIALLY AFFECTED BY THE FIRST STEP ACT

GENERAL ORDER NO. 19-11

On December 21, 2018, the First Step Act of 2018 (FSA) was enacted. Section 603 of the Act may provide certain defendants previously sentenced in this Court with grounds to seek sentence reductions under 18 U.S.C. § 3582(c)(1)(A).

Pursuant to 18 U.S.C. § 3006A(a)(1) and (c), and because of the need to efficiently process petitions under Section 3582(c)(1)(A) as amended by Section 603 of the FSA, IT IS HEREBY ORDERED that the Federal Public Defender for the Central District of California is appointed to represent any defendant who was previously determined to have been entitled to appointment of counsel, or who is now entitled to the appointment of counsel, to evaluate whether that defendant may qualify for a sentence reduction under Section 3582(c)(1)(A) as amended by Section 603 of the FSA, and to present any motions relating thereto to the Court for disposition.

If the Federal Public Defender's Office (FPDO) or previously appointed counsel believes there is a conflict that would prevent the FPDO from assuming appointment



IRS is canceling its layoff plans, will ask some it fired or pushed out to return

[SPONSORED] Redefined virtualization through a streamlined approach

# Timeline: What We Know About the OPM Breach (UPDATED)

OPM Director Katherine Archuleta testifies on Capitol Hill in Washington, Tuesday, June 16, 2015. CLIFF OWEN/AP

By ALIYA STERNSTEIN AND JACK MOORE // JUNE 17, 2015

A recent hearing yielded new details about how hackers were able to make off with data on millions of current and former federal employees.

   

Updated June 26

After no fewer than five congressional hearings and countless hours of testimony from government officials, we're learning more about the massive breach of sensitive government files at the Office of Personnel Management.

We've learned hackers first breached the Office of Personnel Management's networks in late 2013, months before the earlier timeline laid out by officials. Although that intrusion is not believed to have led to the loss of personally identifiable information, it's now believed hackers made off with IT system manuals that, officials say, could have provided a blueprint of sorts into OPM's networks and laid the groundwork for future hacks.

The timeline below, first published June 17, has been extensively updated and revised. The timeline provides the key events leading up to the disclosure of the OPM mega-hack earlier this month including when intruders first breached government and contractors networks


A month later, officials say hackers first breach two contractors involved in conducting background investigations of national security workers: USIS and KeyPoint Government Solutions. The USIS intrusion may go back even further. Andy Ozment, a top DHS cyber official, told a Senate committee June 25 the malicious activity on USIS networks dates back to April 2013. Intruders had access to both contractors' systems for months before being detected.

**March 2014 -- OPM First Detects Malicious Activity**

OPM officials first become aware of malicious activity on its networks. Intruders didn't access PII, but they did make off with blueprints to OPM's networks. The breach is not disclosed to the public. U.S. officials later tell reporters the attempt was thwarted, because they could not identify the loss of any personally identifiable information.

**May 2014 -- OPM Gives USIS a Clean Bill of Health; Separate OPM Security Clearance Hack Begins**

In May, OPM IT security personnel conducted a regular security review of USIS systems. The company's information security systems "met or exceeded the requirements imposed by government customers," according to cyber forensics firm Stroz Friedberg, which was retained by USIS.

Meanwhile, government investigators now say in May 2014, hackers breached a second OPM system holding information on federal employees' background checks and other security clearance information. The breach would go undetected for nearly a year.

**June 2014 -- Contractor Notifies Government of Breach**

USIS first detects the breach of its networks (dating back to December 2013) and notifies OPM in early June. The information is not made public. In congressional testimony this year, OPM officials said the attempted breach of OPM networks and that of USIS happened around the same time.

**July 9, 2014 -- *NY Times* First Reveals Attempted OPM Hack**

*The New York Times* publicly reveal for the first time the OPM intrusion detected by the agency in March. The article, "Chinese Hackers Pursue Key Data on U.S. Workers," is published July 9, 2014.

OPM sent an email to federal workers later that day. "Due to the constant monitoring systems in place at DHS and OPM, we were alerted to a potential intrusion of our network in mid-March," according to the note, which was obtained and published by *The Washington Post*. OPM officials said there were no indications any employee information had been breached. Later, however, officials told Congress the hackers stole manuals describing agency IT systems.

**August 6, 2014 -- USIS Acknowledges Breach; DHS Investigates KeyPoint Breach**

Multiple media reports reveal the USIS hack for the first time. In a statement, the company says the attack "has all the markings of a state-sponsored attack." Officials initially said the USIS breach appeared unrelated to the March 2014 attempted intrusion at OPM. Some 27,000 Department of Homeland Security employees were believed to be affected. The number later rises to more than 31,000 and includes employees at the National Geospatial-Intelligence Agency, Immigration and Customs Enforcement and the U.S. Capitol Police. OPM suspends work with USIS and later decides not to renew its contracts with the company.

Officials from the U.S. Computer Emergency Readiness Team scan networks at both USIS and KeyPoint Government Solutions. Officials detect what have been characterized as two separate breaches at KeyPoint.

One breach is estimated to affect as many 390,000 current and former DHS employees, contractors and even job applicants, who may have had their personal information exposed. It's unclear when the hackers first entered KeyPoint systems, and this breach is not disclosed


Malicious activity in OPM systems maintained in an Interior Department shared-services data centers begins. The activity is not detected until April of the following year. This is the beginning of the breach of more than 4.2 million federal employees' personnel files.

**December 2014 -- OPM Alerts Employees about One of the KeyPoint Breaches**

On Dec. 18, OPM alerts more than 48,000 federal employees about the potential exposure of personal information related to one of the KeyPoint breaches. OPM officials said there wasn't conclusive evidence that hackers had made off with personally identifiable information.

**April 2015 -- OPM Detects Hack of Personnel Files**

At some point in April, OPM officials detected the cyber intrusion of personnel files stored at the Interior Department, now believed to have begun in October. The discovery came as the agency made cybersecurity improvements, officials said. OPM officials contacted DHS and the FBI. In early May, OPM learned employees' personal records had in fact been exfiltrated from government systems.

On April 22, government officials testified before the House Oversight and Government Reform Committee about the 2014 USIS hack. OPM CIO Donna Seymour acknowledged both USIS and OPM were attacked by hackers around the same time in March 2014, but OPM thwarted the attack and was able to "put mitigations in place to better protect the information," she testified.

**May 2015 -- OPM Learns Background Check Data At Risk**

In early May, an incident response team made up of DHS, the FBI and others inform OPM employees' personal records, stored in an Interior Department shared-services data center, had in fact been exfiltrated from government systems starting in December.

Later, the investigation revealed additional systems covering background investigation data on current, former and prospective federal employees had also been breached.

**June 4, 2015 -- OPM Announces Massive Breach of Personnel Files**

OPM publicly announces data breach of personnel data systems affecting as many as 4.2 million current and former federal employees. Some officials say those estimates undercount the true scope of the attack.

**June 12, 2015 -- OPM Confirms Related Breach of Background Check Files**

Officials confirm a second OPM breach snared security clearance files of current, former and prospective federal employees. The data included "SF-86" forms, containing intimate details on their contacts, families and themselves. The number of people affected by the second intrusion remains unclear, officials said.

**June 16, 2015 -- OPM Blames Lax Security on Outdated Technology**

OPM officials face a grilling at a House Oversight and Government Reform Committee hearing. OPM Director Katherine Archuleta said employees' Social Security numbers stored by OPM were not encrypted because it couldn't be done feasibly with the agency's antiquated systems.

Unconfirmed estimates of those affected by the data breach grew to as many as 14 million, though officials at the hearing declined to provide updated estimates and answers in open session about whether the data included information on military service members or intelligence community employees.

**June 23, 2015 -- OPM Says Hackers Used Contractor Credential**


NEXTGOV/FCW

erators must be held accountable for AI's use in conflicts, Air Force secretary saysWhy NIST is prioritizing creating a dictionary of AI development

ictures tech shop to center on the CIOHow a push to the cloud helped a Ukrainian bank keep faith with customers amid warThe people problem behind the government's AI ambitic

OR CONTENT
...wering a resilient
How geospatial
innovation is reinventing
energy security

a resilient future: How geospatial innovation is reinventing energy security

# Passwords Aren't the Problem. You Are.

KPATYHKA/SHUTTERSTOCK.COM

By MATT PHILLIPS // Quartz // JUNE 17, 2015

It's abundantly clear that we are living in an era of profound data insecurity.

   

When you start your first day at Quartz, you get peppered with passwords.



I had that in mind, as I helped a new hire settle in on Monday. So, I urged him—repeatedly—to take a moment and sign-up for a password client that I had used to help me beat my own long-standing struggle with password amnesia: LastPass. For months, the service, which essentially creates an encrypted vault of all your passwords and protects it with a master password, had made my life much better.

Until Tuesday morning. That's when I received an opened an from LastPass indicating that the service had been compromised, and that some sensitive information—including email addresses, password reminders—had been taken. For its part, LastPass says its "vaults" where users keep their passwords to various sites and applications were not compromised.

"So no data stored in your vault is at risk," officials said. But I still had to explain this to the guy I had convinced to use it less than 24 hours before.

A recent survey commissioned by Telesign—a company that sells two-step verification technology—found that roughly 70% of 2,000 people in the UK and US they surveyed don't trust that their password will protect them. They shouldn't. After all, it's abundantly clear that we are living in an era of profound data insecurity.

I mean, Russian hackers read President Obama's unclassified email. And just to review, over the last few months alone we've learned that hackers have breached not only the White House, the but the IRS and the Federal government's office of personnel management, where they perused—among other things—the form people fill out as they apply for security clearances.

What's more, today we learned that the FBI is investigating front office officials from the St. Louis Cardinals in connection with hacking into the Houston Astros' "baseball operations database." The New York Times reports:

> Investigators believe Cardinals officials, concerned that [former Cardinals executive, and current Astros general manager Jeff] Luhnow had taken their idea[s] and proprietary baseball information to the Astros, examined a master list of passwords used by Mr. Luhnow and the other officials who had joined the Astros when they worked for the Cardinals. The Cardinals officials are believed to have used those passwords to gain access to the Astros' network, law enforcement officials said.

There's a reason why hackers—whether they be associated Red China or the St. Louis red birds—aim for passwords. Long ago, we reached the human limits of our ability to remember them. The human mind has pretty strict limitations on remembering long sequences numbers and letters. (Essentially it's about seven items, plus or minus two.) And they're best remembered when they're in familiar chunks, you know, like letters in words. This is why consumers have an average of 24 online accounts, but only about six unique passwords, according to the Telesign study.

In other words, passwords aren't the problem. We are.

NEXTGOV/FCW

all these people.

(*Image via kpatyhka/ Shutterstock.com*)

Share This:

NEXT STORY: Dot-govs Score Points for Protecting Privacy but Poor Email Authentication Remains An Issue

erators must be held accountable for AI's use in conflicts, Air Force secretary saysWhy NIST is prioritizing creating a dictionary of AI development

ictures tech shop to center on the CIOHow a push to the cloud helped a Ukrainian bank keep faith with customers amid warThe people problem behind the government's AI ambitio

...ring a resilient
...OR CONTENT How geospatial
...nnovation is reinventing
...nergy security

a resilient future: How geospatial innovation is reinventing energy security

**Request for Approval under the "Generic Clearance for Improving Customer Experience: OMB Circular A-11, Section 280 Implementation"**
**(OMB Control Number: 0690-0035)**

**TITLE OF INFORMATION COLLECTION:** The Opportunity Project Impact Project

**PURPOSE OF COLLECTION:**
*What are you hoping to learn / improve? How do you plan to use what you learn? Are there artifacts (user personas, journey maps, digital roadmaps, summary of customer insights to inform service improvements, performance dashboards) the data from this collection will feed?*

Over the past seven years, The Opportunity Project (TOP) has catalyzed the development of over 200 digital products, ranging from apps to data visualizations to toolkits. TOP has engaged over 30 federal agencies and 1500 stakeholders from outside of government, including tech companies, nonprofits, universities, think tanks, and many others. TOP participants have leveraged over 350 open datasets to build their products. In total, the federal government and sprint participants have invested millions of dollars into TOP, which makes it imperative to comprehensively document the outcomes of this program.

Our current goal is to investigate the impact of the TOP products that have been created over the past seven years. We seek to create robust documentation of all TOP products, showcase standout success stories that have come out of TOP, identify the broader results stemming from TOP products, and highlight the impact of TOP on the Census Bureau and the federal government more broadly. We would like to summarize these findings in a report.

**TYPE OF ACTIVITY:** (Check one)

[ ] Customer Research (Interview, Focus Groups, Surveys)
[ x ] Customer Feedback Survey
[ ] Usability Testing of Products or Services

**ACTIVITY DETAILS**

1. If this is a survey, will the results of this survey be reported to Touchpoints as part of quarterly reporting obligations specified in OMB Circular A-11 Section 280?
   [ ] Yes
   [x ] No
   [ ] Not a survey

2. How will you collect the information? (Check all that apply)

[ x] Web-based or other forms of Social Media
[ ] Telephone
[ ] In-person
[ ] Mail
[ ] Other, Explain

3. Who will you collect the information from?
*Explain who will be interviewed and why the group is appropriate for the Federal program / service to connect with. Please provide a description of how you plan to identify your potential group of respondents and if only a sample will be solicited for feedback, how you will select them(e.g., anyone who provided an email address to a call center rep, a representative sample of Veterans who received outpatient services in May 2019, do you have a list of customers to reach out to (e.g., a CRM database that has the contact information, intercept interviews at a particular field office?)*

We will collect information from participants of The Opportunity Project program since 2016. We will focus on those who have participated as a tech team, but will also collect information from sprint leaders (government, nonprofit, or local government) as well as those who have been a part of The Opportunity Project network.

4. How will you ask a respondent to provide this information?
*(e.g., after an application is submitted online, the final screen will present the opportunity to provide feedback by presenting a link to a feedback form / an actual feedback form)*

We will collect feedback digitally using an online survey form sent out by email.

5. What will the activity look like?
*Describe the information collection activity - e.g. what happens when a person agrees to participate? Will facilitators or interviewers be used? What's the format of the interview/focus group? If a survey, describe the overall survey layout/length/other details? If User Testing, what actions will you observe / how will you have respondents interact with a product you need feedback on?*

A web-based written survey consisting of short-answer and long-answer form will be utilized to collect information from our respondents

**Request for Approval under the "Generic Clearance for Improving Customer Experience: OMB Circular A-11, Section 280 Implementation"**
**(OMB Control Number: 0690-0035)**

**TITLE OF INFORMATION COLLECTION:** The Opportunity Project Impact Project

**PURPOSE OF COLLECTION:**
*What are you hoping to learn / improve? How do you plan to use what you learn? Are there artifacts (user personas, journey maps, digital roadmaps, summary of customer insights to inform service improvements, performance dashboards) the data from this collection will feed?*

Over the past seven years, The Opportunity Project (TOP) has catalyzed the development of over 200 digital products, ranging from apps to data visualizations to toolkits. TOP has engaged over 30 federal agencies and 1500 stakeholders from outside of government, including tech companies, nonprofits, universities, think tanks, and many others. TOP participants have leveraged over 350 open datasets to build their products. In total, the federal government and sprint participants have invested millions of dollars into TOP, which makes it imperative to comprehensively document the outcomes of this program.

Our current goal is to investigate the impact of the TOP products that have been created over the past seven years. We seek to create robust documentation of all TOP products, showcase standout success stories that have come out of TOP, identify the broader results stemming from TOP products, and highlight the impact of TOP on the Census Bureau and the federal government more broadly. We would like to summarize these findings in a report.

**TYPE OF ACTIVITY:** (Check one)

[ ] Customer Research (Interview, Focus Groups, Surveys)
[ x ] Customer Feedback Survey
[ ] Usability Testing of Products or Services

**ACTIVITY DETAILS**

1. If this is a survey, will the results of this survey be reported to Touchpoints as part of quarterly reporting obligations specified in OMB Circular A-11 Section 280?
   [ ] Yes
   [x ] No
   [ ] Not a survey

6. Please provide your question list.
*Paste here the questions or prompts presented to participants in your activity. If you have an interview / facilitator guide, that can be attached to the submission and referenced here.*

*We will conduct two surveys - one for respondents whose digital products created in TOP sprints are still live, and one for respondents whose products appear to no longer be live and available for use. Please see the attached Word document for more information.*

**Please make sure that all instruments, instructions, and scripts are submitted with the request.**
XXX

7. When will the activity happen?
*Describe the time frame or number of events that will occur (e.g., We will conduct focus groups on May 13,14,15, We plan to conduct customer intercept interviews over the course of the Summer at the field offices identified in response to #2 based on scheduling logistics concluding by Sept. 10th, or "This survey will remain on our website in alignment with the timing of the overall clearance.")*

We plan to send out the online surveys as soon as possible in FY24.

8. Is an incentive (e.g., money or reimbursement of expenses, token of appreciation) provided to participants?
[ ] Yes [ x ] No
If Yes, describe:

XXX

**BURDEN HOURS**

| Category of Respondent | No. of Respondents | Participation Time | Burden Hours |
|---|---|---|---|
| Private Sector | 250 | 20 min | 83.3 |
| | | | |
| Totals | | | |

**CERTIFICATION:**

I certify the following to be true:

1. The collections are voluntary;
2. The collections are low-burden for respondents (based on considerations of total burden hours or burden-hours per respondent) and are low-cost for both the respondents and the Federal Government;
3. The collections are non-controversial;
4. Any collection is targeted to the solicitation of opinions from respondents who have experience with the program or may have experience with the program in the near future;
5. Personally identifiable information (PII) is collected only to the extent necessary and is not retained;
6. Information gathered is intended to be used for general service improvement and program management purposes
7. The agency will follow the procedures specified in OMB Circular A-11 Section 280 for the required quarterly reporting to OMB of trust data and experience driver data from surveys.
8. Outside of the quarterly reporting mentioned in the bullet immediately above, if the agency intends to release journey maps, user personas, reports, or other data-related summaries stemming from this collection, the agency must include appropriate caveats around those summaries, noting that conclusions should not be generalized beyond the sample, considering the sample size and response rates. The agency must submit the data summary itself (e.g., the report) and the caveat language mentioned above to OMB before it releases them outside the agency. OMB will engage in a passback process with the agency.

Name and email address of person who developed this survey/focus group/interview:

**Name:** Dominica Zhu

**Email address:** dominica.zhu@census.gov

**All instruments used to collect information must include:**
**OMB Control No. 0690-0035**
**Expiration Date: 12/31/2026**

FORM CD-450
(REV. 10/18)

U.S. DEPARTMENT OF COMMERCE

# FINANCIAL ASSISTANCE AWARD

☑ GRANT ☐ COOPERATIVE AGREEMENT

| | |
|---|---|
| RECIPIENT NAME<br>Tanisha A. Brown | FEDERAL AWARD ID NUMBER |
| STREET ADDRESS<br>5565 Canoga Ave # 317 | PERIOD OF PERFORMANCE |
| CITY, STATE, ZIP CODE<br>Woodland Hills CA | FEDERAL SHARE OF COST<br>$ |
| AUTHORITY<br>Lead Counsel | RECIPIENT SHARE OF COST<br>$ |
| | TOTAL ESTIMATED COST<br>$ |

CFDA NO. AND NAME

PROJECT TITLE

**This Award Document (Form CD-450) signed by the Grants Officer constitutes an obligation of Federal funding. By signing this Form CD-450, the Recipient agrees to comply with the Award provisions checked below and attached. Upon acceptance by the Recipient, the Form CD-450 must be signed by an authorized representative of the Recipient and returned to the Grants Officer. If not signed and returned without modification by the Recipient within 30 days of receipt, the Grants Officer may unilaterally withdraw this Award offer and de-obligate the funds.**

- ☐ DEPARTMENT OF COMMERCE FINANCIAL ASSISTANCE STANDARD TERMS AND CONDITIONS (31 March 2017)
- ☐ R & D AWARD
- ☐ FEDERAL-WIDE RESEARCH TERMS AND CONDITIONS, AS ADOPTED BY THE DEPT. OF COMMERCE
- ☐ SPECIFIC AWARD CONDITIONS
- ☐ LINE ITEM BUDGET
- ☐ 2 CFR PART 200, UNIFORM ADMINISTRATIVE REQUIREMENTS, COST PRINCIPLES, AND AUDIT REQUIREMENTS, AS ADOPTED PURSUANT TO 2 CFR § 1327.101
- ☐ 48 CFR PART 31, CONTRACT COST PRINCIPLES AND PROCEDURES
- ☐ MULTI-YEAR AWARD. PLEASE SEE THE MULTI-YEAR SPECIFIC AWARD CONDITION.
- ☑ OTHER(S):

13 CFR Chapter III (EDA Regulations), January 2015

EDA Standard Terms & Conditions for Construction Projects (March 2021)

Summary of EDA Construction Standards (July 2018)

| | |
|---|---|
| SIGNATURE OF DEPARTMENT OF COMMERCE GRANTS OFFICER | DATE |
| PRINTED NAME, PRINTED TITLE, AND SIGNATURE OF AUTHORIZED RECIPIENT OFFICIAL | DATE |

CALIFORNIA UNEMPLOYMENT
INSURANCE APPEALS BOARD

Thomas S Pavone
Administrative Law Judge

# NOTICE OF HEARING

Case No. **6540189**

TANISHA A BROWN
Claimant-Appellant

LOVIN ENTERPRISES
c/o ADP UNEMPLOYMENT GRP/TALX
Account No: 295-8589
Employer

EDD: 8530

**HEARING TIME and PLACE**

**DATE:** **Wednesday, May 20, 2020**
**TIME:** **10:15 AM (California Time)**

**INSTRUCTIONS**
**Claimant: Appear by Phone** - Call Toll Free 1-(866) 294-3851
**Employer: Appear by Phone** - Call Toll Free 1-(866) 294-3851
**EDD**: Appear in person at the location below

**PLACE:** **TELEPHONE HEARING**
**CA**

**IF YOU WISH TO PARTICIPATE IN THIS HEARING, YOU MUST CALL THE NUMBER ABOVE 15 MINUTES BEFORE THE TIME SPECIFIED.**

---

* Any additional documents must be received by the Office of Appeals at the address shown on the attached page **by 05/13/2020**. If you miss this deadline, the judge may exclude your documents.
* If an interpreter or reasonable accommodation for a disability is needed, call the phone number below immediately. Si necesita un intèrprete llame el numero de telefono abajo inmediatamente.
* If you are appearing in person, bring all witnesses necessary to support your case. Arrive 15 minutes early to review the appeal file.
* If you are appearing by phone and have witnesses, contact the Office of Appeals for instructions.
* The hearing room is in a secured facility. You may be screened.
* **IMPORTANT: Read the enclosed 'Hearing Information' pamphlet.**

---

**THE FOLLOWING ISSUES WILL BE CONSIDERED AT THE HEARING** (Section references are to the Unemployment Insurance Code unless otherwise noted):

1257(a) Did the claimant wilfully make a false statement or wilfully fail to report a material fact in order to obtain benefits.

**Direct questions to:**

OXNARD OFFICE OF APPEALS
Telephone: (805) 485-5389
Fax: (805) 981-8350

Date Mailed: 05/06/2020

SS
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

To Whom This May Concern,

I am writing this letter to appeal the decision by the State Labor Department of California to disqualify me from receiving unemployment benefits. I received my disqualification notice on March 27, 2020. A copy of my notice is attached to this letter. I respectfully protest the results of my unemployment disqualification.

I have been dismissed from my job and denied unemployment benefits. The reason given is because my supervisor reported I worked on non-related Dreamgirl projects by using my work computer. My former supervisor accused me of advising, Marissa (my direct report) to work on non-related Dreamgirl items for me during work hours. When working on non-related items using Dreamgirl's computer, this was during my own personal time - my break or during my required 1-hour lunch break. There are employees who would use this time to browse the web, shop or watch the news, etc. During my break times, I chose to write and work on things freeing my mind from the stresses brought upon by my job. Although Marissa is a Dreamgirl employee, she is also a freelance graphic designer and inquired if there were any projects she could assist me in. She was advised these projects were not to be done on during work hours and to be done at home. I was not aware that she completed any "freelance" work during office hours which I should not be held responsible.

My employment at Dreamgirl was the most stressful time of my life. This stress affected my well-being as well as my relationships with friends and family. However, during my time at Dreamgirl I accomplished the following:

**- Successfully introduced digital media platform by launching a B2C website and creating video content for Dreamgirl product distribution channels**

**- Improved overall product and sales of Dreamgirl Lingerie, Costume and Wig product channels by 50% within one year**

**- Renegotiated print media contracts resulting in savings of more than $200,000**

**- Grew Dreamgirl's Instagram fan base from 14,000 to 146,000**

With this being said, I wore many hats which caused much anxiety. In my role, I was responsible for Packaging and Distribution which included over 300 styles and SKU's a task for which I was never trained, yet I was not allowed ANY mistakes. Any errors resulted in write-ups and placed in my employee file. I feel that this treatment was unfair. Not only did I oversee the Marketing Department which consisted of 1 graphic designer and 2 freelance employees, I was also required to do Accounting which included all budgets for Dreamgirl trade shows, forecast and comparisons - which was not part of my job description nor was required of my predecessors. There were numerous times I asked for help, but I was denied and was accused of not being qualified or capable of completing my job. I have spoken with two Marketing Director's who held my position previously and I was informed that they were allowed an assistant as well as 4 additional employees in the marketing department and the workload was still unmanageable. Therefore, I feel as though I was being set up for failure from the beginning. I was never given the tools in order to perform my job, nor was I ever trained in order to know and understand what was expected. I was always seen as unorganized, was written up and blamed for all mishaps.

To summarize why I feel being denied for unemployment benefits is unfair, I felt as though I was treated with a different level of respect than my peers. Not only did I deal with the stress and

 

unorganized structure of a business but I also had to tolerate verbal abuse as well as being spoken down to - possibly due to my gender and my race. The CEO would always second guess my abilities and treated me as a peon although I did hold a position as head of my department. My level of respect was never equal to those that were white or of the men who worked for the company. I was constantly disrespected by Barry Raven (CEO and President) and I have attached a few emails to prove the abusive language which was the basis for my anxiety and feelings of inadequacy. Not only did the prior Marketing Director sue the company based on racism and disrespect in the workplace but also other employees throughout the years has sued Dreamgirl based on these circumstances as well.

Based on 20 years of experience in corporate America, I have never been dismissed from any position. This should say a lot about my character as well as work ethic as a valued employee.

Thank you for your consideration,

Tanisha Brown

5-7

**PERSONNEL DEPARTMENT**
**CITY OF LOS ANGELES**
**APPLICATION INSTRUCTIONS**

A. If not completing the fillable on-line version of this application, please fill out this application carefully in ink. All questions must be answered completely and accurately, except items 13 - 16 (which are voluntary) or items 9 - 11 (which are completed only if specified in the job announcement). You may be disqualified for any false statement or for omitting information. We suggest you keep a copy of each application you submit.

B. **ACCEPTANCE - Applicants who fail to submit all required information will not be considered for employment. All applications are accepted on a tentative basis subject to a later review of your employment history. If you do not meet the minimum job requirements or your work record is not acceptable, you will not be considered for employment.**

C. VERIFICATION - The information submitted on your application is subject to verification. Applicants or new employees will be fingerprinted and disqualification may result from factors considered during review (i.e. work history and/or criminal history).

D. SOCIAL SECURITY NUMBER (items 3 & 28) - Federal law (P.L. 93-579, Section 7) requires that you be informed when asked for your Social Security Number that this number must be provided and that it will be used for identification purposes in the City's examination, employment and payroll processes. Our authority for requesting and requiring this information is based upon certain provisions of the Internal Revenue Code, the Social Security Act as amended, and payroll and candidate application processing system procedures approved and implemented prior to June, 1984.

E. RIGHT TO WORK (items 11, 12) - City jobs which require United States Citizenship are identified on the examination announcement. All applicants not currently employed by the City will be required to show proof of United States citizenship or the legal right to work in the United States within three business days of hire. Failure to comply with the requirements of the Immigration Reform and Control Act of 1986 within the time prescribed by the Act may result in termination.

F. DISABILITY (items 15 and 16) - If you have a physical, mental or learning disability which may affect your ability to take the examination for which you are applying, please call our staff at (213) 473-9163, (TDD) (213) 473-9312. Special testing accommodations may be arranged if verification of the disability is provided from a doctor, rehabilitation counselor or other authority. You will be contacted to make specific arrangements. Under provision of Title I of the Americans with Disabilities Act, this information is obtained only to arrange accommodations.

G. EDUCATION AND EXPERIENCE (items 31, 32, 33, 34, & 35) - You must list a complete record of your training and experience. If more space is needed, attach additional sheets. Read the requirements section of the Job Announcement carefully for any special application instructions for that job title. City employees must list the specific Department for which they have worked and show their civil service class titles.

H. SIGNATURE (item 36) - This application must be signed (not printed) BY THE APPLICANT.

**INSTRUCCIONES EN ESPAÑOL AL REVERSO**

Applications may be filed online at: per.lacity.org

Form PDR-1 (Rev. 07/2018)

# APPLICATION FOR EMPLOYMENT

**CITY OF LOS ANGELES**
**PERSONNEL DEPARTMENT**
**AN EQUAL EMPLOYMENT OPPORTUNITY EMPLOYER**

**THIS PORTION OF THE APPLICATION IS NOT AVAILABLE TO AN INTERVIEW BOARD**

1. CITY JOB (EXAMINATION) TITLE: Public Information Director
2. CLASS CODE NO.:
3. SOCIAL SECURITY NUMBER (See Instruction G): 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
4. TYPE OF EXAMINATION (See Instruction B): [X] OPEN [ ] PROMOTIONAL

PREFERRED CONTACT METHOD: US MAIL [ ] E-MAIL [X]

5. NAME: LAST: Brown FIRST: Tanisha MIDDLE: A
6. PRESENT MAILING ADDRESS: NUMBER STREET APARTMENT: 5565 Canoga Ave #317
CITY STATE ZIP CODE: Woodland Hills CA 91367

6a. HOME PHONE – Area & Number: (310) 3499218
6b. WORK PHONE – Area & Number: ( )
7. E-MAIL ADDRESS:

8. P.O. BOX NUMBER CITY:
8a. STATE ZIP CODE:

9. DRIVER'S LICENSE NUMBER: D3176144 STATE: CA EXPIRATION DATE: 11/30/2027

10. COMPLETE ONLY WHEN THE EXAMINATION ANNOUNCEMENT STATES AN AGE REQUIREMENT BIRTHDATE MO. 11 DAY 30 YR. 1983

MARK ONLY WHEN REQUIRED BY THE JOB BULLETIN

11. ARE YOU A UNITED STATES CITIZEN? [X] YES [ ] NO

12. YOU WILL BE REQUIRED TO SUBMIT VERIFICATION OF THE LEGAL RIGHT TO WORK IN THE UNITED STATES WITHIN THREE (3) BUSINESS DAYS BEGINNING WITH YOUR FIRST DAY OF WORK. IN ACCORDANCE WITH THE IMMIGRATION REFORM AND CONTROL ACT OF 1986, WE ARE LEGALLY PROHIBITED FROM EMPLOYING ANYONE WHO CANNOT PROVIDE SUCH VERIFICATION.

RESEARCH AND SPECIAL DATA. The City of Los Angeles is an Equal Employment Opportunity Employer. We request **voluntary** identification of your gender and ethnic/racial group and/or disability so that we can monitor the effectiveness of our Equal Employment Opportunity program. Completing sections 13, 14, 15 and 16 will not affect your employment.

13. WITH WHICH GENDER DO YOU MOST IDENTIFY: [ ] Male [X] Female [ ] Non-Binary

14. ETHNIC GROUP/RACE
- [X] African American (1)
- [ ] Native American (5)
- [ ] Hispanic (2)
- [ ] Native Hawaiian or Pacific Islander (6)
- [ ] Asian (3)
- [ ] Two or More Races (7)
- [ ] Caucasian (4)

Reasonable Accommodations:
City examinations may include written tests, interviews, physical abilities tests or other processes. Reasonable accommodation will be provided to applicants who need assistance to participate in the selection process. Please review the Selection Process of the Job Bulletin for the types of tests included in this examination.

15. Do you need a reasonable accommodation to participate in the selection process? YES [ ] NO [X]

16a. If Yes, please describe the desired accommodation: ____________

16.b Have you ever been granted an accommodation for a previous City examination? YES [ ] NO [X]

You will be contacted by telephone or by mail regarding your request for reasonable accommodation. If you have not previously done so, you will be required to provide written verification from an appropriate professional confirming your disability and appropriate accommodation. Verification forms may be obtained at the Personnel Dept. or by calling 213-473-9163.

17. RECRUITMENT RESEARCH: FOR OPEN CANDIDATES, PLEASE INDICATE WHERE YOU LEARNED ABOUT THIS JOB. CHECK ONE OR WRITE ANSWER:

- [X] NOTIFICATION CARD (A)
- [ ] FRIEND OR RELATIVE (B)
- [X] CITY BULLETIN BOARD (C)
- [ ] CITY EMPLOYEE (D)
- [ ] NEWSPAPER AD (E)
- [ ] CAREER DAY/JOB FAIR (F)
- [ ] 24-HOUR JOBLINE (G)
- [ ] CHANNEL 35 CITY VIEW (H)
- [ ] PERSONNEL DEPT. SATELLITE OFFICE (I)
- [ ] INTERNET (J) - PLEASE LIST WEBSITE: ____________
- [ ] OTHER ____________

**Applicants – Do not use the space below – For Personnel Department Use Only**

STAFF | DATE

J K L M N O P Q R S T

a b c d e f g h i j k

Dis. testing Acc. Requested [ ] YES [ ] NO

STAFF | DATE

APPL. APPROVED | MIL. CREDIT

**Test Location** A B C D E F

Does applicant fall within 6 month lacking clause [ ] YES [ ] NO

When will applicant meet full requirements? Date:

U ____________
V ____________
W ____________

continue on page 2

THIS PAGE OF THE APPLICATION IS NOT AVAILABLE TO AN INTERVIEW BOARD

18. May the Personnel Department contact **YOUR PAST EMPLOYERS** for references?
If YES, then read the following statements and sign your name on the line below. I authorize the City of Los Angeles Personnel Department to obtain employment information from any previous employer. A photostatic copy of this authorization will be considered to be as valid as the original.

☐ Yes ☐ No

Signature ______________ Date: ______________

May the Personnel Department contact **YOUR PRESENT EMPLOYER** for references?
If **YES**, then read the following statements and sign your name on the line below: I authorize the City of Los Angeles Personnel Department to obtain employment information from my current employer. A photostatic copy of this authorization will be considered to be as valid as the original.

☐ Yes ☐ No

Signature ______________ Date: ______________

19. Have you previously worked for the City of Los Angeles? If "yes", and you are not currently employed by the City, please complete the following:

☐ Yes ☐ No

FROM/TO: ______________ Department/Class Title: ______________

FROM/TO: ______________ Department/Class Title: ______________

20. Have you passed any examination given by the City of Los Angeles in the last two years?

☐ Yes ☒ No

If "yes", list examination titles and dates passed: ______________

21. Have you ever been fired or asked to resign in order to avoid being fired from a job?

☐ Yes ☒ No

If "yes", please complete the following (List all cases except layoffs for lack of work. Attach additional sheet if necessary). (NOTE-**Promotional applicants** must list all **probationary terminations** while employed by the City but are not required to list terminations occurring prior to original City appointment if employed by the City for at least one year.):

Employer's Name and Address ______________

Date and reason for discharge ______________

22. List names used in the past, including names used in other records:

23. U.S. Military Service. To receive military service credit of 5 points, allowed by City Charter Section 1006, veterans must have served on active duty in one of the periods authorized by the Personnel Department and have been released from active duty within the previous 5 years, or present evidence of a military service connected disability. **To receive such credit you must present proof of your honorable discharge and dates of active duty and/or proof of a military service connected disability along with your application to: Personnel Department, Employment Services Section, Room 100, 700 E. Temple Street, Los Angeles, CA 90012, at the time of filing.** This proof must be shown each time you file an application. Military credit is allowed only in open examinations.

APPLICANTS – DO NOT DETACH THIS PAGE

continue on page 3

24. CITY JOB (EXAMINATION) TITLE

Public Information Director

25. CLASS CODE NUMBER

26. TYPE OF EXAMINATION

(Same as Page 1, Space 4)

[X] OPEN [ ] PROMOTIONAL [ ] STATUS [ ] SPECIAL

27. PLEASE PRINT NAME – Last, First, Middle

Brown Tanisha A

28. SOCIAL SECURITY NUMBER

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

HIGH SCHOOL EDUCATION:

29a. DID YOU GRADUATE FROM HIGH SCHOOL OR PASS THE GED TEST?

[X] YES [ ] NO (Answer 31b)

29b. IF UNDER 18 YEARS OF AGE, CAN YOU PROVIDE A WORK PERMIT OR A GED CERTIFICATE AFTER AN EMPLOYMENT OFFER IS MADE?

[ ] YES [ ] NO

30. SPECIAL TESTING INFORMATION IF REQUIRED IN THE EXAMINATION ANNOUNCEMENT INSTRUCTIONS:

31. ADDITIONAL EDUCATION **ENTER REQUESTED INFORMATION IN ALL COLUMNS**

| NAME AND LOCATION OF UNIVERSITIES COLLEGES OR TRADE SCHOOLS ATTENDED | COMPLETION DATES | UNITS COMPLETED SEMESTER | UNITS COMPLETED QUARTER | MAJOR SUBJECT OR COURSE | UNITS COMPLETED IN MAJOR | TITLE OF DEGREE/ CERTIFICATE RECEIVED |
|---|---|---|---|---|---|---|
| University of California Riverside | 2001-2005 | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

32. SPECIAL COURSES REQUIRED FOR THIS EXAMINATION:

| Course Name: | Units Completed Semester | Units Completed Quarter | Name of School | Date Completed: |
|---|---|---|---|---|
| | | | | |

(Attach additional sheet if necessary)

33. SPECIAL LICENSES REQUIRED FOR THIS EXAMINATION:

| LICENSES: | DATE ISSUED | ISSUING AGENCY: | EXPIRATION DATE: |
|---|---|---|---|
| | | | |

34. LANGUAGE PROFICIENCY (OTHER THAN ENGLISH: INDICATE SPOKEN AND/OR WRITTEN). COMPLETE ONLY WHEN STATED ON EXAMINATION ANNOUNCEMENT.

MARK ONLY WHEN REQUIRED BY THE JOB BULLETIN.

35. SUPPLEMENTAL INFORMATION

APPLICANTS – DO NOT DETACH THIS PAGE

**Read and complete below – Complete work experience on page 4**

The following statements are general conditions for employment. This application does not constitute an offer for employment, merely the opportunity to compete for the position. Your application is subject to review and may be rejected at any time if shown that you do not meet the qualifications specified in the bulletin for the position for which you are applying. Please read and initial the following three statements, and sign and date the application in Box 36. You **must** answer the work experience section on PAGE 4 for your application to be considered complete.

As a condition of employment for a safety-sensitive position, I may be required to undergo a drug and alcohol abuse screening test prior to appointment and I must meet background and medical standards as well. TAB ________ Initial Here

I also understand that this application, supplements and attachments become the property of the City of Los Angeles Personnel Department. No copies of these documents shall be made available to or provided to me until the entire examination is complete. TAB ________ Initial Here

I acknowledge my responsibility to comply with any court-ordered child support obligations and understand that as an employee of the City of Los Angeles, my name and any other pertinent information requested will be provided to the LA County District Attorney to assist in enforcement activities. TAB ________ Initial here

I certify that all statements on this application form and attachments are true and complete to the best of my knowledge. I understand that false, misleading or incomplete information shall be sufficient cause for disqualification or dismissal and other penalties as may be prescribed by law.

36. SIGNATURE (Original in ink; pencil or photocopy not accepted.)

DATE

PERFORMANCE (Do not use until instructed to do so)

COMPLETE THE WORK EXPERIENCE SECTION ON PAGE 4

INTERVIEW (Do not use until instructed to do so)

continue on page 4

39. WORK EXPERIENCE: **BEGIN WITH YOUR MOST RECENT JOB - LIST EACH JOB SEPARATELY.** List all jobs regardless of duration, including part-time jobs, military service and any periods of unemployment during the last ten years. Also, list volunteer experience and jobs held more than ten years ago which relate to the job for which you are applying. **City employees must use the correct civil service class title.** If you have no work experience, indicate NONE. Please Note: Incomplete information will delay the processing of your application.

| DATES | EMPLOYERS | DUTIES |
|---|---|---|
| MONTH AND YEAR: FROM April 2017 TO Feb 2019<br>TOTAL MOS. WORKED 24 / HRS. PER WEEK 12<br>PAID POSITION? YES: ☑ NO: ☐ | NAME OF CURRENT OR LAST EMPLOYER: DG Brands<br>ADDRESS (OR CITY DEPARTMENT): 5548 Lindbergh Ln<br>CITY, STATE AND ZIP CODE: Bell CA 90201<br>IMMEDIATE SUPERVISOR'S NAME: Lisa Dixon | YOUR TITLE Director of Marketing<br>DUTIES PERFORMED<br>• Create marketing strategies to increase engagement and brand awareness.<br>• Developed and planned all marketing and communication aspect of the DG brand.<br>• Developed a timeline and worked with the venue as a freelancer to support management.<br>• Created and managed all social channels which included print nd digal media.<br>• Wrote all public relation assets from press releases to media kits.<br>REASON FOR LEAVING better opportunity |
| MONTH AND YEAR: FROM Feb 2014 TO May 2018<br>TOTAL MOS. WORKED 40 / HRS. PER WEEK 8<br>PAID POSITION? YES: ☑ NO: ☐ | NAME OF CURRENT OR LAST EMPLOYER: SAGE Publishing<br>ADDRESS (OR CITY DEPARTMENT): 2455 Teller Rd<br>CITY, STATE AND ZIP CODE: Thousand Oaks, CA 91320<br>IMMEDIATE SUPERVISOR'S NAME: Nicole Smith | YOUR TITLE Email Producer<br>DUTIES PERFORMED<br>• Coded, created and deployed over 60 marketing emails.<br>• Created all euscationa material for student programming.<br>• Organized all marketing seminars to discuss key inititives to help improve business.<br>• Developed A/B Testing to decide which campaigns performed better and increaded ROI.<br>REASON FOR LEAVING |
| MONTH AND YEAR: FROM Feb 2014 TO Feb 2018<br>TOTAL MOS. WORKED 36 / HRS. PER WEEK 14<br>PAID POSITION? YES: ☑ NO: ☐ | NAME OF CURRENT OR LAST EMPLOYER: ATTRACT MEDIA<br>ADDRESS (OR CITY DEPARTMENT): 5565 Canoga Ave #317<br>CITY, STATE AND ZIP CODE: Woodland Hills CA 91367<br>IMMEDIATE SUPERVISOR'S NAME: Self-Employed | YOUR TITLE Freelance Publishing Editor<br>DUTIES PERFORMED<br>• Established editorial and print budgets.<br>• Reviewed all proposals for the magazine and content creation.<br>• Reviewed all article submissions and hired freelance writers and designers.<br>• Planned all articles and research news and relevant topics.<br>• Worked with all print vendors for production and events.<br>REASON FOR LEAVING |
| MONTH AND YEAR: FROM May 2012 TO Dec 2014<br>TOTAL MOS. WORKED 11 / HRS. PER WEEK 8<br>PAID POSITION? YES: ☑ NO: ☐ | NAME OF CURRENT OR LAST EMPLOYER: Univision<br>ADDRESS (OR CITY DEPARTMENT): 5999 Center Dr.<br>CITY, STATE AND ZIP CODE: Los Angeles CA 90045<br>IMMEDIATE SUPERVISOR'S NAME: Carolina Fernandez | YOUR TITLE Project Coordinator<br>DUTIES PERFORMED<br>• Provided relevant data to review which campaigns performed the best.<br>• Applied SEO and CMS tools daily to verify key words and headlines.<br>•Monitored expenses for Univision promotions and special projects.<br>REASON FOR LEAVING |
| MONTH AND YEAR: FROM Jan 2004 TO Oct 2011<br>TOTAL MOS. WORKED 24 / HRS. PER WEEK 8<br>PAID POSITION? YES: ☑ NO: ☐ | NAME OF CURRENT OR LAST EMPLOYER: Rudy Rivas<br>ADDRESS (OR CITY DEPARTMENT): 831 S. Douglas St<br>CITY, STATE AND ZIP CODE: El Segundo CA 90045<br>IMMEDIATE SUPERVISOR'S NAME: | YOUR TITLE National Magazine Editor<br>DUTIES PERFORMED<br>• Managed artist and booked talent for shows<br>• Rebrand the look of the magazine by hiring new talent, freelancers and new partnerships.<br>• Write and edit articles for blog and print magazine.<br>REASON FOR LEAVING |
| MONTH AND YEAR: FROM TO<br>TOTAL MOS. WORKED / HRS. PER WEEK<br>PAID POSITION? YES: ☐ NO: ☐ | NAME OF CURRENT OR LAST EMPLOYER:<br>ADDRESS (OR CITY DEPARTMENT):<br>CITY, STATE AND ZIP CODE:<br>IMMEDIATE SUPERVISOR'S NAME: | YOUR TITLE<br>DUTIES PERFORMED<br>REASON FOR LEAVING |
| MONTH AND YEAR: FROM TO<br>TOTAL MOS. WORKED / HRS. PER WEEK<br>PAID POSITION? YES: ☐ NO: ☐ | NAME OF CURRENT OR LAST EMPLOYER:<br>ADDRESS (OR CITY DEPARTMENT):<br>CITY, STATE AND ZIP CODE:<br>IMMEDIATE SUPERVISOR'S NAME: | YOUR TITLE<br>DUTIES PERFORMED<br>REASON FOR LEAVING |

APPLICANTS – DO NOT DETACH THIS PAGE

**IF MORE SPACE IS NEEDED ATTACH ADDITIONAL SHEETS**

BEFORE THE WORKERS' COMPENSATION APPEALS BOARD

OF THE STATE OF CALIFORNIA

| | |
|---|---|
| TANISHA BROWN, Applicant, vs. ADP TOTAL SOURCE INC/LOVIN ENTERPRISES INC and AMERICAN HOME ASSURANCE COMPANY BY HELMSMAN MANAGEMENT SERVICES, LLC INSURING ADP TOTALSOURCE INC/LOVIN ENTERPRISES INC Defendants. | No. ADJ16867343 |

DEPOSITION BY ZOOM OF TANISHA A. BROWN, the applicant herein, noticed by LAW OFFICES OF BRADFORD & BARTHEL, LLP, appeared remotely before me, at 2:06 p.m., Monday, March 6, 2022, before Lisbeth K. Munoz, CSR 13106.

Job Number 958652

# Thank you!

Division of Workers' Compensation - Workers' compensation court public information search

## Case detail information

| EAMS case number | Case location | Date of injury | Assigned judge | Archived |
|---|---|---|---|---|
| ADJ16867343 | VNO-ADJ | 05/01/2018 - 02/01/2020 | TROY SLATEN | |

| Injured worker first name | Injured worker last name | Employer |
|---|---|---|
| TANISHA | BROWN | ADP TOTAL SOURCE INC LOVIN ENTERPRISES INC |
| | | ADP TOTAL SOURCE INC LOVING ENTERPRISES INC |
| | | LOVIN' ENTERPRISES, INC |

| | |
|---|---|
| Body Part 1 | 840 NERVOUS SYSTEM - NOT SPECIFIED |
| Body Part 2 | 841 NERVOUS SYSTEM - STRESS |
| Body Part 3 | 842 NERVOUS SYSTEM - PSYCHIATRIC/PSYCH |

| Participant name | Role | Address |
|---|---|---|
| ADP TOTAL SOURCE INC LOVIN ENTERPRISES INC | EMPLOYER | 5548 LINDBERGH LN BELL CA 90201 |
| ADP TOTAL SOURCE INC LOVING ENTERPRISES INC | EMPLOYER | 5548 LINDBERGH LC BELL CA 90201 |
| AIG CLAIMS COSTA MESA | CLAIMS ADMINISTRATOR | PO BOX 25977 SHAWNEE MISSION KS 66225 |
| BRADFORD BARTHEL WOODLAND HILLS | LAW FIRM | PO BOX 348450 SACRAMENTO CA 95834 |
| GB AND C LOS ANGELES | LAW FIRM | 3440 WILSHIRE BLVD STE 1207 LOS ANGELES CA 90010 |
| HELMSMAN MANAGEMENT ROCKLIN | CLAIMS ADMINISTRATOR | PO BOX 779008 ROCKLIN CA 95677 |
| LAW SIDE LOS ANGELES | LAW FIRM | 8605 SANTA MONICA BLVD STE 92394 LOS ANGELES CA 9006 |
| LOVIN' ENTERPRISES, INC | EMPLOYER | 5548 LINDBERGH LANE BELL CA 90201 |
| METRO HEALTHCARE MEDICAL CRP LOS ANGELES | LIEN CLAIMANT | 3440 WILSHIRE BLVD STE 1207 LOS ANGELES CA 90010 |

New Search | Previous

--

Best,

Azul Arellano

SEC Form 4

**FORM 4**

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden | |
| hours per response: | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934 or Section 30(h) of the Investment Company Act of 1940

1. Name and Address of Reporting Person*
Carino Tanisha
(Last) (First) (Middle)
C/O ALEXION PHARMACEUTICALS, INC
121 SEAPORT BOULEVARD
(Street)
BOSTON MA 02210
(City) (State) (Zip)

2. Issuer Name and Ticker or Trading Symbol
ALEXION PHARMACEUTICALS, INC. [ ALXN ]

3. Date of Earliest Transaction (Month/Day/Year)
12/02/2020

4. If Amendment, Date of Original Filed (Month/Day/Year)

5. Relationship of Reporting Person(s) to Issuer (Check all applicable)
Director — 10% Owner
X Officer (give title below) — Other (specify below)
EVP & CCAO

6. Individual or Joint/Group Filing (Check Applicable Line)
X Form filed by One Reporting Person
Form filed by More than One Reporting Person

## Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock, par value $.0001 per share | 12/02/2020 | | F | | 665[1] | D | $121.76 | 17,632 | D | |
| Common Stock, par value $.0001 per share | 12/03/2020 | | S | | 1,530[2] | D | $122.26 | 16,102 | D | |

## Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

1. This sale was made to cover withholding taxes immediately following the vesting of previously granted Restricted Stock Units.

2. This sale was made pursuant to the terms of a sales plan designed to meet the requirements of Rule 10b5-1(c)(1) of the Securities Exchange Act.

**Remarks:**

/s/ Douglas Barry, Attorney-in-Fact for Tanisha Carino — 12/04/2020
** Signature of Reporting Person — Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

**Tanisha M. Brown (Skadden Attorney): Legal name overlap that could be leveraged in corporate filings or misrepresentation. This firm is also listed on Brett's' webpage although there based on the Bar of California website Brett is not an active broker**

Skadden

← tanisha.brown@skadden.com

Enter password

Password

Forgot my password

Sign in

Skadden, Arps, Slate, Meagher & Flom LLP

"To login to this application, please use your primary Skadden email address and your Skadden network password. If you are having difficulty, please contact PC Support at +1-914-750-7272.

11:09

oppenheimrealestate.com

OPPENHEIM
REAL ESTATE

SELLING
SUNSET
NETFLIX | NOW STREAMING

Brett is consistently named by The Hollywood Reporter as one of Los Angeles's Top 25 Real Estate Agents and has gained global recognition as a star of the hit Netflix Original Series, Selling Sunset.

OPPENHEIM
REAL ESTATE

As a former securities litigation attorney at two of the world's largest international law firms, Skadden, Arps LLP and Latham & Watkins LLP, Brett spent years defending a consortium of investment banks against liability in excess of ten billion dollars stemming from the MCI/WorldCom corporate bond default.

3:57 SOS 

barrons.com 

EXPLORE OUR BRANDS

BARRON'S

## My Watchlist

New watchlist 

Search and Add Symbols 

| Symbol | Price/Vol | % Chg |
|---|---|---|
| NFLX Netflix Inc. | $1,194.63 Vol. 3M | 0.22% $2.61 |
| TBG TBG Dividend Fo... | $31.38 Vol. 32K | -1.76% -$0.56 |

ACORD

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY) 10-28-2022

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

**IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).**

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Berkshire Hathaway Direct Insurance Company<br>1314 Douglas Street<br>Omaha NE, 68102 | PHONE (A/C, No, Ext): 800-507-4495 | FAX (A/C, No): 800-589-7316 | |
| | E-MAIL ADDRESS: service@threeinsurance.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Berkshire Hathaway Direct Insurance Company | | 10391 |
| INSURED<br>Communication Products LLC<br>2287 Mulholland Hwy<br>Calabasas, CA 91302 | INSURER B : | | |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

COVERAGES — CERTIFICATE NUMBER: — REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY; CLAIMS-MADE [ ] OCCUR [X]; GEN'L AGGREGATE LIMIT APPLIES PER: [X] POLICY [ ] PRO-JECT [ ] LOC; OTHER: | | | CP140190180P2022 | 10/29/2022 | 10/29/2023 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 1,000,000 |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 3,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ SEE GENERAL AGGREGATE |
| | | | | | | | | $ |
| A | AUTOMOBILE LIABILITY; [ ] ANY AUTO; [ ] OWNED AUTOS ONLY; [ ] SCHEDULED AUTOS; [X] HIRED AUTOS ONLY; [X] NON-OWNED AUTOS ONLY | | | CP140190180P2022 | 10/29/2022 | 10/29/2023 | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | HIRED AND NON-OWNED | $1,000,000/3,000,000 |
| | UMBRELLA LIAB [ ] OCCUR; EXCESS LIAB [ ] CLAIMS-MADE; DED [ ] RETENTION $ | | | | | | EACH OCCURRENCE | $ |
| | | | | | | | AGGREGATE | $ |
| | | | | | | | | $ |
| A | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N; ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? [Y] (Mandatory in NH); If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | CP140190180P2022 | 10/29/2022 | 10/29/2023 | [X] PER STATUTE [X] OTHER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 3,000,000 |
| A | OCCUR; ERRORS & OMISSIONS [X] | | | CP140190180P2022 | 10/29/2022 | 10/29/2023 | PerOccur/Aggregate | $1,000,000/3,000,000 |
| | CYBER [X] | | | | | | PerOccur/Aggregate | $1,000,000 / 3,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Communication Products LLC<br>2287 Mulholland Hwy<br>Calabasas, CA 91302 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE<br>[signature] |

© 1988-2015 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

ACORDs provided by Forms Boss. www.FormsBoss.com; (c) Impressive Publishing 800-208-1977

# EXHIBIT D



REPUBLIC OF THE PHILIPPINES
SECURITIES AND EXCHANGE COMMISSION
SEC Building, EDSA, Greenhills
City of Mandaluyong, Metro Manila

Company Reg. No. 31168

# CERTIFICATE OF FILING OF AMENDED BY-LAWS

KNOW ALL MEN BY THESE PRESENTS:

This is to certify that the Amended By-Laws of

A BROWN COMPANY, INC.

copy annexed, adopted on March 12, 2012 by the Board of Directors pursuant to the authority duly delegated to it by the stockholders of at least two-thirds of the outstanding capital stocks on June 27, 2011, certified by a majority of the Board of Directors and countersigned by the Secretary of the Corporation, was approved by the Commission on this date, pursuant to the provisions of Section 48 of the Corporation Code of the Philippines, Batas Pambansa Blg. 68, approved on May 1, 1980, and attached to the other papers pertaining to said corporation.

IN WITNESS WHEREOF, I have set my hand and caused the seal of this Commission to be affixed to this Certificate at Mandaluyong City, Metro Manila, Philippines, this 13th the day of June, Twenty Twelve.

BENITO A. CATARAN
Director
Company Registration and Monitoring Department



# COVER SHEET

3 1 1 6 8

SEC Registration Number

A BROWN COMPANY, INC.

(Company's Full Name)

2704 EAST TOWER PSE, CENTRE ORTIGAS CENTER, PASIG CITY

(Business Address: No. Street City / Town / Province)

JASON C. NALUPTA 632-0905

1 2 3 1 Month of June

LETTER re: AMENDMENT OF BY-LAWS

Form Type

Secondary License Type, if applicable

Department Requiring this Doc

Amended Articles Number/Section

Total Amount of Borrowings

Total No. of Stockholders

Domestic

Foreign

To be Accomplished by SEC Personnel Concerned

File Number

LCU

6-4-12

Document I D

Cashier

STAMPS

6-01-2012

Remarks = pls. use black ink for scanning purposes

AMENDED BY-LAWS *

of

A BROWN COMPANY INC.
(FORMERLY "EPIC HOLDINGS CORPORATION")

ARTICLE I

MEETING OF STOCKHOLDERS

SECTION 1. ANNUAL MEETING – The annual meeting of stockholders shall be held during the month of June of each year, at the place where the principal office of the Company is located, and on such date and time as the Board of Directors may determine.[1]

SECTION 2. SPECIAL MEETING - Special meeting of stockholders may be called by the President, or by the order of the Board of Directors, whenever he or they shall deem it necessary, and it shall be the duty of the President to order and call such meeting whenever the holders of record of not less than one-fourth of the outstanding capital stock of the Company with the voting privilege shall in writing so request.

SECTION 3. NOTICES – Notices of the time and place of holding any annual meeting, or any special meeting, of stockholders, shall be given by the Secretary of the Corporation either by posting the same enclosed in a postage prepaid envelope addressed to each stockholders on record at his last known address or be delivering the same to him in person, at least ten (10) days before the date set for such meeting. The notice of every special meeting shall state briefly the objects of the meeting, and no other business shall be transacted at such meeting except by consent of all the stockholders with voting privilege.

No notice of any meeting need be published in any newspaper or in any other medium.

Failure to give or any defect or irregularity in giving the notice of any regular meeting, shall not affect nor invalidate any action taken at such meeting.

* As last amended on 12 March 2012 by the Board of Directors pursuant to the authority delegated to them by the Stockholders on 27 June 2011.

[1] As amended per SEC certificate dated 26 October 1998.

If all stockholders with voting privilege shall, in person, or by attorney or proxy appointed in writing, be present at or waive notice of any meeting, either annual or special, no notice of such meeting shall be required and any action taken at such meeting shall be valid and binding.

SECTION 4. ORDER OF BUSINESS – The order of business of annual stockholders meeting shall be as follows:

1. Proof of the required notice of the meeting
2. Proof of the presence of a quorum
3. Reading of minutes of the previous meeting and action thereon
4. Report of the Board of Directors
5. Unfinished Business
6. New business
7. Appointment of inspectors of election to serve until the close of the next annual meeting
8. Election of Directors for ensuing year

The order of business to be followed at any meeting may be determined by the presiding officer or by vote of the majority in interest of the stockholders with voting privilege present or represented at such meeting.

SECTION 5. VOTING – At every meeting of stockholders, every stockholder with voting privilege shall be entitled to one vote for each share of stock standing in his name on the books of the Company, provided, however, that in the case of the election of Directors every stockholder with voting privilege shall be entitled to accumulate his votes in the manner provided by law. Every stockholder entitled to vote at any meeting of may vote by proxy, provided that the proxy shall have been appointed in writing by the stockholder himself, or by his duly authorized attorney. The instrument appointing a proxy shall be exhibited to the Secretary and the Inspectors of Election, and shall be lodged with the Secretary at the time of the meeting if he shall so request.

SECTION 6. QUORUM – A quorum for any meeting of stockholders shall consist of a majority of the voting stock of the Corporation, and a majority of such quorum shall decide any question at the meeting save and except in those matters where the Corporation Code of the Philippines requires the affirmative vote of a greater proportion. In the presence of a quorum the stockholders attending or represented at the time and place at which it may have been adjourned, or any officer entitled to preside at such meeting or to act as Secretary thereof, may adjourn such meeting for any period.

SECTION 7. ELECTION OF INSPECTORS – The stockholders with voting privileges may, at each annual meeting, appoint two persons (who need not be stockholders) except in those cases where the Corporation Code requires the affirmative vote of a greater proportion to act as inspectors of election at all meetings of stockholders until the close of the next annual meeting. If any inspector shall refuse to serve, or neglect to attend any meeting of stockholders or his office shall become vacant, the meeting may appoint an inspector in his place.

SECTION 8. MINUTES Minutes of all meetings of stockholders shall be kept and shall be carefully preserved as a record of the business transacted at such meeting. The minutes shall contain such entries as may be required by law.

SECTION 9. RECORD DATE – The Board of Directors may set a record date, prior to each meeting of the stockholders of the corporation for the determination of the number of shares (A) to which each stockholder is entitled to vote at such meeting, and (B) entitled to dividend whether cash, property, or stock, or to the exercise of pre-emptive rights.

SECTION 10. SUBMISSION OF PROXY – Proxies shall be submitted to the Corporate Secretary at least two (2) business days prior to the date of the meeting of stockholders or prior to the date set by the Board of Directors for the submission thereof.

## ARTICLE II

## BOARD OF DIRECTORS

SECTION 1. QUALIFICATIONS – The Board of Directors shall consist of such number indicated in the Articles of Incorporation.[2]

All Directors shall be holders of at least one (1) share of stock of the Corporation shall be at least a college graduate or have sufficient experience in managing the business to substitute for such formal education; shall be at least twenty-one (21) years old; shall have proven to possess integrity and probity; and shall be assiduous.[3]

SECTION 2. ELECTION The directors shall be elected annually by the stockholders at the annual meeting, and shall hold office until their successors are elected and qualified, unless removed from office as provided

[2] As amended by the Board of Directors on 12 March 2012 pursuant to the authority to amend the By-Laws delegated by the shareholders on 27 June 2011.

[3] As amended per SEC certificate dated 9 October 2003

by law. It shall not be necessary to publish notice of the election of the directors in any newspaper or in any other medium.

The Board shall create a Nominations Committee, which shall have at least three (3) voting (one of whom must be independent) and one (1) non-voting Director in the person of the HR Director Manager.[4]

SECTION 3. POWERS AND QUORUM The directors shall act only as a board, and the individual directors shall have no power as such.

A majority of the whole number of directors shall constitute a quorum for the transaction of business and every decision of a majority of a quorum assembled as a board shall be valid as a corporate act.

In the absence of a quorum, one or more directors present at the time and place for which a meeting shall have been called may adjourn any meeting from time to time until a quorum shall be present;

SECTION 4. DUTIES – The Directors shall conduct fair business transactions with the Corporation and to ensure that personal interest does not bias Board decisions; devote time and attention necessary to properly discharge his duties and responsibilities; act judiciously; exercise independent judgment; have a working knowledge of the statutory and regulatory requirements affecting the Corporation, including the contents of its Articles of Incorporation and By-Laws, the requirements of the Commission, and where applicable, the continuing soundness, effectiveness and adequacy of the Corporation's control environment.[5]

SECTION 5. MEETING The Board of Directors shall meet as soon as practicable after the annual meeting, of which directors may be held at such time and places, and upon such notice as the Board of Directors by resolution may prescribe. Special meetings of the Board may be called by the President or by or by the written request of any two (2) directors, upon at least one day's notice of the time and place of holding, given personally, or by letter, telegram, or telephone. Any regular or special meeting of the Board of Directors may be held in Cagayan de Oro City[6] or at such other place either within or without the Philippines as may be designated by the Board.

[4] As amended per SEC certificate dated 9 October 2003.
[5] *Ibid.*
[6] As amended per SEC certificate dated 16 November 2001.

SECTION 6. VACANCIES – If any vacancy shall occur among the directors by death or from any other cause, such vacancy may be filled, pending action by the stockholders, by vote of a majority of the directors constituting a quorum at any directors' meeting.

In case of a vacancy in the Board of Directors, the remaining directors shall continue to act, but if at any time their number be reduced to less than a majority, the vacancies shall be filled by the stockholders at a special meeting called for the purpose.

Directors may be removed and the vacancies so caused shall be filled in a manner prescribed by law.

SECTION 7. COMPENSATION - Directors shall receive such compensation for their services as may, from time to time, be fixed by the stockholders.

SECTION 8. MINUTES – Minutes of all meetings of the Board of Directors shall be kept and carefully preserved as a record of the business transacted at such meeting. The minutes shall contain such entries as may be required by law.

SECTION 9. EXECUTIVE COMMITTEE There shall be an Executive Committee to be composed of at least three (3) members to be appointed by the Board. The Executive Committee shall have the power to act or such specific matters within the competence of the Board, as may be delegated to it by the Board, except with respect to: (1) the approval of any action for which shareholders' approval is also required; (2) the filling of vacancies in the Board; (3) the amendment or repeal of By-Laws or adoption of new By-Laws; (4) the amendment or repeal of any resolution of the Board, which by its express terms is not so amenable or repealable; and (5) a distribution of cash dividends to the shareholders. The Board shall appoint one of the members of the Executive Committee as its Chairman and the said committee shall act by majority vote of all its members.[7]

SECTION 10. NOMINATION COMMITTEE It shall pre-screen and shortlist all candidates nominated to become a member of the board of directors.[8]

---

[7] As amended by the Board of Directors on 12 March 2012 pursuant to the authority to amend the By Laws delegated by the shareholders on 27 June 2011.

[8] As amended per SEC certificate dated 9 October 2003.

SECTION 11. AUDIT COMMITTEE - The audit committee shall be composed of at least three (3) members of the Board, one (1) of whom shall be an independent director. Each member shall have adequate understanding at least or competence at most of the company's financial management systems and environment.[9]

The Audit Committee shall check all financial reports against its compliance with both the internal financial management handbook and pertinent accounting standards, including regulatory requirements; pre-approve all audit plans, scope and frequency one (1) month before the conduct of external audit; perform direct interface functions with the internal and external auditors; elevate to international standards the accounting and auditing processes, practices and methodologies and maintain a transparent financial management system that will ensure the integrity of internal control activities throughout the company.[10]

SECTION 12. ELECTION OF INDEPENDENT DIRECTORS. - The election of Independent Directors shall be made in accordance with the by-laws of the Corporation except as otherwise provided in other parts of this by-laws and subject to pertinent existing laws, rules and regulations of the Commission.

Single balloting for the regular and independent director/s shall be made. In case, however, of failure of election for independent director/s, the Chairman of the Meeting shall call a separate election during the same meeting to fill up the vacancy.

In case of resignation, disqualification or cessation of independent directorship, the vacancy shall be filled by the vote of at least majority of the remaining directors, if still constituting a quorum, upon the nomination of the Nomination Committee, otherwise said vacancies shall be filled by the stockholders in a regular meeting called for that purpose. An independent director so elected to fill a vacancy shall serve only for the unexpired term of his predecessor in office.[11]

---

[9] As amended per SEC certificate dated 9 October 2003.
[10] *ibid.*
[11] As amended per SEC certificated dated 18 October 2005.

ARTICLE III

OFFICERS, AGENTS, AND EMPLOYEES

SECTION 1. DESIGNATION – The Board of Directors at their first meeting, and annually thereafter shall elect as officers of the Company, a Chairman, a President, one or more Vice President, a Treasurer and a Secretary, and may from time to time appoint such other officers as they may deem proper to hold office for such terms as the Board may determine from time to time.

The Secretary shall have the qualifications required by law.

SECTION 2. COMPENSATION - The compensation of all officers elected or appointed by the Board of Directors shall be fixed by the Board.

SECTION 3. CHAIRMAN – The Chairman of the Board shall be the chief executive officer of the Corporation and shall have a general control and management of the business affairs of the Corporation. He shall preside at all meetings of the Board of Directors and Stockholders. He shall have such powers and duties as are usually incident to the office of the chief executive officer and shall perform such other duties as may be imposed on him by law, the Articles of Incorporation and these By Laws; or as may be assigned to him by the Board of Directors. [12]

SECTION 4. PRESIDENT – The President, subject to the control of the Board, shall have general supervision of the business and affairs of the Corporation. He shall, in the absence of the Chairman, preside at all meetings of the stockholders and of the Board of Directors. He may sign with the Secretary any or all certificates of stock of the Corporation; provide the stockholders and the Board of Directors such reports, memoranda, accounts and data which may be required of him; and; in general, perform all duties incident to the office of the President and such other duties as may from time to time be assigned to him by the Board of Directors or as prescribed by these By-Laws. [13]

SECTION 5. THE VICE-PRESIDENT(S) – If one or more Vice-Presidents are appointed, he/they shall have such powers and perform such duties as may from time to time be assigned to him/them by the Board of Directors or by the President.

[12] As amended by the Board of Directors on 12 March 2012 pursuant to the authority to amend the By-Laws delegated by the shareholders on 27 June 2011

[13] *Ibid.*

In case of the absence or inability to act of the President, the Vice-President, or if these be more than one, such Vice-President as the Board may designate for the purpose, shall have the powers and discharge the duties of the President.[14]

SECTION 6. CORPORATE SECRETARY The Corporate Secretary is an officer of the company and a high level of competence and dedication to duty is expected of him. The Corporate Secretary shall be a Filipino citizen. Considering his varied functions and duties, he must possess some level of competence not only in legal matters but also in other areas deemed necessary for him to perform the tasks assigned to him.[15]

The Corporate Secretary shall gather and analyze all documents, records and other information essential to the conduct of his duties and responsibilities to the corporation; as to agenda, get a complete schedule thereof at least for the current year and put the Board on notice before every meeting assist the Board in making business judgment in good faith and in the performance of their responsibilities and obligations; attend all Board meetings and maintain record of the same; and submit to the Commission, at the end of every fiscal year, and annual certification as to attendance of the directors during Board meetings.[16]

SECTION 7. ASSISTANT SECRETARIES The Board of Directors, may designate to the Assistant Secretaries all or any parts of the duties of the Secretary.

SECTION 8. TREASURER -- The Treasurer shall have charge of the funds, securities, receipts and disbursements of the Company. He shall deposit, or cause to be deposited, all moneys and other valuable effects in the name and to the credit of the Company in such bank or trust companies, or with such bankers or other depositories, as the Board of Directors may from time to time designate. He shall render to the President or to the Board of Directors whenever required an account of the financial condition of the Company, and of all his transactions as Treasurer. As soon as practicable after the close of each fiscal year, he shall make, or cause to be made, and submit to the Board of Directors a like report for such fiscal year. He shall keep, or cause to be kept, correct of all the business and transactions of the Company.

[14] As amended by the Board of Directors on 12 March 2012 pursuant to the authority to amend the By-Laws delegated by the shareholders on 27 June 2011.
[15] As amended per SEC certificate dated 9 October 2003.
[16] *Ibid.*

In case of the absence of the Treasurer or his inability to act, such Assistant Treasurer or if there is more than one, such Assistant Treasurers as the Board of Directors may designate, shall have all the foregoing powers and duties.

SECTION 9. POWERS, DUTIES AND COMPENSATION – The Board of Directors shall from time to time prescribe the powers and duties and fix the compensation of the officers, agents, and employees of the Company when such powers and duties are not prescribed by the by-laws.

SECTION 10. EXTERNAL AUDITOR – An external auditor shall enable an environment of good corporate governance as reflected in the financial records and reports of the company, an external auditor shall be selected and appointed by the stockholders upon recommendation of the Audit Committee.[17]

SECTION 11. INTERNAL AUDITOR – The Corporation shall have in place an independent internal audit function which shall be performed by an Internal Auditor or a group of Internal Auditors, through which its Board, senior management, and stockholders shall be provided with reasonable assurance that its key organizational and procedural controls are effective, appropriate and complied with.[18]

## ARTICLE IV

## INDEMNIFICATION OF DIRECTORS AND OFFICERS

SECTION 1. The Corporation shall indemnify every Director or officer, his heirs, executors and administrators against all costs losses and expenses reasonably incurred by such person in connection with any civil, criminal, administrative or investigative action, suit or proceeding (other than an action by the corporation) to which he may be, or is, maybe a party by reason of his being or having been a Director or officer of the corporation, except in relation to matters as to which he shall be finally adjudged in such action suit or proceeding to be liable for negligence or misconduct,

In the event of a settlement or compromise, indemnification shall be proved only in connection with such matter covered by the settlement as to which the corporation is advised by counsel that the person to be indemnified did not commit a breach of duty as such Director or officer.

[17] As amended per SEC certificate dated 9 October 2003.
[18] *Ibid.*

The amount payable by way of indemnity shall be determined and paid only pursuant to a resolution adopted by a majority of the members of the Board of Directors.

The costs and expenses incurred in defending the aforementioned action, suit or proceeding may be paid by the corporation in advance of the final disposition of such action, suit, or proceeding, as authorized in the manner provided for in the preceding paragraph upon receipt of an undertaking by or on behalf of the Director or an officer to repay such amount unless it shall indubitably be determined that he is entitled to be indemnified by the corporation as authorized in this Article.

## ARTICLE V

## COMPENSATION

SECTION 1. BONUS The bonus of the members of the Board of Directors, the officers and employees of the corporation will be given upon the recommendation of the Compensation and Remuneration Committee and shall not exceed ten (10) per centum of the net income of the corporation (excluding the unrealized equity in the net earnings of affiliated and subsidiary corporations) before this bonus and taxes of the preceding year or preceding years if in a cumulative basis. Twenty-five per centum (25%) of the entire bonus shall be distributed to the Directors and the balance thereof shall be distributed to the officers and employees in such amounts and manner as may be recommended by the Compensation and Remuneration Committee and as may be approved by the Board of Directors.[19]

## ARTICLE VI

## CONTRACTS AND OBLIGATIONS

SECTION 1. No agreement, contract or obligation involving the borrowing of money of the credit or liability of the Company shall be made without the approval of the Board of Directors, except by an officer, agent, or employees thereunto generally or specifically authorized by the Board of Directors.

[19] As amended by the Board of Directors on 12 March 2012 pursuant to the authority to amend the By-Laws delegated by the shareholders on 27 June 2011.

ARTICLE VII

BANKS, DEPOSITS CHECKS AND DRAFTS

SECTION 1. FUNDS The funds of the Company shall be disbursed by checks or drafts, upon the authorized depositories of the Company signed by such officer or officers, agents or employees as the Board may from time to time designated.

ARTICLE VIII

SHARES AND THEIR TRANSFERS

SECTION 1. ISSUE AND TRANSFER – The Board of Directors shall provide for the issue and transfer of the capital of the Company and shall be entitled to a certificate of stock certifying the number of shares owned by him. It shall be signed by the President or Vice-President and countersigned by the Secretary or Assistant Secretary and sealed with its corporate seal. Certificate shall be issued in consecutive order from certificate books of the Company, an certificates shall be numbered in the order in which they are issued. Upon the stub of each certificate issued shall be entered the name of the person, firm, or corporation owing the stock represented by such certificate, the number of shares in respect of which the certificate is issued and in case of cancellation, the date thereof.

Every certificate surrendered for exchange or transfer of stock shall be cancelled and affixed to the original stub in the certificate book, except in the cases provided for in Section 4 or Article VI of these by-laws.

SECTION 2. STOCK AND TRANSFER BOOK – There shall be kept by the Secretary of the Company a book to be known as the "Stock and Transfer Book" containing the names alphabetically arranged, of the stockholders of the Company, showing their places of residence, the number of shares of stock held by them, respectively, the time when they became the owners thereof, and the amounts paid thereon, as well as other entries required by law. Transfer of stock shall be made only on the transfer book of the Company by the holder in person, or by his duly authorized attorney, or surrender of the certificate or certificates representing the stocks to be transferred. Every power of attorney or authority to transfer stock shall be in writing duly executed and filed with the Company. The Board of Directors may appoint some suitable entity or individual to facilitate the transfer of shares, under regulations such regulations as the Board may from time to time prescribe.

SECTION 3. LOSS OR DESTRUCTION OF CERTIFICATES – The Board of Directors may direct a new certificate or certificates of stock to be issued in the place of any certificate or certificates theretofore issued and alleged to have been lost or stolen, or destroyed, The Board of Directors, before authorizing the issuance of a new certificate or certificates may first require the owner of the stock represented by the certificate or the certificates lost, stolen or destroyed or his legal representative, to file affidavit, in triplicates, showing the circumstances as to how, when and where the certificate or certificates were lost, stolen or destroyed, the number of shares represented by each certificate, the serial number if the certificate and the name of the issuer.

After verifying the affidavit as well as the other information and evidence presented by the claimant with the books of the corporation, the corporation may cause the publication once a week for three consecutive weeks in a newspaper of general circulation notice containing the name if the corporation the name of the registered owner, the serial number of the said certificate or certificates and the number of shares represented by each certificate and a statement that, "after the expiration of one year from the date of the last publication, if no contest has been presented to the corporation regarding the said certificate/certificates of stock, the right to make such interest shall be barred and the corporation shall cancel in its books certificate/certificates of stocks which have been lost, stolen or destroyed and issue in lieu thereof new certificates of stock." However, the replacement certificates shall not be delivered to the claimant within one year from the last date of publication unless, if the Board of Directors so requires, the registered owner files a bond or other security which shall run for a period of one year for a sum and in such form and with such sureties as may be satisfactory to the Board of Directors, In cases where an action is pending in court regarding the ownership of the lost, stolen, or destroyed certificate, the issuance of a replacement certificate shall be suspended until final decision by the court regarding its ownership.

In this connection all the provisions of the RA No. 201 shall be observed.

SECTION 4. TRANSFER, MORTGAGES AND PLEDGES - Transferees, mortgages, and pledges of the stock of the company or any interest therein, shall promptly transfer the same, or register notice of their lien, on the books of the company and their failure to do so shall stop them from making any claim against the Company by reason of the issuance of another certificate in the name or to the order of the owner or registered holder

of the original certificate, or for any other reason. Transferees, mortgages, and pledges of the stock of the Company or of any interest therein, are required to ascertain from the stock certificate and stock transfer books of the Company that the Company has no claim or defense against the holder or registered owner of the certificate transferred and shall hold all certificates subject to all claims or defenses noted therein. This action shall not construed as a limitation upon or waiver of any right, claims, or defenses not noted in the stock certificate and stock transfer books of the Company.

ARTICLE IX

ADDRESSES

SECTION 1. ADDRESS – Every stockholder and transferee and every attorney and proxy for any stockholder shall furnish the Secretary with an address at which notice of meetings and all other corporate notices from any officer of the Company may be served upon or mailed to him and in default thereof, notices may be addressed to him either at his last known address or at the office of the Company.

ARTICLE X

DIVIDENDS

SECTION 1. DIVIDENDS – The Board of Directors may declare dividends only from the surplus profits from the business of the Company.

ARTICLE XI

CORPORATE SEAL

SECTION 1. CORPORATE SEAL - the corporate seal of the company unless otherwise ordered by the Board of Directors, shall be in circular form and shall bear the words:

A Brown Company, Inc.
Incorporated 1966
Philippines

ARTICLE XII

FISCAL YEAR

SECTION I. FISCAL YEAR. The fiscal year of the Company shall begin on the 1st day of January in each year and end on the thirty-first of December following.

ARTICLE XII

AMENDMENTS

SECTION 1. AMENDMENTS. these By Laws or any of them may be amended or repealed at any regular meeting of the stockholders entitled to vote, or at a special meeting duly called for that purpose.

KNOWN ALL MEN BY THESE PRESENTS:

That we, the undersigned majority of the directors and the same time the stockholders of the A Brown Company Inc., a corporation duly organized under the laws of the Philippines, hereby certify that the foregoing amended By Laws were duly adopted and approved by the stockholders of the corporation representing a majority of all subscribed capital stock thereof at a meeting of the stockholders of the corporation held on the 2nd day of January 1967.

(sgd.)
ADELAIDA M. BENDANA BROWN
Director-Stockholder

(sgd.)
BARKER H. BROWN
Director-Stockholder

(sgd.)
ANNABELLE P. BROWN
Director-Stockholder

(sgd.)
WALTER W. BROWN
Director-Stockholder

(sgd.)
PATRICIA B. JUAT
Director-Stockholder

# DIRECTORS' CERTIFICATE

KNOW ALL MEN BY THESE PRESENTS:

The undersigned, being the Chairman and Corporate Secretary and at least a majority of the members of the Board of Directors of **A BROWN COMPANY, INC.** (the "Corporation"), a corporation duly organized and existing under the laws of the Philippines, with principal office address at the Xavier Estates Uptown, Airport Road, Balulang, Cagayan de Oro City, under oath do hereby certify that the attached instrument is a true and faithful copy of the Amended By-Laws of the Corporation reflecting the following amendments:

*a. Amendment to Article II*

ARTICLE II
BOARD OF DIRECTORS

SECTION 1. QUALIFICATIONS The Board of Directors shall consist of such number indicated in the Articles of Incorporation.

SECTION 9. EXECUTIVE COMMITTEE – There shall be an Executive Committee to be composed of at least three (3) members of the Board to be appointed by the Board. The Executive Committee shall have the power to act on such specific matters within the competence of the Board, as may be delegated to it by the Board, except with respect to: (1) the approval of any action for which shareholders' approval is also required; (2) the filling of vacancies in the Board; (3) the amendment or repeal of By-Laws or the adoption of new By-Laws; (4) the amendment or repeal of any resolution of the Board, which by its express terms is not so amendable or repealable; and (5) a distribution of cash dividends to the shareholders. The Board shall appoint one of the members of the Executive Committee as its Chairman and the said committee shall act by majority vote of all its members.

*b. Amendments to Article III*

ARTICLE III
OFFICERS, AGENTS AND EMPLOYEES

SECTION 1. DESIGNATION – The Board of Directors at their first meeting, and annually thereafter, shall elect as officers of the Company, a Chairman, a President, one or more Vice Presidents, a Treasurer, and a Secretary, and may from time to time appoint such other officers as they may deem proper to hold office for such terms as the Board may determine.

SECTION 3. CHAIRMAN The Chairman of the Board shall be the chief executive officer of the Corporation and shall have the general control and

management of the business and affairs of the Corporation. He shall preside at all meetings of the Board of Directors and Stockholders. He shall have such powers and duties as are usually incident to the office of the chief executive officer and shall perform such other duties as may be imposed on him by law, the Articles of Incorporation, and these By Laws; or as may be assigned to him by the Board of Directors.

SECTION 4. PRESIDENT - The President, subject to the control of the Board of Directors, shall have general supervision of the business and affairs of the Corporation. He shall, in the absence of both the Chairman, preside at all meetings of the stockholders and of the Board of Directors. He may sign with the Secretary any or all certificates of stock of the Corporation; provide the stockholders and the Board of Directors such reports, memoranda, accounts and data which may be required of him; and, in general, perform all duties incident to the office of the President and such other duties as may from time to time be assigned to him by the Board of Directors or as prescribed by these By-Laws.

SECTION 5. THE VICE-PRESIDENT(S) If one or more Vice-Presidents are appointed, he/they shall have such powers and perform such duties as may from time to time be assigned to him/them by the Board of Directors or by the President.

*c. Amendment to Article V*

ARTICLE V
COMPENSATION

SECTION 1. BONUS - The bonus of the members of the Board of Directors, the officers and employees of the corporation will be given upon the recommendation of the Compensation and Remuneration Committee and shall not exceed ten (10) per centum of the net income of the corporation (excluding the unrealized equity in the net earnings of affiliated and subsidiary corporations) before this bonus and taxes of the preceding year or preceding years if in a cumulative basis. Twenty-five per centum (25%) of the entire bonus shall be distributed to the Directors and the balance thereof shall be distributed to the officers and employees in such amounts and manner as may be recommended by the Compensation and Remuneration Committee and as may be approved by the Board of Directors.

The foregoing amendments to the By-Laws were approved and adopted by at least a majority of the members of the Board of Directors in a meeting held on 12 March 2012, the power to amend the Company's By-Laws having been delegated on 27 June 2011 by the stockholders representing at least two-thirds (2/3) of the outstanding capital stock of the Company.

IN ATTESTATION OF THE ABOVE, this Certificate has been signed this MAY 2 9 2012 at Pasig City, Metro Manila.

**WALTER W. BROWN**
Chairman
TIN 128-993-816

**ROBERTINO E. PIZARRO**
President
TIN 118-301-188

**ANNABELLE P. BROWN**
Director
TIN 128-993-824

**ELPIDIO M. PARAS**
Director
TIN 106-126-150

**ANTONIO S. SORIANO**
Director
TIN 124-750-54

**DOMENICO V. LANUZA**
Director
TIN 243-616-771

ATTEST:

**JASON C. NALUPTA**
Corporate Secretary
TIN 908-541-534

SUBSCRIBED AND SWORN to before me this MAY 29 2012 affiants exhibiting to me their respective Residence Certificates and other identification documents, as follows:

| | RES. CERT. NO. PASSPORT NO./OTHER I.D. | DATE/PLACE ISSUED Date/Place Issued |
|---|---|---|
| Walter W. Brown | CTC No. 00026396<br>TIN 128-993-816 | January 24, 2012 Quezon City |
| Robertino E. Pizarro | CTC No. 09696078<br>TIN 118-301-188 | January 13, 2012 Cagayan de Oro City |
| Annabelle P. Brown | CTC No. 00026397<br>TIN 128-993-824 | January 24, 2012 Quezon City |
| Elpidio M. Paras | CTC No. 09695213<br>TIN 106-126-150 | January 10, 2012 Cagayan de Oro City |
| Antonio S. Soriano | CTC No. 09682666<br>TIN 114-750-521 | January 9, 2012 Cagayan de Oro City |
| Domenico V. Lanuza | CTC No. 11142846<br>TIN 243-616-771 | January 13, 2012 Pasig City |
| Jason C. Nalupta | CTC No. 14594914<br>SSS No. ID No. 33-5258550-0 | January 6, 2012 Manila |

Doc. No. 13 ;
Page No. 4 ;
Book No. 3 ;
Series of 2012.

PAULA DANICA B. LANDAYAN
NOTARY PUBLIC
Appointment No. 215 / 12-31-2012
2704 East Tower, PSE, Ortigas, Pasig
PTR No. 7545980 / 01-04-2012 / Pasig City
IBP No. 875863 / 12-27-2011/ Cavite
Roll No. 59179

F:\DATA\CLIENTS\273\CORP\DIR-CERT BY LAWS AMENDMENT.DOC

# EXHIBIT E



Companies House

# AR01 (ef)

## Annual Return

X47ETA4B

*Received for filing in Electronic Format on the:* **14/05/2015**

| | |
|---|---|
| *Company Name:* | **MRR (READING) LIMITED** |
| *Company Number:* | **08064336** |
| *Date of this return:* | **10/05/2015** |
| *SIC codes:* | **95240** |
| *Company Type:* | **Private company limited by shares** |
| *Situation of Registered Office:* | **113 HIGH STREET<br>WARGRAVE<br>READING<br>RG10 8DD** |

## Officers of the company

*Company Director* *1*

| | |
|---|---|
| *Type:* | **Person** |
| *Full forename(s):* | **BARRY** |
| *Surname:* | **RAVEN** |
| *Former names:* | |
| *Service Address:* | **UNIT 10 SHEEPLANDS**<br>**WARGRAVE**<br>**READING**<br>**UNITED KINGDOM** |

*Country/State Usually Resident:* **ENGLAND**

*Date of Birth:* **02/10/1973** *Nationality:* **BRITISH**

*Occupation:* **RESTORATION**

## Statement of Capital (Share Capital)

| | | | |
|---|---|---|---|
| **Class of shares** | **A ORDINARY** | *Number allotted* | **100** |
| | | *Aggregate nominal value* | **100** |
| *Currency* | **GBP** | *Amount paid per share* | **1** |
| | | *Amount unpaid per share* | **0** |

*Prescribed particulars*

**EACH SHARE HAS FULL RIGHTS IN THE COMPANY WITH RESPECT TO VOTING, DIVIDENDS AND DISTRIBUTIONS.**

## Statement of Capital (Totals)

| | | | |
|---|---|---|---|
| *Currency* | **GBP** | *Total number of shares* | **100** |
| | | *Total aggregate nominal value* | **100** |

## *Full Details of Shareholders*

The details below relate to individuals / corporate bodies that were shareholders as at 10/05/2015 or that had ceased to be shareholders since the made up date of the previous Annual Return

*A full list of shareholders for the company are shown below*

*Shareholding 1* : **100 A ORDINARY shares held as at the date of this return**
*Name:* **BARRY RAVEN**

## *Authorisation*

*Authenticated*

*This form was authorised by one of the following:*

Director, Secretary, Person Authorised, Charity Commission Receiver and Manager, CIC Manager, Judicial Factor.

Case 2:25-cv-07678-MEMF-MBK Document 1 Filed 08/15/25 Page 57 of 63 Page ID #:57
8/14/25, 3:34 AM Gmail - Fw: Formal Notice of Unauthorized Use of IP, Identity, and Business Assets

3:57 SOS

barrons.com

EXPLORE OUR BRANDS

BARRON'S

## My Watchlist

New watchlist

Search and Add Symbols

| Symbol | Price/Vol | % Chg |
|---|---|---|
| ↑ NFLX<br>**Netflix Inc.** | **$1,194.63**<br>**Vol. 3M** | 0.22%<br>$2.61 |
| ↓ TBG<br>**TBG Dividend Fo...** | **$31.38**<br>**Vol. 32K** | -1.76%<br>-$0.56 |

## Recently Viewed Tickers

Case 2:25-cv-07678-MEMF-MBK Document 1 Filed 08/15/25 Page 58 of 63 Page ID #:58

10:20

Re: Selling Sunset- Tanisha & Producing Team Intro (SHE.E.O)

Inbox

SM

Sundee M Jun 14

To Sean Bjordal, You, Sarah Johnson, +3

Hi Team!

Please meet Tanisha! She is working with Amanza on the fabulous SHE.E.O pop up that she is designing! Sean can you connect with Tanisha to hammer out the details for dates, etc. please!

Also Tanisha- do you mind resending the pitch deck so the team has it? I couldn't share that from our text chain :)

Thanks all!!

Store Renderings:
https://drive.google.com/drive/folders/1pXciQk-j9iRmdLIrkWkeL_SViD4-ifeZ

Reply to All

                            

Case 2:20-cv-02291-DOC-KES Document 991 Filed 06/24/25 Page 37 of 62 Page ID #:28860

TLS data. *Id.* at 5-6. In sum, the County contends that the Roadmap Agreement should not be extended because it would bind the County to an outdated framework when it is actively implementing more effective solutions.

**f. Analysis of Alleged Breach**

At the heart of this evidentiary record lies a persistent problem: the inability to verify the City's reported data. Laura Frost, a Director at A&M who helped lead the A&M Assessment, testified that neither the City, nor LAHSA provided adequate documentation showing that the reported TLS beds were newly created. Tr., 18, June 3, 2025. She explained that approximately 70% of the contracts LAHSA initially identified as creating new beds lacked any associated spending details. *Id.* This was compounded by inconsistent internal contract data that failed to specify how many beds were authorized, created, or utilized. *Id.* at 19. Further, the reported address and site rosters failed to align with the number of beds reported; in some cases, the addresses even overlapped with those also being reported under the Alliance Settlement. *Id.* at 19, 99.

These verification issues are not new, in fact they were raised in open court months prior to the Evidentiary Hearing. During a hearing on March 27, 2025, these issues were openly discussed, and the Parties were invited to discuss the findings of the A&M Assessment with A&M or provide the missing data. *See* Tr., 108, March 27, 2025. But even after this hearing, the Chief Administrative Officer ("CAO") of Los Angeles still failed to provide A&M with the data necessary to confirm whether the TLS beds had been created under the Roadmap Agreement. Tr., 179, June 3, 2025. The evidentiary record also contains no testimony or exhibits from the City directly addressing or rebutting these concerns. Instead, the evidentiary record reflects a consistent lack of cooperation and responsiveness—an unwillingness to provide documentation unless compelled by court order or media scrutiny. And rather than spending taxpayer dollars on finding the missing data or striving to provide verification, the City fought with the findings and methods of the A&M Assessment, the same methods they agreed to and paid for.

Case 2:20-cv-02291-DOC-KES Document 991 Filed 06/24/25 Page 38 of 62 Page ID #:28861

A&M's findings are not isolated. During the Evidentiary Hearing, the October 2021 Audit by the Los Angeles County Auditor-Controller was entered into the record. Tr., 87, June 2, 2025. This audit, commissioned to determine whether the City had accurately reported New Beds to receive an $8 million incentive bonus from the County, similarly concluded that the City failed to accurately report beds in accordance with the Roadmap MOU. Evidentiary Hearing Exhibit # 140 ("Ex. 140") ("Joint Status Report of Defendants Re: MOU"). A sample review of 1,106 beds found that 28% of those beds were not actually open and occupiable, and the City could not provide documentation to confirm that another 24% were either. *See generally id.* These findings are also echoed by the Special Master's annual report, which likewise could not verify the existence of many beds the City claimed under the Roadmap. *See* Ex. 93 at 10. Despite all this, the City chose to put on no evidence during the seven-day hearing to substantiate its Roadmap reporting.

In an effort to preserve resources, the Court provided the City with one final opportunity to cure its evidentiary deficiencies. After the close of evidence, it issued an Order directing the City to produce a comprehensive spreadsheet containing key data for each of the 2,679 TLS slots and 130 scattered-site beds it claimed to have created under the Roadmap Agreement. Amended Order Requiring City Verification of TLS Reporting (Dkt. 967). This data—long requested by A&M but previously withheld—was finally produced only by Court Order. In disclosing this data, the City also came clean that there was some double counting or false reporting. *See* Declaration of Matthew W. Szabo re Court's Directive ("Szabo Decl.") (Dkt. 980) at 1-2. But even omitting these beds, there were still key data points given for the necessary amount of TLS slots. Thus, in light of this, the Court holds that there is not sufficient evidence to find a breach under the Roadmap Agreement.

The Court's primary concern is ensuring the creation of shelter or housing for PEH—not arbitrating disputes over financing strategies or the definition of terms. But the Court not finding a breach at this time does not equate to an acceptance of the City's lack of accountability and verification. To belabor litigation over the Roadmap Agreement any further

would only redirect resources away from urgently needed housing efforts and into sanctions or further litigation over receivership.

Yet even in making that finding, the Court expresses deep skepticism. The data produced was not proactively disclosed in the name of transparency but was instead submitted under pressure, and only after the threat of judicial remedy loomed. Without accurate data, the public is left to rely on the assurance of public officials who have already presided over repeated reporting failures.

Ultimately, the Court's decision not to declare a breach reflects judicial restraint, not confidence. The pattern is clear: documentation is withheld until exposure is imminent, public accountability is resisted until judicially mandated, and the truth of reported progress remains clouded by evasive recordkeeping. As the Court observed, these failures have undermined public trust and judicial trust alike. While the Court has accepted the City's latest data to avoid derailing housing efforts, it makes clear that such acceptance should not be mistaken for vindication. The City's compliance rests on shaky ground, upheld not by verifiable facts, but by the last-minute declarations of its own officials. If the Roadmap Agreement has taught us anything, it is that seeking accountability with the City of Los Angeles is like chasing the wind.

**B. LA Alliance Settlement Agreement**

**1. Overview**

Plaintiffs argue that the City is in breach of its obligations under the Settlement Agreement in three ways. *See generally* Plaintiffs' Reply. First, the City has not met Section 5.2's obligation to create a bed plan. *Id.* at 2-4. Second, the City has failed to employ its best efforts to meet its bed creation milestones under Section 5.2. *Id.* at 4-10. Third, the City has failed to use best efforts to meet its encampment reduction milestones under Section 5.2. *Id.* at 10-13.

In response, the City contends that Plaintiffs' arguments are premature as it has until June 13, 2027, to provide 12,915 "housing or shelter solutions" and until June 30, 2026, to achieve 9,800 encampment "reductions." City Brief at 16. The City also argues that finding a breach is premature because Section 8.2, which provides for a pause of its obligations during

Case 2:20-cv-02291-DOC-KES Document 991 Filed 06/24/25 Page 40 of 62 Page ID #:28863

emergencies, was triggered by the Mayor's continued declaration of emergency during the January 2025 wildfires in the City. *Id.* at 13. Alternatively, the City argues that it has employed best efforts and is in full compliance with the Settlement Agreement. *Id.* at 19-31.

**2. Interim Breaches of the LA Alliance Settlement Agreement**

While the Court does not find at this time that the City has breached the Settlement Agreement as a whole, the City has failed to meet critical internal obligations under the Agreement. In order to ensure compliance moving forward and the City's success in 2027, the Court details the City's significant failures, clarifies the City's obligations, and institutes greater safeguards below. Transparency, accuracy, and accountability are essential to compliance.

**a. Outdated and Incomplete Bed Plan**

The Settlement Agreement required the City to "create a Required Number of housing or shelter solutions, which is equal to, but (in the City's discretion) may be greater than, the shelter and/or housing capacity needed to accommodate sixty percent (60%) of unsheltered City Shelter Appropriate PEH [persons experiencing homelessness] within the City based on LAHSA's 2022 Point in Time count." Ex. 25, §3.1. Further, the City was required to calculate the "Required Number." *Id.* §5.1. It is undisputed that the City met that obligation by calculating 12,915 as the Required Number in 2022. Tr., 244, 252-253, May 28, 2025 (Dkt. 949).

Plaintiffs argue that the City has failed to fulfill Section 5.2, which requires the City to "create plans" and "provide the plans" to Plaintiffs, because the City currently has no plan detailing how it intends to reach the 12,915 required shelter or housing solutions. Plaintiffs' Reply at 2-3.

Section 5.2 of the Settlement Agreement provides:

> "Thereafter the City will create plans and develop milestones and deadlines for: (i) the City's creation of shelter and housing solutions to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in each Council District as determined by the Required Number; (ii) the City's plan for encampment engagement, cleaning, and reduction in each Council District; (iii) the City's creation of shelter and/or housing to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in the City as determined by the Required Number; and (iv) the City's

plan for encampment engagement, cleaning, and reduction in the City. The City will provide the plans, milestones and deadlines to Plaintiffs, and the City and Plaintiffs agree to work together in good faith to resolve any concerns or disputes about the plans, milestones, and deadlines, and will consult with the Court for resolution, if necessary. The City will provide a report setting forth the milestones and deadlines. The Parties agree the City will promptly employ its best efforts to comply with established plans, milestones, and deadlines."

*Id.* §5.2.

In November 2022, the City provided a "bed plan" titled "Potential Project List as of 11/9/2022" that listed projects to partially fulfill its obligation to create 12,915 solutions under the Agreement. Evidentiary Hearing Exhibit # 114 ("Ex. 114") ("LA Alliance Milestones Potential Project List"); Tr., 88-93, May 29, 2025 (Dkt. 953). Matthew Szabo, the Chief Administrative Officer of the City, testified that the plan did not provide projects totaling 12,915 solutions. Tr., 88-93, May 29, 2025. The November 2022 plan includes about 8,000 shelter and housing solutions. Ex. 114.

On August 30, 2024, the Court ordered the City to provide a "detailed written version of the proposed bed plan" that had been discussed by Szabo in court the day prior. Order Re: Bed Plan (Dkt. 765). On September 12, 2024, the City submitted its proposed plan. Evidentiary Hearing Exhibit # 113 ("Ex. 113") ("City of Los Angeles Proposed Bed Plan") (Dkt. 775). The plan proposed transitioning 2,500 Roadmap MOU beds to count towards Alliance Settlement obligations once the Roadmap MOU expired in June 2025. *Id.* After meeting with the County, Special Master Martinez, and Judge Birotte, the City withdrew its September 2024 bed plan in October of that year. Tr., 119-120, May 29, 2025. Since then, no additional or updated bed plan has been produced to Plaintiffs or the Court. *Id.* at 120-121; *see also* Tr., 267, June 3, 2025 (Dkt. 969).

The City argues that it met its obligation by providing the November 2022 plan because the Settlement Agreement does not require that there be a single, complete plan to create 12,915 beds and no hard deadline to provide such a plan. The City maintains that it has ample time to provide an updated plan after the emergency "pause" under Section 8.2 ends, the Court

resolves disputes over the Agreement, and the City finalizes how it will create the remaining beds. City Brief at 19-20.

The Court agrees with the City that there may be multiple plans and they may be iterative. However, with only two years to go, the City must provide an updated bed plan detailing how it intends to meet its obligation to create 12,915 housing or shelter solutions by the end of the Settlement term. The City's reliance on an outdated and incomplete plan from November 2022 of only about 8,000 beds runs the risk that the City will not sufficiently plan to fund the beds.

The City seems to suggest that requiring a plan would unfairly commit it to a specific strategy. That is not so—the City may update the plan as needed. Because elected officials change and funding sources change, the plan will not be set in stone. Such flexibility was agreed to in Section 3.2 giving the City "sole discretion" to choose the type of housing or shelter solution. Requiring a plan now, even if it is later changed, is consistent with the Court's August 30, 2024 Order and the terms of the Settlement. It will also ensure that the City is successful in 2027. The City shall provide such a plan to Plaintiffs and the Court by October 3, 2025.

**b. Missing Shelter and Housing Solution Milestones**

Plaintiffs argue that the City has not employed its "best efforts" to create the 12,915 required shelter or housing solutions and that it has consistently missed its own milestones for bed creation. Plaintiffs' Reply at 4. The City concedes that it "has fallen short of interim milestones" but maintains that it has used best efforts to create thousands of beds and is on track to exceed the required 12,915 beds by June 2027. City Brief at 21. The City's most recent quarterly report shows 6,724 beds were open as of March 31, 2025, and another 4,278 beds were "in process." Evidentiary Hearing Exhibit # 35 ("Ex. 35") (City Quarterly Status Report April 15, 2025") (Dkt. 892-1), at 6. Plaintiffs argue that the City has incorrectly prioritized investment in permanent supportive housing which is too slow and too expensive. Plaintiffs' Reply at 7. Plaintiffs, however, do not set the City's housing policy and the Settlement Agreement left the type of solution to the City's "sole discretion." Ex. 25, §3.2.

That being said, it is undisputed that the City did not meet the milestones for shelter and housing creation that it set for itself. The City provided Plaintiffs with a chart of "Alliance Milestones" for shelter and housing solution creation for each quarter of each fiscal year from fiscal year 2022-23, until 2026-27. Evidentiary Hearing Exhibit #24 ("Ex. 24") ("Housing-Shelter Alliance Milestones") (Dkt. 863-5). The City has consistently missed those milestones according to its quarterly reports. Each missed milestone inflicted material harm to the public and those living on the streets who were denied shelter or housing:

- January 17, 2023: The City reported 721 beds open as of the quarter ending December 31, 2022, short of its target of 1,622 (56% deficit). City Quarterly Status Report, Ex. A, at 7, Jan. 17, 2023 (Dkt. 516-1). **The City failed to shelter 901 Angelenos as promised.**
- April 21, 2023: The City reported 935 beds open as of the quarter ending March 31, 2023, out of a target of 2,482 (62% deficit). City Quarterly Status Report, Ex. A, at 7, Apr. 21, 2023 (Dkt. 539-1). **The City failed to shelter 1,547 Angelenos as promised.**
- July 17, 2023: The City reported 1,748 beds open as of the quarter ending June 30, 2023, out of a target of 3,700 (53% deficit). City Quarterly Status Report, Ex. A, at 8, July 17, 2023 (Dkt. 598-1). **The City failed to shelter 1,952 Angelenos as promised.**
- October 16, 2023: The City reported 2,347 beds open as of the quarter ending September 30, 2023, out of a target of 4,138 (43% deficit). City Quarterly Status Report, Ex. A, at 8, Oct. 16, 2023 (Dkt. 652-1). **The City failed to shelter 1,791 Angelenos as promised.**
- January 16, 2024: The City reported 2,810 beds open as of the quarter ending December 31, 2023, out of a target of 5,190 (46% deficit). City Quarterly Status Report, Ex. A, at 8, Jan. 16, 2024 (Dkt. 660-1). **The City failed to shelter 2,380 Angelenos as promised.**

- April 15, 2024: The City reported 3,018 beds open as of the quarter ending March 31, 2024, out of a target of 5,688 (47% deficit). City Quarterly Status Report, Ex. A, at 8, April 15, 2024 (Dkt. 728-1). **The City failed to shelter 2,670 Angelenos as promised.**
- July 15, 2024: The City reported 4,017 beds open as of the quarter ending June 30, 2024, out of a target of 5,950 (32% deficit). City Quarterly Status Report, Ex. A, at 8, July 15, 2024 (Dkt. 757-1). **The City failed to shelter 1,933 Angelenos as promised.**
- October 18, 2024: The City reported 4,455 beds open as of the quarter ending September 30, 2024, out of a target of 6,235 (29% deficit). City Quarterly Status Report, Ex. A, at 6, Oct. 18, 2024 (Dkt. 797-1). **The City failed to shelter 1,780 Angelenos as promised.**
- January 22, 2025: The City reported 4,815 beds open as of the quarter ending December 31, 2024, out of a target of 6,714 (nearly 30% deficit). City Quarterly Status Report, Ex. A, at 5, Jan. 22, 2025 (Dkt. 858-1). **The City failed to shelter 1,899 Angelenos as promised.**
- April 15, 2025: The City reported 6,724 beds open as of the quarter ending March 31, 2025, out of a target of 6,782 (1% deficit). Ex. 35 (Dkt. 892-1), at 6. **The City failed to shelter 58 Angelenos as promised.**

These milestones are not optional or aspirational. They are crucial benchmarks to ensure the City succeeds in 2027. If all of the City's shelter and housing solutions are backloaded and the City continues to miss its targets, the City runs the risk of rushing to create solutions and not meeting its obligations in 2027 at the cost of those waiting for shelter. Incremental progress and accountability are the key to mitigating that risk.

Additionally, each missed milestone represents a missed opportunity to shelter residents living and dying on the streets. Although the City reports that it has nearly reached its goal in the last status report due to the recent inclusion of Inside Safe beds, the City delayed creating shelter and housing solutions for thousands of people as promised from 2023 to 2025. The

suffering—from hypothermia to heat stroke, from gangrene leading to amputations to hepatitis, from scabies to insect infestation, and from sexual violence to rat bites—that resulted from that delay cannot be undone. Therefore, the City shall submit to the Court an updated milestones document that comports with its updated bed plan by October 3, 2025.

**c. Creation of Housing or Shelter Solutions**

Section 3.1 requires the City to "create a Required Number of housing or shelter solutions" but the Settlement Agreement does not define what it means to "create" solutions. Ex. 25. During the evidentiary hearing, Intervenors raised this issue and questioned whether certain solutions in the City's compliance reporting had been "created" by the City. *See* Tr., 97-105, May 30, 2025 (Dkt. 955). CAO Szabo did not know what the status was of several buildings before the City purchased or master-leased them and included them in the City's compliance reporting. *Id.* For example, he did not know whether the Stuart Hotel was previously available to house homeless individuals before the City entered into an occupancy agreement to use it as interim housing. *Id.* at 99-102.

Intervenors argue that the City must clarify what role it plays in creating the shelter and housing solutions it is counting towards its obligations. Intervenors' Brief at 25. Further, Intervenors argue that the City must consider and identify whether units counted were already covenanted as affordable units because if they were, the City did not "create" them. *Id.* at 26.

Intervenors highlight that the City itself has already defined "create" in response to Intervenors' initial objections to the Settlement Agreement:

> The word 'create' indicates that the City will create new beds that are not already in existence. *See, e.g.*, Webster's Dictionary, https://www.merriam-webster.com/dictionary/create ('create' means 'to bring into existence' and 'to produce or bring about by a course of action or behavior'; Black's Law Dictionary, 6th Ed. 1990 ('create' means 'to bring into being; to cause to exist; to produce'). Therefore, the Intervenors' concern 'that the City could count existing shelter beds or housing units towards the number of shelter beds needed to reach the 60% threshold' (ECF No. 434 at 22) is wrong.

City of Los Angeles' Reply to Objections to the Settlement Agreement (Dkt. 438), at 9 (emphasis in original).

Despite the City's own assertion that "create" means "new" beds, the City is currently counting numerous units that already existed before the Settlement Agreement. The question then is how the City caused those units to come into existence as housing or shelter solutions for people experiencing homelessness. The City's reporting does not answer this question and the City provided no clarification during the seven days of the evidentiary hearing.

For clarity moving forward, the Court holds that "create" means, as the City previously said, to bring into existence as a shelter or housing solution for people experiencing homelessness. Beginning in the quarterly report slated for October 2025, the City shall include an explanation for each unit that already physically existed prior to the Settlement Agreement of how the City contributed to bringing that unit into existence as a shelter or housing solution for people experiencing homelessness as opposed to its prior use. For example, the City might explain that a hotel was formerly vacant or market rate until the City began master leasing rooms for people experiencing homelessness. Because the City was not able to provide any explanation for its counting of previously existing units during the evidentiary hearing and has not submitted any since, this further explanation is necessary to ensure compliance moving forward.

**d. Inside Safe Reporting**

Plaintiffs argue that beds contracted through Inside Safe booking agreements should not be counted toward the City's Settlement obligations. Inside Safe is an interim housing program run through the Mayor's office. Inside Safe beds are contracted through either occupancy agreements, which entail the master leasing of an entire hotel, or booking agreements, which pay for a hotel room for individuals on an as needed basis. Tr., 97-99, 103, May 29, 2025 (Dkt. 953). Plaintiffs argue that beds contracted with booking agreements should not count because they are for an indeterminate amount of time and may not be contracted for through the Settlement Agreement's full term. Plaintiffs rely heavily on the fact that the City did not count Inside Safe beds contracted for through booking agreements, as opposed to occupancy agreements, until recently because they were not booked through June 2027.

Case 2:20-cv-02291-DOC-KES Document 991 Filed 06/24/25 Page 47 of 62 Page ID #:28870

Indeed, in the City's Housing and Homelessness Committee meeting earlier this year, the CAO's staff reported to the committee that it was not counting any Inside Safe beds that were not contracted through June of 2027. Tr., 106-108, May 29, 2025. But then, beginning in the City's most recent status report for the quarter ending March 31, 2025, the City began to report all of its Inside Safe beds toward its Alliance Settlement obligations regardless of the contract duration. Ex. 35. To be clear, the nearly 2,000 bed increase reported from the status report in January 22, 2025, to the status report in April 15, 2025, is due to the inclusion of more Inside Safe beds *not* the creation of new beds. To explain this, the City's decision to count all the Inside Safe beds, CAO Szabo testified that the Inside Safe program has matured and all Inside Safe beds are fully compliant with the Settlement. Tr., 106-107, May 29, 2025. He testified that it was never his office's position that they could not be counted, it was merely their decision not to count them. *Id.*

The terms of the Settlement allow the City to count Inside Safe beds whether they are contracted through occupancy or booking agreements and whether they are contracted for through June 2027 or not. The Settlement explicitly allows the City to count "hotels/motels" and leaves the type of housing or shelter solution to the City's "sole discretion." Ex. 25, §3.2. It has long been understood by both the Court and the Parties that the beds need not be static so long as 12,915 beds exist in June 2027. The City highlights that Plaintiffs made this point themselves in a December 29, 2023 email to the City:

> We have noted, several times, that while the City is required to increase and maintain its bed capacity through the first half of 2027, that does not mean that a specific bed created must stay available for the term of the settlement. Instead, should a specific bed no longer be available (i.e. an interim facility which is only leased for 12-36 months), the City may create at least another bed to maintain capacity and avoid bed reduction.

Evidentiary Hearing Exhibit # 216 ("Ex. 216") (Dkt. 964-10), at 4-5. This position is consistent with the Plaintiffs' continued demand that the City prioritize interim housing and shelter over permanent supportive housing.

While the City has flexibility in deciding which solutions to create, the Court is committed to ensuring that each of the 12,915 beds ultimately exists. CAO Szabo testified

about the Inside Safe booking agreements: "Of course, if they're temporary, if the beds come offline before June of 2027, our obligation would be to replace those beds, of course, because our understanding is that there's no obligation that the beds are static. We have to establish the total number of 12,915." Tr., 108, May 29, 2025. The Court will hold the City to this promise.

**e. Data Reporting and Verification**

Special Master Martinez's reports and the A&M Assessment have shown that it is extremely difficult, if not impossible, to verify the housing and shelter solutions that are reported by the City to meet its obligations. The Court receives numbers of shelter and housing solutions created by the City in its quarterly reports with no documentation to substantiate the numbers. When errors are found in the data reported, the City has repeatedly ignored the errors or attacked the messenger instead of engaging with and correcting the issues. This pattern has persisted for years and is untenable if the City is to succeed in meeting its obligations by 2027.

The City's inability or unwillingness to verify its reporting or even explain how it counts and reports solutions was on stark display during the evidentiary hearing. At no point during the costly and time-intensive seven-day hearing did the City attempt to substantiate its reporting which had been called into question by Special Master Martinez, in addition to other witnesses, and which A&M had not been able to replicate.

Special Master Martinez's first report covering the period July 1, 2022, through December 31, 2023, put the City on notice that it needed to improve its data gathering and reporting to be successful. *See* Independent Monitoring Report Year One (Dkt. 674), at 21. Special Master Martinez reiterated this concern in her second report and highlighted her inability to verify the City's beds. For example, Special Master Martinez often performs spot checks on housing or shelter sites reported by the City. Tr., 257-258, June 3, 2025. She was unable to check twenty sites listed in the City's December 2024 report because they were not part of the HMIS system. *Id.* at 258; *see also* Ex. 93 at 21. After following up with LAHSA and the City about those sites, Martinez still has not received a response. Tr., 258-261, June 3, 2025.

After over a year of work by ten professionals, A&M was also not able to replicate the City's reporting to the Court. A&M concluded that "one of the primary obstacles was the inability to verify the number of beds the City reported under the Roadmap and Alliance Programs." Assessment at 4. By releasing multiple drafts of the A&M assessment and providing the Parties with over six weeks to meet with the A&M team before finalizing the Assessment, the Court gave the City ample time to correct A&M or substantiate its reporting. Instead of providing the specific data requested by A&M to verify reporting, the City did nothing. Again, during the evidentiary hearing, the City chose to dismiss A&M's findings and attempt to undermine A&M's credibility instead of simply providing the data or explaining its reporting to the Court. The City wasted significant time during the hearing berating A&M for not adhering to certain governmental accounting standards even though the City *agreed to* the standards used by A&M and *paid for* the Assessment to resolve Plaintiffs' previous sanctions motion. In short, the City has been on notice for years that its data collection and reporting is woefully insufficient but continues to ignore its responsibility to report accurate numbers to the Court.

The inability to verify the City's reporting is a serious roadblock to compliance. In addition to the recent evidentiary hearing, confusion over and inconsistencies within the reporting have led to dozens of informal conferences, mediation sessions, and hearings throughout this litigation. Significant time and resources have been spent by all the Parties in debating and litigating details of the City's reporting. Days of the evidentiary hearing in May and June could have been avoided if the City had simply provided the data requested of it or put on witnesses to explain its reporting. For this reason, the Court seeks to limit further confusion and pave a smoother road to compliance by requiring the Parties to choose a third party to monitor reporting as was originally agreed to in the Settlement.

The Settlement Agreement provides that the "Parties will engage a mutually agreed-upon third party to provide data collection, analysis, comments, and regular public reports on the City's compliance with the terms of this Agreement. The City shall be responsible for paying all fees, if any, or for obtaining grants or other private funding, if needed." Ex. 25, §7.2.

In Special Master Martinez's first monitoring report, she underscored the importance of Section 7.2. She reported that:

> Initial discussions were initiated with the City and the Alliance, yet it appears that a third party has not been hired to gather the crucial data required for this agreement. It is paramount that the City adheres to these vital provisions to ensure full compliance with all aspects of the agreement. While deadlines may not be specified, it is crucial for the City to disclose details about its existing data collection systems and make the data gathering, analysis, and feedback easily accessible for transparency and accountability purposes.

Independent Monitoring Report Year One (Dkt. 674), at 19-20. The Parties have never fulfilled Section 7.2.

To address verification failures, the Parties shall meet and confer on a third-party Monitor by August 22, 2025, and, subject to the Court's approval, select the Monitor by September 12, 2025. Subject to the Parties' input, the Monitor will at least be responsible for reviewing the City's data prior to publication of its quarterly reports, verifying the numbers reported, engaging with the Parties and LAHSA to resolve data issues, and providing public reports on data compliance. The Monitor shall have full access to the data that the City uses to create its reports to the Court. To streamline disputes over verification and compliance, the Court also orders that the Parties attend an in-person court hearing after the submission of each quarterly report. This accountability measure will ensure that disagreements are efficiently resolved as they arise.

Additionally, the Court reemphasizes the importance of public transparency which goes hand in hand with accountability and Settlement compliance. The Court has requested for years that the City and County maintain public websites with third-party service provider contracts and invoices for homelessness services. After creating such websites, the City and County have previously failed to keep them updated. *See* Order Setting Hearing for June 6, 2024 (Dkt. 744). Again, the Court requests that the City update its public website to include all service provider contracts and invoices particularly those tied to beds reported under the Settlement Agreement. The Monitor shall review and provide guidance on public accessibility to the contracts and invoices.

**f. Encampment Reduction Milestones**

Section 5.2 requires the City to "create plans and develop milestones and deadlines for…(ii) the City's plan for encampment engagement, cleaning, and reduction in each Council District…" Ex. 25, §5.2. In January 2024, the City and Plaintiffs agreed to the goal of 9,800 reductions of tents, makeshift shelters, cars, and RVs by June 30, 2026. Evidentiary Hearing Exhibit # 65 ("Ex. 65") (Dkt. 668-1), at 82–84; Joint Stipulation to Resolve Plaintiffs' Motion for Order Re: Settlement Agreement Compliance and Sanctions (Dkt. 713), at 2–3. In the City's most recent quarterly report, the City had performed 6,129 encampment reductions as of March 31, 2025. Evidentiary Hearing Exhibit # 63 ("Ex. 63") ("Alliance Settlement Agreement Encampment Quarterly Reports") (Dkt. 892-2), at 2. Plaintiffs argue that the City is not meeting its encampment reduction milestones because it is improperly counting cleanings under Care and Care+ operations as reductions and that its reporting violates the Court's March 24, 2025, Order defining reductions. The City maintains that it is not required to make offers of shelter or housing as part of its encampment reduction plan.

In response to the Plaintiffs' Motions for Settlement Agreement compliance, the briefing on the Motions, and several hearings, the Court clarified on March 24, 2025, what may be counted as a reduction by the City. Evidentiary Hearing Exhibit # 52 ("Ex. 52") (Order re Plaintiff's Motion re Settlement Agreement Compliance") (Dkt. 874). The Court held the following:

> For clarity, the Court holds that per the terms of the Settlement Agreement there is a distinction in providing milestones and deadlines for encampment clean-ups and Encampment Reductions. The City may not report clean-ups from programs such as Care or Care+ as Reductions to prove compliance with the Settlement Agreement because they are not permanent in nature. The Court agrees with Plaintiff that cleaning an area, only to have unhoused individuals move back in without offers of shelter or housing, is not a "Resolution" or Encampment "Reduction" and shall not be reported as such. Thus, the City is only to report Encampment Reductions that have a more permanent meaning such that unhoused individuals are moved off of the street and given shelter or housing.

*Id.* (internal citations omitted).

The Court further stated that it would decide the details of encampment reduction reporting and the metrics necessary at a later date. *Id.*

The Court's Order was consistent with its express authority under Section 5.2 to resolve disputes about the plans, milestones, and deadlines and its authority to enforce the Settlement. Despite the Court's Order in March, the City never filed a motion for reconsideration or modification of the Settlement Agreement based on the clarification. The City merely orally objected to the Order at the March 27, 2025 hearing and then proceeded to ignore the Order. The City failed to amend its prior reports to the Court and willfully disobeyed the Order in its April 15, 2025 quarterly status report. Based on the evidence presented at the evidentiary hearing, the Court reaffirms its previous Order and again clarifies the following for the City.

To count encampment reductions under the Settlement Agreement, each reduction must be accompanied by an offer of shelter or housing to the individual or individuals whose tent, makeshift shelter, or vehicle is removed. Individuals need not accept the offer, but an offer of available shelter or housing must be made. If a tent, makeshift shelter, or vehicle is abandoned and the owner cannot be found, such an offer would be impracticable and is not required. It is also impracticable for the City to track whether the person offered shelter or housing remains housed indefinitely for the purposes of the Settlement Agreement.

This definition of reduction is consistent with the City's representations to the Plaintiffs throughout the litigation including the City's reliance on Inside Safe encampment resolutions and interchangeable use of the terms "resolution" and "reduction." The City's current position that reductions only consist of the removal of tents, makeshift shelters, and vehicles is new and flies in the face of its own plans and promises.

The Parties and this Court have used the term "encampment reduction" and "encampment resolution" interchangeably. The City's own quarterly reporting is titled "Encampment Resolution Data." *See e.g.*, Ex. 63. Special Master Martinez also testified that she has used "reduction" and "resolution" interchangeably, has observed the City doing the same in city council meetings and its reporting, and has not been corrected by the City for using the terms interchangeably. Tr., 137-139, June 4, 2025 (Dkt. 976).

Whether using reduction or resolution, the City has routinely defined the term consistent with the Parties' understanding of an encampment resolution which includes offers of shelter or housing. The City's October 3, 2023 plan submitted to the Plaintiffs titled "Encampment Engagement, Cleaning, and Resolution Plans and Milestones" explicitly includes matching available beds to encampment residents as part of encampment resolutions and reductions. Ex. 65, at 64-71. The City's eight-page plan details the City's "encampment resolution" process: "In order to resolve an encampment, the City must ensure there are beds available to match with encampment residents and that service providers have the capacity to provide case management and other services." *Id.* at 69. Each page of the plan has the heading "LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC" which confirms the City's intent to use this plan to comply with its agreement with the Plaintiffs to conduct 9,800 encampment reductions.

The City argues that the October 3, 2023 plan was just a proposal that was rejected by Plaintiffs. City Brief at 29. That is misleading. There is evidence that Plaintiffs rejected the number of reductions and the deadlines in the City's plan but not the mutual understanding of what an encampment reduction was and entailed. The City never corrected or changed its plan of how encampment reductions were defined and carried out so when the City and Plaintiffs reached their agreement on 9,800 reductions, the plan promised by the City remained intact and all Parties proceeded with that understanding.

During the evidentiary hearing, there was extensive testimony on the Mayor's Inside Safe program from CAO Szabo and Dr. Etsemaye Agonafer, the Deputy Mayor for Homelessness and Community Health. Under Inside Safe, an "encampment resolution" occurs when individuals living outside are offered interim housing and voluntarily accept it. Evidentiary Hearing Exhibit # 44 ("Ex. 44") (Dkt. 863-7), at 42-45. The Mayor's Office of Housing and Homelessness Solutions stated: "Following an encampment resolution, the same outreach teams monitor the original location for re-population, engage with new or old residents at the site, and offer housing as it becomes available." *Id.* at 44.

CAO Szabo testified that merely shifting encampments during cleanings under Care and Care+ is not counted as reductions but rather the reduction numbers reported represent tents,

makeshift shelters, and vehicles that are removed and taken into the City's custody. Tr., 145-146, May 30, 2025 (Dkt. 955). Szabo testified that the encampment reductions reported to the Court are based on Care, Care+, and Inside Safe operations. *Id.* at 147. Because Inside Safe's encampment resolutions necessarily entail offers of interim housing, at least some of the encampment reductions reported to the Court should have been accompanied by an offer of shelter or housing, but that number is unknown.

The City has consistently represented to Plaintiffs that encampment reductions and resolutions are the same thing and that both include offers of shelter or housing just as the Mayor's Inside Safe program does. The City's attempt to unilaterally change its definition of encampment reduction now ignores its past conduct and promises, the Court's prior Order, and the plain meaning of the Settlement Agreement. Based on the definition of encampment reduction articulated by the Court above, the City shall report its updated encampment reduction data beginning in the October 2025 quarterly status report.

The Monitor provided for in Section 7.2 will also be responsible for reviewing whether offers of shelter or housing were made to those whose belongings are counted as encampment reductions. It is expected that the City be able to provide the name of the shelter or housing that was offered and available for each encampment reduction, but the details of what documentation is required will be finalized by the Monitor in consultation with the Parties.

**3. Section 8.2 Emergency Provision**

Section 8.2 of the Alliance Settlement Agreement states:

> In the event of fires, floods, earthquakes, epidemics, quarantine restrictions, or other natural catastrophic occurrences; terrorist acts, insurrections or other large scale civil disturbances; or any local or fiscal emergency declared by the Mayor of Los Angeles and the Los Angeles City Council under the authority vested in them by the Los Angeles City Charter and Los Angeles Administrative Code (or other applicable ordinances, resolutions, or laws), the obligations of the City as set forth in Sections 3, 4, and 5 of this Agreement shall be paused, and the Parties agree to meet and confer on any necessary and appropriate amendments to those obligations.

Ex. 25 at 10. The City invokes this clause, arguing that its obligations under the Settlement Agreement are currently paused due to the ongoing State of Emergency

declared by the Mayor in response to the 2025 wildfires. According to the City, because that emergency declaration has not been rescinded, the operative obligations are suspended. City Brief at 13.

Plaintiffs dispute this interpretation. They contend that any "pause" authorized under Section 8.2 was limited to the duration of the fires and that invoking the emergency clause beyond that time constitutes an attempt to "avoid the accountability the Settlement Agreement requires and demands." Plaintiffs' Reply at 18.

Further escalating the dispute, the City accuses Plaintiff of breaching the Agreement by failing to honor the required meet-and-confer process before seeking judicial enforcement. City Brief at 15. In support, the City points to email correspondence allegedly demonstrating Plaintiffs' unwillingness to engage in discussions. *Id.*

There is no question that the Palisades Fire and Eaton Fire were catastrophic events that profoundly affected many Angelenos. It is also not the Court's role to second-guess the City's emergency declarations absent clear evidence of bad faith. Here, Plaintiff has not offered sufficient evidence for the Court to find that the emergency declaration is no longer operative or was improperly invoked. As such, the Court must defer to the City's position that the Agreement's obligations are currently paused under Section 8.2 because of the state of emergency declaration.

That said, the Settlement Agreement also imposes a duty on both parties to meet and confer in good faith to determine the necessary adjustments during any such pause. The Court reiterates that this responsibility remains ongoing and mutual. Resorting to the Court for answers that should first be addressed collaboratively under the Agreement only undermines its purpose. The Parties are therefore expected to continue engaging in good faith to define the scope and terms of any pause moving forward.

It is important to note that the invocation of Section 8.2 does not excuse the City from its ongoing responsibilities—particularly with respect to accurate reporting and verification of beds. The pause provision is not a blanket exemption from compliance. The data verification issues predated both the January 2025 fires and the resulting

emergency declaration. Accordingly, the Court will not permit the City to use this emergency as a pretext to avoid its obligations under the Settlement Agreement. This pause only applies to obligations that are truly impacted by the emergency, not to longstanding failures in transparency, accountability, or compliance.

**C. Remedy for Breaches**

The City breached the LA Alliance Settlement Agreement in four ways. The City failed to provide a plan for how it intends to create 12,915 shelter or housing solutions. For years, the City consistently missed its shelter and housing creation milestones. The City also improperly reported encampment reductions and disobeyed the Court's order on encampment reductions. Finally, the City flouted its reporting responsibilities by failing to substantiate its reporting and failing to provide accurate and comprehensive data when requested by the Court, Special Master Martinez, the Parties, and A&M.

To remedy the City's failures, each Party recommends a different solution. Special Master Martinez recommends an independent fiduciary monitor to track and oversee spending, manage contracting, and perform other oversight tasks. Ex. 93, at 25-27. The Plaintiffs demand a receivership and/or some combination of the following:

> (i) extension of Alliance and/or Roadmap Agreements for a minimum period of two years to ensure compliance and oversight; (ii) Appointment of Compliance and/or Fiduciary Monitor at the City's expense with full, immediate, and unfettered access to City and LAHSA data; (iii) Forensic Financial Audit; (iv) Forensic Data Quality Audit with mandate to adhere to recommendations; (v) orders to create a Skid Row plan, including immediate housing and sheltering of women, children, and families and ultimately extending to every unsheltered resident; (vi) City-funded investigation and report on data manipulation allegations; and (vii) an award of attorneys' fees both incurred in this matter to enforce the settlement agreement and prospectively for efforts related to the City's compliance with the Agreements.

Plaintiffs' Brief at 25. The Intervenors, on the other hand, advocate for "more robust incremental monitoring and verification." Intervenors' Brief at 28.

**1. Reaffirming LA Alliance Settlement Obligations**

The interim breaches of the LA Alliance Settlement Agreement committed by the City necessitate course correction now in order to avoid an overall breach of the Agreement in 2027.

To facilitate compliance and greater oversight, the City is ordered to do the following as previously detailed in each section above:

- Provide the Parties and the Court with an updated "bed plan" for how it intends to meet its obligation to create 12,915 shelter or housing solutions by October 3, 2025[11]
- Provide the Parties and the Court with updated bed creation milestones consistent with the updated bed plan by October 3, 2025
- Beginning in the quarterly status report slated for October 2025, the City shall include an explanation for each unit that already physically existed prior to the Settlement Agreement of how the City "created" that unit, meaning contributed to bringing that unit into existence as a shelter or housing solution for people experiencing homelessness as opposed to its prior use
- Meet and confer with Plaintiffs on selecting a third-party Monitor by August 22, 2025, and select this Monitor by September 12, 2025, subject to the Court's approval
- Attend in-person court hearings after the submission of each quarterly status report starting with the October 2025 quarterly report on November 12, 2025
- Report encampment reduction data consistent with the Court's definition beginning in the October 2025 quarterly report and provide accompanying data on shelter or housing offers to the Monitor

Notably, each of the above requirements are actions that the City was already under an obligation to do. Failure to comply with these orders may result in sanctions.

**2. Attorney's Fees for Plaintiffs and Intervenors**

The City's refusal to provide updated plans, meet its milestones, correct its encampment reduction numbers, and verify its reporting has unnecessarily and unfairly wasted the resources of the Parties and the Court. By consistently refusing to provide explanations and verification of its reporting, the City has forced Plaintiffs into the position of investigating and monitoring

[11] These deadlines are in recognition of the Los Angeles City Council's summer recess from July 2 through July 29, 2025.

the numbers reported. Special Master Martinez and A&M were appointed and paid to undertake that role, but the City has stalled and blocked them too from achieving meaningful review. The City blames its complex administrative structure and the added layer of LAHSA bureaucracy for its failures instead of complying and providing the required data. Days of the evidentiary hearing could have been avoided if the City had simply substantiated its own reports. The City refused to do so even during the seven-day hearing. Obfuscation and delay cannot be tolerated.

Federal courts possess certain "inherent powers," not conferred by rule or statute, "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962). This authority includes the ability to "fashion an appropriate sanction for conduct that abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). An assessment of attorney's fees is a "less severe sanction" that is "undoubtedly within a court's inherent power as well." *Id.* (citing *Hutto v. Finney*, 437 U.S. 678, 689, n.14 (1978)). This narrowly defined power can be exercised in certain circumstances. *Id.* (citation omitted). One such circumstance is assessing attorney's fees as a sanction for the "willful disobedience of a court order." *Id.* (citing *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 (1975)). Another circumstance is awarding attorney's fees when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 45-46 (citation omitted). In this last instance, if a Court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may assess attorney's fees against the responsible party." *Id.* at 46 (citation omitted). This circumstance also extends to when a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order." *Id.*

The Supreme Court has made clear that such a sanction has to be compensatory in nature rather than punitive. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 102 (2017) (citing *Mine Workers v. Bagwell*, 512 U.S. 821, 826-30 (1994)); *see also Lake v. Gates*, 130 F.4th 1054, 1059 (9th Cir. 2025) (applying *Goodyear* when reviewing a district court's sanctions). Simply, this means the fee award can only redress the wronged party for losses sustained, it may not impose an additional amount as punishment for the sanctioned party's misbehavior. *Id.*

at 108 (citation omitted). Thus, this Court must track the compensation to the wrong and the loss resulting from that wrong. *Id.* A compensatory sanction must be "calibrated to the damages caused by the bad-faith acts on which it is based." *Id.* (citations and quotations omitted). This kind of causal connection is appropriately framed as a but-for test where the complaining party may recover "only the portion of his fees that he would not have paid for but the misconduct." *Id.* at 109 (citation omitted).

Unlike the Special Master and A&M, Plaintiffs are not paid to monitor the City's compliance. Plaintiffs have diligently and persistently raised important issues to the Court's attention. As a sanction for the City's noncompliance, including disobeying the Court's order on encampment reductions, Plaintiffs' efforts should be compensated. Based on Intervenors' active role in the evidentiary hearing and briefing, the Court will require that the City pay attorney's fees to both Plaintiffs and Intervenors if Plaintiffs and Intervenors are able to show how they have been harmed by the City's conduct and the resulting losses to them under the law. Under similar circumstances, the City previously agreed to pay Plaintiffs' fees and costs on the verge of the Court's finding of bad faith and sanctions. *See* Tr., 17, March 8, 2024 (Dkt. 684); Joint Stipulation to Resolve Plaintiffs' Motion for Order Re: Settlement Agreement Compliance and Sanctions (Dkt. 713).

Plaintiffs and Intervenors may submit motions for attorney's fees by July 25, 2025, at 5 p.m. The City's opposition is due by 5 p.m. on August 15, 2025, and Plaintiffs' and Intervenors' replies are due by 5 p.m. on August 29, 2025.

**3. Receivership**

Appointment of a receiver over state or local government functions by a federal court is an extreme and "invasive equitable remedy" only available in limited situations. *Melendres v. Skinner*, 113 F.4th 1126, 1136 (9th Cir. 2024). Receivership is typically the last resort after all other less intrusive remedies have been exhausted. Before imposing a receivership, federal courts have favored a gradual approach incrementally ramping up compliance measures such as monthly status conferences, sanctions, appointment of a special master or monitor, and issuing general consent orders. *See Dixon v. Barry*, 967 F. Supp. 535, 554 (D.D.C. 1997); *see also*

*Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 WL 2932253, at *26 (N.D. Cal. Oct. 3, 2005). Only then, if "nothing short of receivership" can remedy constitutional violations, courts turn to receivership. *Plata*, 2005 WL 2932253, at *23.

Weighing all of the options, this is not the time for a receivership over the City's homelessness response system. Although democracies can be inefficient and even wasteful, only the voters of Los Angeles have the power to elect representatives to solve these problems. Public pressure has recently led the City and the County to begin to make structural reforms to the homelessness system including withdrawing funding from LAHSA and forming new agencies. Plaintiffs speculate that these impending, massive changes will not make a difference; but, the people and their elected officials have the right to try.

The Supreme Court recently summarized this principle:

> Homelessness is complex. Its causes are many. So may be the public policy responses required to address it. … Almost 200 years ago, a visitor to this country remarked upon the 'extreme skill with which the inhabitants of the United States succeed in proposing a common object to the exertions of a great many men, and in getting them voluntarily to pursue it.' 2 A. de Tocqueville, Democracy in America 129 (H. Reeve transl. 1961). If the multitude of amicus briefs before us proves one thing, it is that the American people are still at it. Through their voluntary associations and charities, their elected representatives and appointed officials, their police officers and mental health professionals, they display that same energy and skill today in their efforts to address the complexities of the homelessness challenge facing the most vulnerable among us.
>
> Yes, people will disagree over which policy responses are best; they may experiment with one set of approaches only to find later another set works better; they may find certain responses more appropriate for some communities than others. But in our democracy, that is their right. Nor can a handful of federal judges begin to 'match' the collective wisdom the American people possess in deciding 'how best to handle' a pressing social question like homelessness.

*City of Grants Pass, Oregon v. Johnson*, 603 U.S. 520, 560 (2024).

The multitude of solutions available to handle the homelessness crisis in Los Angeles and the Court's deference to voters and policymakers does not, however, excuse noncompliance by the City. Flexibility with how to meet its obligations does not mean the obligations are optional. The Court takes the City's commitments seriously and will not permit

noncompliance. The City voluntarily agreed to resolve claims and issues in this matter through a promise to create new housing and shelter solutions for those languishing on its streets. Nearly seven unhoused community members die each day in the County of Los Angeles. These deaths are preventable and represent a moral failure by all of us. The City's Settlement Agreement that this Court oversees is only one response, as the Supreme Court put it, to this complex problem. The Settlement Agreement is a critical step, nonetheless.

**D. Conclusion**

Every day, the people of Los Angeles wake up to the sight of human suffering in every part of the City—people sleeping on sidewalks, searching for safety, shelter, or just a place to use the bathroom. And every day, those living on the streets wake to another morning of uncertainty, exposed to danger, stripped of privacy, dignity, and hope.

Unhoused individuals hear about programs and promises. They hear that hundreds of millions are being spent, that homelessness is being addressed, that success is being claimed. Yet many still cannot find a bed, a bathroom, or a hot meal. Their lived reality does not match the headlines.

Angelenos, too, are asked to believe. They vote to tax themselves in hopes of helping their suffering neighbors. They give willingly because they want change. But every day, they see less money in their pockets for groceries and more suffering on the streets. This gap between sacrifice and visible results erodes public trust and deepens collective grief.

People turn to the Court, hoping it holds the solutions—that the law can bend to save lives. But if solving homelessness were as simple as issuing a ruling, it would have been solved long ago. So the Court must focus on what it can control: the promises made, and whether they are being kept. The agreements in this litigation were meant to be a turning point in this crisis. Yet a review of the record reveals missed milestones, neglected obligations, and a troubling lack of oversight. That neglect carries real consequences, borne most heavily by those with the least, by the people whose lives depend on those promises being fulfilled.

The remedies here are not punishment. They are progress. The Court institutes a monitor to oversee compliance and ask the hard questions on behalf of Angelenos. It mandates

quarterly, in-court hearings, beginning November 12, 2025, and continuing as needed, to ensure these commitments are honored.

The Court wants the City to succeed. Because when the system fails, people die. And when it works—even slowly—lives are saved.

## V. DISPOSITION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motions for Settlement Agreement Compliance (Dkt. 767, 863).

DATED: June 24, 2025

David O. Carter

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE